**21SL-CC03334**

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

**THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI**

| | |
|---|---|
| THE STATE OF MISSOURI ex rel.<br>ERIC S. SCHMITT,<br><br>*Plaintiff*,<br><br>v.<br><br>SAM PAGE, in his official capacity as<br>St. Louis County Executive;<br><br>FAISAL KHAN, in his official capacity<br>as Director of the St. Louis County<br>Department of Public Health;<br><br>ST. LOUIS COUNTY DEPARTMENT<br>OF PUBLIC HEALTH,<br><br>TISHAURA JONES, in her official<br>capacity as St. Louis City Mayor;<br><br>FREDRICK ECHOLS, in his official<br>capacity as Acting Director, Department<br>of Health for the City of St. Louis; and<br><br>DEPARTMENT OF HEALTH FOR<br>THE CITY OF ST. LOUIS<br><br>*Defendants*. | No. _____ |

**PETITION**

Exhibit

1

1

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

## NATURE OF THE ACTION

1.      St. Louis County and St. Louis City seek expanded government power that has failed to protect Missouri citizens living within their boundaries in the past and is not based on sound facts and data.

2.      Missouri Attorney General Eric S. Schmitt seeks to protect the liberty and constitutional rights of the people of Missouri.

3.      During the previous year, no government in Missouri restricted liberty more than St. Louis County and St. Louis City.

4.      Despite having the most restrictive and unconstitutional orders in Missouri, St. Louis County and St. Louis City suffered some of the highest COVID-19 case rates and death rates in Missouri.

5.      Even though the most effective defense to COVID-19 is through vaccination, St. Louis City is below the statewide average for vaccination rates.

6.      At the time they issued these new Mask Mandates, St. Louis County and St. Louis City trailed below state averages in COVID-19 cases and deaths for the previous seven days.

7.      At the time they issued these new Mask Mandates, the Centers for Disease Control had not changed the guidance in effect on masks at the time that St. Louis County and St. Louis City lifted all COVID-19 restrictions on May 14, 2021.

8.      Attorney General Schmitt brings this action to prevent unlawful, unconstitutional, arbitrary, capricious, and unreasonable conduct by St. Louis County Executive Sam Page; Director of the St. Louis County Department of Public Health Dr.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

Faisal Khan; the St. Louis County Department of Public Health; St. Louis City Mayor Tishaura Jones; Acting Director of the Department of Health of St. Louis City Dr. Fredrick Echols; and the Department of Health for the St. Louis City ("Defendants").

## HISTORY OF UNCONSTITUTIONAL RESTRICTIONS IN ST. LOUIS COUNTY AND ST. LOUIS CITY

9.      Attorney General Schmitt has previously stopped St. Louis County from violating fundamental liberties with its COVID-19 restrictions.

10.     Starting on November 17, 2020, St. Louis County began enforcing its "Safer at Home" Order, which was so overbearing and restrictive that it only allowed St. Louis County residents to leave their home for nine enumerated reasons and only allowed in-person contact with up to 10 other individuals in a "support bubble."

11.     On April 9, 2021, all adult Missourians became vaccine-eligible.  Also on April 9, 2021, the Supreme Court of the United States struck down government COVID-19 restrictions that violated fundamental liberties.  *See Tandon v. Newsom*, 141 S. Ct. 1294 (2021).

12.     On April 20, 2021, Attorney General Schmitt demanded answers from Dr. Khan about serious constitutional and legal issues the Fifth Amended Safer at Home Order in effect at that time.  *See* Ex. A (letter from Attorney General Schmitt to Dr. Khan detailing those issues with respect to St. Louis County's Fifth Amended Safer at Home Order).

13.     On April 27, 2021, counsel for St. Louis County, instead of Dr. Khan, responded to the Attorney General's letter.  Counsel's letter ignored numerous issues raised

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

by the Attorney General and failed to satisfactorily answer others.  Ex. B (letter from St. Louis County Counselor Beth Orwick to Attorney General Eric Schmitt).

14.    The next day, while facing potential litigation from the Missouri Attorney General's Office, County Executive Page announced that St. Louis County planned to lift some COVID-19 restrictions as early as the following Monday, May 3, 2021.

15.    On May 3, 2021, St. Louis County rescinded its Fifth Amended Safer at Home Order and replaced it with a new order, referred to as the "Reopen STL Order."

16.    Because the new order continued to violate constitutional liberties and was arbitrary and capricious, Attorney General Schmitt filed suit against County Executive Page, Dr. Khan, and the St. Louis County Department of Health on May 11, 2021.  Petition, *Missouri ex rel. Schmitt v. Page* (No. 21SL-CC02111).

17.    Just three days later, on May 14, 2021, St. Louis County and St. Louis City lifted all COVID-19 restrictions.

## COVID-19 DATA IN ST. LOUIS COUNTY AND ST. LOUIS CITY

18.    St. Louis County and St. Louis City were the first governmental entities in Missouri to mandate the wearing of face masks, beginning on July 3, 2020.

19.    St. Louis County and St. Louis City kept COVID-19 orders in place until May 14, 2021.

20.    St. Louis County and St. Louis City had the most restrictive COVID-19 orders in Missouri from July 3, 2020 until the orders were lifted on May 14, 2021.

21.    Despite these restrictive orders, dozens of Missouri counties had lower COVID-19 case rates and death rates than St. Louis County and St. Louis City.

22.    As of July 25, 2021, St. Louis County had a COVID-19 case rate of 10,649.90 per 100,000 people.  *COVID-19 Data and Reports*, Saint Louis Cnty., https://stlcorona.com/resources/covid-19-statistics (last visited July 25, 2021).

23.    As of July 26, 2021, more than 90 of Missouri's 114 counties had fewer cumulative cases per 100,000 people than St. Louis County's reported rate of 10,649.90 per 100,000 people.  *COVID-19 in Missouri*, Dep't of Health & Senior Servs., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

24.    As of July 25, 2021, St. Louis County reported 229.60 cumulative COVID-19 deaths per 100,000 people.  *COVID-19 Data and Reports*, Saint Louis Cnty., https://stlcorona.com/resources/covid-19-statistics (last visited July 25, 2021).

25.    As of July 26, 2021, more than 90 of Missouri's 114 counties had fewer cumulative deaths per 100,000 people than St. Louis County's reported rate of 229.60 per 100,000 people.  *COVID-19 in Missouri*, Dep't of Health & Senior Servs., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

26.    As of July 25, 2021, St. Louis City had a COVID-19 cumulative case rate of 7,603.90 per 100,000 people.  *COVID-19 Data*, City of St. Louis, https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/data/index.cfm (last visited July 25, 2021).

27.    As of July 26, 2021, more than 30 of Missouri's 114 counties had fewer cumulative cases per 100,000 people than St. Louis City's reported rate of 7,603.90 per

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

100,000 people. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

28.    As of July 25, 2021, St. Louis City reported 172.8 COVID-19 cumulative deaths per 100,000 people. *COVID-19 Data*, CITY OF ST. LOUIS, https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/data/index.cfm (last visited July 25, 2021).

29.    As of July 26, 2021, more than 60 of Missouri's 114 counties had fewer cumulative deaths per 100,000 people than St. Louis City's reported rate of 172.8 per 100,000 people. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

30.    St. Louis County and St. Louis City COVID-19 case infection rates for the seven days before they issued their new orders on July 26, 2021—when they had no mask mandates—were below state averages.

31.    In the seven days before St. Louis County and St. Louis City issued these orders on July 26, 2021, Missouri reported 183 new COVID-19 cases per 100,000 people, ranking 25th in the country for new cases. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

32.    In the seven days before St. Louis County issued its new mask order on July 26, 2021, it reported 121 new cases per 100,000 people.  According to the state dashboard,

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

69 other jurisdictions had higher cases per 100,000 people than St. Louis County. *COVID-19 in Missouri*, Dep't of Health & Senior Servs., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

33.     In the seven days before St. Louis City issued its new mask order on July 26, 2021, it reported 138 new cases per 100,000 people.  According to the state dashboard, 64 other jurisdictions had higher cases per 100,000 people than St. Louis City. *COVID-19 in Missouri*, Dep't of Health & Senior Servs., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

34.     St. Louis County's and St. Louis City's COVID-19 death rates for the seven days before they issued their orders on July 26, 2021—when they had no mask requirements—fall below state averages.

35.     In the seven days before St. Louis County and St. Louis City issued these orders on July 26, 2021, Missouri reported 18 new COVID-19 deaths for a rate of 0.30 deaths per 100,000 people, which ranked the state 25th in the country for new deaths. *COVID-19 in Missouri*, Dep't of Health & Senior Servs., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

36.     In the seven days before St. Louis County issued this new order on July 26, 2021, St. Louis County reported two deaths for a rate of 0.20 deaths per 100,000 people. *COVID-19 in Missouri*, Dep't of Health & Senior Servs.,

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

https://health.mo.gov/living/healthcondiseases/communicable/novel-

coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

37.     In the seven days before St. Louis City issued this new order on July 26, 2021, St. Louis City reported zero deaths for a rate of 0 deaths per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-

coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

38.     Unlike St. Louis County and St. Louis City, many counties never imposed mask mandates.

39.     For example, neighboring St. Charles County never imposed a government mask mandate.  As of July 26, 2021, St. Charles County had a lower COVID-19 cumulative case rate than St. Louis County's 9,022 per 100,000 people, and a lower COVID-19 cumulative death rate than St. Louis County's 119 per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-

coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

40.     As another example, Reynolds County never imposed a government mask mandate.  As of July 26, 2021, Reynolds County had the lowest COVID-19 case rate and death rate in the state, reporting 4,593 cumulative cases per 100,000 people and 48 deaths per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-

coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

## VACCINE DATA IN ST. LOUIS

41.     Just 41.9% of people in St. Louis City have had the first vaccination dose (compared to 47.1% of Missourians) and only 35.3% of people in St. Louis City have completed vaccination (compared to 40.8% of Missourians).  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  St. Louis County is slightly above the state percentage rate with 51.2% and 45.0%, respectively.  *Id.*

42.     Counties such as Atchison (42.9%), Boone (52.7%), Cole (43.9%), Franklin (45.6%), Gasconade (42.0%), Jackson (44.3%), and St. Charles (49.5%) have higher first vaccination dose rates than St. Louis City.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  The City of Joplin has a 52.9% rate.  *See id.*

43.     Counties such as Atchison (39.5%), Boone (46.6%), Cole (38.7%), Franklin (40.6%), Gasconade (37.6%), Greene (35.6%), Jackson (39.1%), Nodaway (35.8%), and St. Charles (44.6%) have higher vaccination completion rates than St. Louis City.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  The City of Joplin has a 44.8% rate.  *See id.*

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

44.     St. Louis City's vaccination rate is about the same as Shelby County's 35.2% vaccination rate.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS.,                https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).

## JUSTIFICATIONS FOR LIFTING RESTRICTIONS IN MAY 14, 2021

45.     When St. Louis County and St. Louis City lifted all COVID-19 restrictions on May 14, 2021, they relied on several data points that do not support new entry of a mask mandate now.

46.     St. Louis County and St. Louis City removed their original mask mandates because the CDC announced that fully vaccinated people could stop wearing masks outdoors in crowds and in most indoor settings.  Sam Clancy and Dori Olmos, *Mask mandates lifted in St. Louis as city, county align with CDC guidance*, KSDK (May 13, 2021),      https://www.ksdk.com/article/news/health/coronavirus/st-louis-county-updated-health-guidelines/63-d081f91a-8fc6-4a0c-bbcc-ea3bf36ed0cb.

47.     County Executive Page said that the St. Louis County and St. Louis City health departments would "make sure all of our recommendations are in line with the CDC guidance."  Gregg Palermo, Zara Barker, & Blair Ledet, *St. Louis City & County announce new COVID guidelines*, FOX2NOW (May 13, 2021). https://fox2now.com/news/st-louis-city-county-set-friday-announcement-on-covid-guidelines-following-new-cdc-mask-guidance/.

48.     County Executive Page previously said that "St. Louis County certainly plans to adopt CDC recommendations into our public health protocols, and we'll have an

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

announcement soon." Sarah Fentem, *St. Louis, St. Louis County Could Lift Some Coronavirus Restrictions Next Week*, St. Louis Public Radio (Apr. 28, 2021), https://news.stlpublicradio.org/coronavirus/2021-04-28/st-louis-st-louis-county-plan-to-lift-some-coronavirus-restrictions.

49.     The CDC has not changed its guidance since May 14, 2021, and as of July 26, 2021, advises that fully vaccinated people can "resume activities without wearing masks or physically distancing," unless required by law or a business. CDC, *Interim Public Health Recommendations for Fully Vaccinated People* (updated July 21, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.

50.     Neither the St. Louis County nor St. Louis City Mask Mandates issued July 26, 2021 exempt fully vaccinated people from compliance.

51.     The Mask Mandates issued by St. Louis County and St. Louis City on July 26, 2021 are not consistent with current CDC guidance for fully vaccinated people.

52.     After receiving Attorney General Schmitt's letter, County Executive Page said that "[t]he easing of restrictions is made possible as more people get vaccinated, and I urge everyone to get vaccinated as early as possible." Sarah Fentem, *St. Louis, St. Louis County Could Lift Some Coronavirus Restrictions Next Week*, St. Louis Public Radio (Apr. 28, 2021), https://news.stlpublicradio.org/coronavirus/2021-04-28/st-louis-st-louis-county-plan-to-lift-some-coronavirus-restrictions.

53.     When St. Louis County and St. Louis City removed their COVID-19 restrictions, St. Louis County had vaccination rates of 41.9% with the first vaccination dose and 33.2% fully vaccinated, and St. Louis City had vaccination rates of 33.1% with the

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

first vaccination dose and 26% fully vaccinated.  Sam Clancy & Dori Olmos, *Mask mandates lifted in St. Louis as city, county align with CDC guidance*, KSDK (May 13, 2021)  https://www.ksdk.com/article/news/health/coronavirus/st-louis-county-updated-health-guidelines/63-d081f91a-8fc6-4a0c-bbcc-ea3bf36ed0cb.

54.     St. Louis County and St. Louis City both have higher first vaccination dose rates and fully vaccinated rates on July 26, 2021 than they did on May 14, 2021.

### THE NEW MASK MANDATES

55.     On July 26, 2021, Defendants issued the "Mask Mandates," which require all individuals aged five and older to wear masks while indoors regardless of vaccination status with very limited exceptions.

56.     But there is no evidence that Defendants considered the underlying data, science, and evidence that fail to justify issuing mask mandates at this time.

57.     Similarly, Defendants imposed the Mask Mandates on schoolchildren, ignoring that those children are less likely to get COVID-19, less likely to get seriously ill if they do get it, and are less likely to transmit the disease while, at the same time, suffering disproportionately from masking requirement.

58.     The Defendants' Mask Mandates are a continuation of a series of arbitrary, capricious, unlawful, and unconstitutional COVID-19 related restrictions.  There is no reason to allow such orders to continue.

### JURISDICTION AND VENUE

59.     This Court has jurisdiction under Mo. Const. art V, § 14(a), § 536.150, RSMo, §§ 527.010 et seq., RSMo, and other applicable law.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

60.     Venue is proper in this Court under § 508.010.2(2) RSMo.

## PARTIES

61.     Plaintiff State of Missouri is a sovereign State of the United States of America.

62.     Eric S. Schmitt is the 43rd Attorney General of the State of Missouri. Attorney General Schmitt is authorized to "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved."  § 27.060, RSMo.

63.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in controlling the exercise of sovereign power over individuals and entities within its borders; Missouri's sovereign interest in ensuring the enforcement of Missouri law within Missouri's borders; and Missouri's quasi-sovereign and *parens patriae* interest in the freedom, health, and physical, psychological, educational, and economic well-being of a significant segment of its populace, including but not limited to their rights to religious freedom.  This interest includes, but is not limited to, preventing the spread of the COVID-19 virus within the state.

64.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in ensuring that its municipal authorities do not exercise authority vested in them under state law in a fashion that violates the Missouri Constitution or Missouri law.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

65.     Attorney General Schmitt sues to vindicate Missouri's interest in ensuring that the children of the State receive an appropriate education.

66.     Dr. Sam Page ("Page") is the County Executive of St. Louis County.  He is sued in his official capacity.

67.     Dr. Faisal Khan ("Khan") is the Director of the St. Louis County Department of Public Health.  He is a "local health authority" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(26).  He is sued in his official capacity.

68.     The St. Louis County Department of Public Health ("County DPH") is an agency of St. Louis County acting under the direction of Defendants Page and Khan. County DPH constitutes a "local public health agency" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(27).

69.     Together, Page, Khan, and County DPH are the "County Defendants."

70.     Mayor Tishaura Jones ("Jones") is the Mayor of the City of St. Louis.  She is sued in her official capacity.

71.     Dr. Fredrick Echols ("Echols") is the Acting Director of the Department of Health for the City of St. Louis.  He is a "local health authority" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(26).  He is sued in his official capacity.

72.     The Department of Public Health for the City of St. Louis ("City DPH") is an agency of St. Louis City acting under the direction of Defendants Jones and Echols. City DPH constitutes a "local public health agency" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(27).

Electronically Filed - St. Louis County - July 26, 2021 - 05:50 PM

73.     Together, Jones, Echols, and City DPH, are the "City Defendants."

## FACTUAL ALLEGATIONS

74.     Missouri incorporates by reference the allegations in all preceding paragraphs.

75.     St. Louis County is a charter county of the State of Missouri.  St. Louis City is a charter city of the State of Missouri.

76.     Defendants cite some legal authority to support the Mask Mandates, but to the extent any authority is provided, the authority is not unlimited.

77.     First, the authority cited by Defendants provides only for "creation and enforcement of adequate orders to prevent the spread of the disease and other measures . . . as appropriate disease control measures based upon the disease . . . and any other available information related to . . . the disease or infection."   19 C.S.R. 20.040(2)(G).

78.     Second, any restrictions cannot be "unconstitutional, unlawful, unreasonable, arbitrary, or capricious . . . .  § 536.150.1, RSMo.  Government action is arbitrary, capricious, and unreasonable when it is based on *post hoc* rationalization, when it fails to consider an important part of the problem it is addressing, and when it fails to consider less restrictive alternatives before infringing on citizens' liberty.  *See*, *e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905, 1909 (2020); *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015).  "[A]n agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously."  *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

(Mo. App. W.D. 1995) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In addition, agencies must consider whether there are less restrictive policies that would achieve their goals.  *See Regents of the Univ. of Calif.*, 140 S. Ct. at 1912 (quoting *State Farm Mut. Auto.*, 463 U.S. at 51).

79.     The County Defendants have a history of transgressing those limits, as well as other constitutional prohibitions against religious discrimination, in their orders related to the COVID-19 emergency.  *See* Ex. A (detailing those issues); Petition, *Missouri ex rel. Schmitt v. Page* (No. 21SL-CC02111) (pointing out similar deficiencies in St. Louis County's Reopening STL Order); *cf.* Ex. B (failing to address the points Attorney General Schmitt raised with respect to the Fifth Amended Safer at Home Order).

80.     The City Defendants have moved in lock-step with the County Defendants and engaged in a similar history of transgressing statutory and constitutional bounds in the COVID-19 orders they have issued.

81.     Indeed, on information and belief, the County Defendants and the City Defendants worked together to alter or rescind their COVID-19 restrictions to avoid scrutiny and to avoid lawsuits by the Attorney General.

82.     The Defendants' Mask Mandates are no different.  They exceed Defendants' statutory and constitutional authority and trample the rights of their citizens.

## I.     The Mask Mandates

83.     The County Defendants' and City Defendants' Mask Mandates are slightly different (the "County Mask Mandate," attached as Exhibit C, and the "City Mask Mandate," attached as Exhibit D).   They both coincide, however, on their main

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

requirement:  Everyone over the age of five must wear a mask when indoors, even if they are vaccinated.

84.     Specifically, each order requires individuals over the age of five to wear a "face covering" while "in indoor and enclosed public buildings and spaces and public transportation vessels."  *See* Ex. C § III.1; Ex. D § 1.

    a.    The County Mask Mandate defines "face covering" as "a device, usually made of cloth, that covers the nose and mouth." Ex. C, § III.1. The City Mask Mandate does not define "face covering," but on information and belief, it defines "face covering" no differently.

    b.    The County Mask Mandate clarifies that "indoor and enclose public buildings and spaces" "include[s] all indoor and enclosed spaces other than private dwellings or private transportation vehicles."  Ex. C, § III.1.  The City Mask Mandate has no similar clarification, but it also does not suggest that the order has a more limited scope.  Thus, both Mask Mandates have wide application; they cover schools and places of worship as well as restaurants, bars, public transportation, grocery stores, hospitals, and more.

    c.    The Mask Mandates apply regardless of whether social distancing is possible in the indoor area.

85.     Both Mask Mandates provide for similar exceptions.

    a.    Both Mask Mandates exempt those who have trouble breathing with a mask, or who "are unconscious, incapacitated, or otherwise unable

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

to remove" the mask.  Ex. C § III.3.iv; Ex. D § 2.c.

b.   Both Mask Mandates exempt those consuming food and drink.  Ex. C, § III.3.vii; Ex. D § 2.b.  The County Mask Mandate specifically excludes consumption for religious purposes.  Ex. C § III.3.vii.

c.   Both Mask Mandates exempt those who need to remove masks for "obtaining a service" that involves "the nose or face."  Ex. C. § III.3.viii; Ex. D § 2.d.  The County Mask Mandate specifically includes instances where removal "is necessary to perform the service." § Ex. III.3.viii.

86.   However, the two Mask Mandates' exemptions do differ in some ways.

a.   The County Mask Mandate exempts those "with health conditions that prohibit wearing a Face Covering."  Ex. C § III.3.iii.  By contrast, the City Mask Mandate requires "an official order or documentation from a medical or behavioral health provider" that they should not wear face coverings to be exempt.  Ex. D § 2.a.

b.   The County Mask Mandate exempts deaf and hard-of-hearing individuals, and those communicating with such individuals, "where the ability to see the mouth is essential for communications."  Ex. C § III.3.v.  There is no equivalent exemption in the City Mask Mandate.

c.   The County Mask Mandate exempts people "who are alone in a separate room, office, or interior space."  Ex. C § III.3.vi.  There is no equivalent exemption in the City Mask Mandate.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

87.     Neither Mask Mandate has a sunset provision.

88.     The County Mask Mandate expressly says it does not meet the requirements of § 67.265.1(1), RSMo.  Ex. C § I.A.  The City Mask Mandate makes no such claim.

89.     The County Mask Mandate was signed on July 26, 2021.

90.     The City Mask Mandate was signed on July 23, 2021.

## II.     Justification for the Mask Mandates

91.     The City Mask Mandate provides no explicit justification for its order.  To be sure, the order points to "a resurgence of COVID-19 cases;" increased transmission, hospitalization, and deaths; and the fact that less than half of St. Louis City has been vaccinated.  Ex. D.  But the City Mask Mandate does not then discuss how the order would ameliorate any of those issues.

92.     The County Mask Mandate purports to justify the order, first, by discussing the spread of COVID-19 cases in the county.  *See* Ex. C § I.B.  The order highlights claims that the COVID-19 variants, particularly the delta variant, could spread more easily.  *See id.*  It also claims that "[s]urges are increasingly impacting [*sic*] younger adults and children."  *Id.*  The order does not discuss hospitalizations or death rates.

93.     The County Mask Order then claims that masks prevent transmission of COVID-19 in two ways.  One is through "source control," which refers to the alleged ability of masks to "prevent infected persons from exposing others to [COVID-19] by blocking exhalation of virus-containing droplets into the air."  Ex. C § I.C.  The other is by protecting uninfected wearers by "forming a barrier to large respiratory droplets . . . and partially filtering out small droplets and particles from inhaled air."  *Id.*  The County Mask

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

Order then points to studies it claims supports those conclusions.  *See id.*

94.     Both Mask Mandates claim, as their purpose, the goal of slowing the spread of COVID-19.  *See* Ex. C § II; Ex. D.  The County Mask Mandate also notes that its recommendation is supposedly consistent with federal and local experts.  *See* Ex. C § II.

## III.    Authorization

95.     The City Mask Mandate relies on the Charter of St. Louis City and 19 C.S.R. § 20-20.050(c) to authorize its restrictions.  *See* Ex. D.  However, 19 C.S.R. § 20-20.050(c) does not exist; and 19 C.S.R. § 20-050 only provides for isolating or closing certain areas of assembly.

96.     The County Mask Mandate relies on more authorities than the City Mask Mandate.  But those authorities do not authorize the County's Mask Mandate.  Notably, the County Mask Mandate does not cite § 192.300, RSMo (providing when county health officials may make additional health rules), as authorizing the order.

## COUNT ONE – DECLARATION THAT THE MASK MANDATES ARE SUBJECT TO § 67.265.1(1), RSMo

97.     Missouri incorporates by reference the allegations in all preceding paragraphs.

98.     Missouri seeks a declaration that the Mask Mandates are subject to the requirements of § 67.265.1(1), RSMo.

99.     There is an emergency order declared pursuant to chapter 44, RSMo.

100.    Both the County Mask Mandate and the City Mask Mandate are orders that "directly or indirectly closes, partially closes, or places restrictions on the opening of or access to any one or more business organizations, churches, schools, or other places of

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

public or private gathering or assembly, including any order, ordinance, rule, or regulation of general applicability or that prohibits or otherwise limits attendance at any public or private gathering . . . ."  § 67.265.1(1), RSMo.

101.   First, both Mask Mandates place restrictions on access to "business organizations, churches, schools, or other places of public or private gathering or assembly," § 67.265.1(1), RSMo, because they limit access to those entities only to masked individuals or individuals who fall under an exception to the mask requirement.

102.   Second, both Mask Mandates will indirectly close those "business organizations, churches, schools, or other places of public or private gathering or assembly," § 67.265.1(1), RSMo, that wish to provide personal choice to their customers about whether they wear a mask or not.  Furthermore, the Mask Mandates will also close those entities where masking is impossible or so uncomfortable as to be impossible.

103.   As a result, both Mask Mandates are subject to § 67.265.1(1), RSMo, and expire after thirty days absent authorization by a majority vote of St. Louis County's or St. Louis City's governing body.

## COUNT TWO – DECLARATION THAT THE MASK MANDATES ARE NOT IN EFFECT PER § 67.265.4, RSMo

104.   Missouri incorporates by reference the allegations in all preceding paragraphs.

105.   As discussed above, both Mask Mandates are subject to § 67.265.1(1), RSMo.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

106.    Missouri also seeks a declaration that the County Mask Mandate and the City Mask Mandate are not in effect per the terms of § 67.265, RSMo.

107.    Specifically, under § 67.265.4, RSMo, "the health officer, local public health agency, public health authority, or executive shall provide a report to the governing body containing information supporting the need for such order."

108.    On information and belief, neither Page, Khan, Jones, nor Echols provided the required report under § 67.265.4, RSMo.

109.    As a result, the Mask Mandates are not effective, as that information must be provided "[p]rior to or concurrent with" the issuance of any order subject to § 67.265.1(1), RSMo.

110.    In addition, the authority cited by both the County Mask Mandate and the City Mask Mandate is insufficient to support those orders.

111.    Neither the County nor the City cited to § 192.300, RSMo, because they improperly sought to avoid being subject to § 67.265 through § 192.300.5.

## COUNT THREE – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS AS APPLIED TO SCHOOLCHILDREN, § 536.150.1, RSMo

112.    Missouri incorporates by reference the allegations in all preceding paragraphs.

113.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious."  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

114.    The Mask Mandates impose a duty on all elementary schoolchildren (defined as all children who are of the age to attend K-12 school) in St. Louis County and the City of St. Louis to wear a mask with few exceptions when they are at school.  They are therefore an agency decision that determines "legal rights, duties, or privileges."  § 536.150.1, RSMo.

115.    The schoolchildren of St. Louis County and the City of St. Louis are not validly subject to the Mask Mandates because they are "unreasonable, arbitrary, or capricious," § 536.150.1, RSMo, for a number of reasons.

116.    First, the masking requirement for schoolchildren is unreasonable, arbitrary, and capricious.  Schoolchildren are generally not at risk of serious illness even if they get COVID-19, thus reducing the need for harsher non-pharmaceutical intervention.  *See*, *e.g.*, Marty Makary, Opinion, *The Flimsy Evidence Behind the CDC's Push to Vaccinate Children*, Wall St. J. (July 19, 2021) ("Our report found a mortality rate of zero among children without a pre-existing medical condition such as leukemia.").  On information and belief, Defendants failed to consider that fact in deciding to promulgate the Mask Mandates.

117.    Second, on information and belief, Defendants failed to consider a number of important factors relating to masking for schoolchildren:

    a.    To start, the Mask Mandates fail to account for the fact that children are less likely to contract COVID-19 and, if they do contract it, display less severe symptoms.  *See*, *e.g.*, Nicholas G. Davies, *Age-Dependent Effects in the Transmission and Control of COVID-19 Epidemics*, 26

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

NATURE MED. 1205, 1205 (2020) (concluding that susceptibility of infection in those under twenty is half that for those over twenty and that those under twenty do not manifest clinical symptoms as often). That suggests that children are also less likely to transmit the virus, *see id.* at 1208–09, which appears to be the consensus position.[1] There is thus a much less pressing need for masking among young children.  That includes within schools.  One study found "an infection rate of 0.13% among students and 0.24% among staff" after analyzing in-school infection data from over 47 states.  Patrick Boyle, *Kids, School, and COVID-19: What We Know—and What We Don't*, AAMC (Nov. 5, 2020).  Rather, schools are more likely to be affected by COVID-19 rates in the community than be sites of super-spreader events.  *See id.*[2]

---

[1] *See, e.g.*, Eun Young Cho et al., Letter to the Editor, *Interpreting Transmissibility of COVID-19 in Children*, 26 EMERGING INFECTIOUS DISEASES 3106, 3107 (2020) (interpreting data); Patrick Boyle, *Kids, School, and COVID-19: What We Know—and What We Don't*, AAMC (Nov. 5, 2020), https://bit.ly/3kQDvyG ("Several studies have found that children transmit the virus, but perhaps not as often as adults, especially in younger age groups.  It's not clear why."); Eli Somekh et al., *The Role of Children in the Dynamics of Intra Family Coronavirus 2019 Spread in Densely Populated Areas*, 39 PEDIATRICS INFECTIOUS DISEASE J. 202, 203–04 (2020) (noting studies indicating that children are less likely to get COVID-19, and finding similar results).

[2] *See also, e.g.*, CDC, *Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs—Updated* (updated July 9, 2021), https://bit.ly/3rxQeaR; *Questions and Answers on COVID-19: Children Aged 1–18 Years and the Role of Schools Settings*, European Centre for Disease Prevention & Control (updated Jan. 25, 2021), https://bit.ly/3j3yHDJ.  *But see* Zoe Hyde, Perspectives, *COVID-19, Children and Schools: Overlooked and at Risk*, 213 MED. J. AUSTL. 444, 446 (2020) (arguing that schools play a bigger role in transmission than assumed, but conceding that

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

b.      But while the risks schoolchildren face from COVID-19, as well as the risk that they transmit the virus, are relatively low, there is a significant cost to forcing them to mask.  For one, masks hinder "verbal and non-verbal communication."   Jonas F. Ludvigsson, Editorial, *Little Evidence for Facemask Use in Children Against COVID-19*, 110 ACTA PAEDITRICA 742, 742 (2021); *see* Harris, *supra* ("Some child development researchers also worry that widespread mask-wearing may hamper children's linguistic and emotional development.").   Indeed, one of the studies the County Mask Mandates cites says as much.  *See* John T. Brooks, et al., *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, Journal of the American Medical Association, Feb. 10, 2021, at 7 (finding that "children were less accurate with faces that wore a mask compared to faces that were not covered," but not cited for that proposition, *see* Ex. C § C).  And the same risks associated with mask use in adults—namely, that the masks may create a false sense of security and improper use of face masks, especially touching of the masks will eliminate any, if not exceed, any benefit achieved by having students wear masks.  *See id.*

---

"[w]hether young and older children transmit the virus similarly is unknown and requires urgent clarification").

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

c.    There are also common-sense concerns with having schoolchildren wear a face mask all day while at school, such as general discomfort. *See* Harris, *supra* ("In a self-selected survey of German schoolchildren, more than half of the participants reported headaches.").

d.    Finally, children with special needs may find it especially difficult to wear masks, thus jeopardizing their ability to be in public places under the Mask Mandate. *See The Challenge of Face Masks*, *supra*. While the Mask Mandate's exempts those who are not able to wear a mask, that exemption is vague.  It is therefore unclear whether it would exempt all special needs children—for example, all of those on the autism spectrum. *See id.*

118.    On information and belief, Defendants failed to consider those factors in applying the Mask Mandates to schoolchildren.  They therefore failed to engage in reasoned decision-making, and, as a result, subjected schoolchildren in the St. Louis area to unnecessary, burdensome, and harmful mask mandates.

119.    For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious and the schoolchildren of St. Louis County and St. Louis City should not be subject to them.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

### COUNT FOUR – DECLARATION THAT THE MASK MANDATES ARE UNLAWFUL AS TO SCHOOLCHILDREN, § 536.150.1, RSMo

120.   Missouri incorporates by reference the allegations in all preceding paragraphs.

121.   The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unlawful" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

122.   By law, local health authorities may create and enforce only orders "adequate . . . to prevent the spread of [a] disease and other measures considered by the . . . local health authority as appropriate disease control measures based upon the disease . . . ."  19 C.S.R. § 20-20.040.2(G).

123.   For the reasons discussed in Count Three, the Mask Mandates are not an appropriate disease control measure for schoolchildren and are not adequate to prevent the spread of COVID-19 in that group.

124.   For those reasons, the Mask Mandates are an unlawful order and the schoolchildren of St. Louis County and St. Louis City should not be subject to them.

### COUNT FIVE – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS, § 536.150.1, RSMo

125.   Missouri incorporates by reference the allegations in all preceding paragraphs.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

126.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious."   § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

127.    The Mask Mandates impose a duty on all citizens in St. Louis County and the City of St. Louis to wear a mask with few exceptions when they are in a public space. It therefore is an agency decision that determines "legal rights, duties, or privileges." § 536.150.1, RSMo.

128.    The citizens of St. Louis County and the City of St. Louis are not validly subject to the Mask Mandates because they are "unreasonable, arbitrary, or capricious," § 536.150.1, RSMo, for a number of reasons.

129.    To start, the City Mask Mandate clearly fails the requirement of reasoned decision-making.  It provides no discussion of why the mandate addresses the harms it identifies.  *See* Ex. D.  The City Mask Mandate therefore suggests that the City Defendants failed to grapple at all with *any* relevant science, data, statistics, studies, or alternatives, or that they were aware of such things.

130.    Both Mask Mandates are arbitrary and capricious because they fail to account for over a year of data that showed the previous St. Louis County and St. Louis City restrictions were less effective than counties that had no restrictions.

131.    The Mask Mandates are arbitrary and capricious because they require vaccinated individuals to wear masks, despite the CDC guidance that this is not necessary. The Mask Mandates fail to address this issue.

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

132.   On information and belief, Defendants failed to consider whether the Mask Mandates—because they treat vaccinated individuals like unvaccinated ones—discourage people from receiving the vaccine by implying that vaccines have limited efficacy.  *Cf.* Rachel Holloway et al., *Updated Preparedness and Response Framework for Influenza Pandemics*, MORBIDITY & MORTALITY WEEKLY REPORT, Sept. 26, 2014, at 6 (saying vaccine availability is a consideration when determining what actions to take during a pandemic).

133.   For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious and the people of St. Louis County and St. Louis City should not be subject to them.

## COUNT SIX – DECLARATION THAT THE MASK MANDATES ARE UNLAWFUL, § 536.150.1, RSMo

134.   Missouri incorporates by reference the allegations in all preceding paragraphs.

135.   The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unlawful" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

136.   By law, local health authorities may create and enforce only orders "adequate . . . to prevent the spread of [a] disease and other measures considered by the . . . local health authority as appropriate disease control measures based upon the disease . . . ."  19 C.S.R. § 20-20.040.2(G).

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

137.    For the reasons discussed in Count Five, the Mask Mandates are not an appropriate disease control measure and are not adequate to prevent the spread of COVID-19.

138.    For those reasons, the Mask Mandates are an unlawful order and the people of St. Louis County and St. Louis City should not be subject to them.

## COUNT SEVEN – DECLARATION THAT THE MASK MANDATES ARE UNCONSTITUTIONAL AS VOID FOR VAGUENESS, § 536.150.1, RSMo

139.    Missouri incorporates by reference the allegations in all preceding paragraphs.

140.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that the Mask Mandates are "unconstitutional" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

141.    The Missouri Constitution prohibits government restrictions that are unconstitutionally vague.  "The test in enforcing the doctrine is whether the language conveys to a person of ordinary intelligence a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Feldhaus v. State*, 311 S.W.3d 802, 806 (Mo. banc 2010).  And "[t]here must be sufficient guidance provided by the statute so as to avoid arbitrary and discriminatory applications." *State v. Stokely*, 842 S.W.2d 77, 81 (Mo. banc 1992).

142.    The County Mask Mandate is vague and self-contradictory on many points, including but not limited to the following:

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

a.      The County Mask Mandate exempts "private dwellings" from the definition of "public building and spaces," but it does not define "dwelling."  Ex. C § III.1.  Thus, it is ambiguous whether the order applies to non-public buildings that are not dwellings—for example, private office spaces or clubs.  Such places are not "public" but they are not traditionally considered "dwellings" either.

b.      The order does not define what health conditions permit an individual to avoid wearing a mask, or even provide exemplars beyond suggesting (without being clear the suggestion is part of the exemption) that the health condition must be "contrary to [the individual's] health and safety."  *See* Ex. C § III.3.iii.  As a result, the order is vague and vests too much discretion in officials to make on-the-spot determinations of whether a health condition falls within the exemptions scope.

c.      The order does not define when, for deaf and hard-of-hearing people and those communicating with them, "the ability to see the mouth is essential for communication."  Ex. C § III.3.v.  As a result, the order is vague and vests too much discretion in officials to make on-the-spot determinations of whether seeing a communicator's mouth is essential for communication.

d.      The order does not define when a person is alone in "an interior space."  Ex. C § III.3.vi.  That phrase is ambiguous; for example, it

31

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

could cover, or not cover, two people, at opposite ends of a 100-foot hall.

143.   The City Mask Mandate is vague and self-contradictory on many points, including but not limited to the following:

a.   What is an "indoor and enclosed public building[] or space[]" is not defined in the order.  Ex. D § 1.  As a result, the order's scope is vague and ambiguous.  For example, that phrase could be read to cover all indoor and enclosed spaces, which would mean it applies to private dwellings; alternatively, it could be read only to cover buildings open to the public; or, alternatively, it could be read to cover all spaces, public or private, that are not dwellings.

b.   The City Mask Mandate does not define what form an order or documentation from a medical or behavioral health provider must look like in order to be exempt from the masking requirement.  Ex. D § 2.a.  Nor does it say how an individual is to prove they have such documentation.   As a result, the scope of this exemption is unconstitutionally vague and ambiguous, and it vests significant enforcement discretion in officials to determine what documentation is sufficient.

c.   What is a "disability" that "[p]revent[s a person] from wearing or taking off face coverings" or "prevent[s them] from communicating while wearing face coverings" is not defined.  Ex. D § 2.e.  As a result,

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

the scope of that exception is vague and ambiguous.  For example, it could be read as covering certain individuals—especially children—who fall on the autism spectrum, and therefore have trouble wearing masks.  *See*, *e.g.*, *The Challenge of Face Masks*, ORG. FOR AUTISM RES. (Nov. 12, 2020), https://bit.ly/3eVYRa3.  Alternatively, it could be read to cover only those for whom it is impossible to wear or communicate with masks—which would also indicate that the exception is, in part, superfluous with the exception for those who are "unable to remove the Face Covering without assistance."  Ex. D § 2.c.  It could also mean that people may remove their masks simply to communicate better or more effectively; or it could only cover instances where communication is impossible.

d.      What is "actively engaged in consuming food or drink" is also not defined in the order.  Ex. D. § 2.b.  But the scope of that exception is also incredibly vague.  It is unclear, for example, whether it requires masking between bites or sips, or whether it permits people to remain unmasked throughout the meal, or something in between.

144.    For those reasons, the Mask Mandates are unconstitutional and the people of St. Louis County and St. Louis City should not be subject to them.

**COUNT EIGHT – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS AS TO RELIGIOUS INSTITUIONS AND**

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

## THOSE WHOSE RELIGIOUS EXERCISE THE MASK MANDATES BURDEN, § 536.150.1, RSMo

145.   Missouri incorporates by reference the allegations in all preceding paragraphs.

146.   The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious," as well as "unlawful" and "unconstitutional," as to those individuals whose religious exercise the mandate burdens.   § 536.150.1, RSMo.   The Mask Mandates are not subject to administrative review.  *Id.*

147.   By law, Defendants "may not restrict a person's free exercise of religion, unless: (1) The restriction is in the form of a rule of general applicability, and does not discriminate against religion, or among religions; and (2) The governmental authority demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances."  § 1.302.1, RSMo (Missouri RFRA).

148.   On information and belief, Defendants did not consider whether the Mask Mandates would restrict religious exercise, furthers a compelling government interest, and is not unduly restrictive considering the relevant circumstances.  That, they had to do, or to otherwise provide an exemption for religious exercise; their failure was arbitrary and unlawful.  *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2395–96 (2020) (Alito, J., concurring) (discussing this point in the context of the federal Religious Freedom and Restoration Act).

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

149.    The County Mask Mandate also violates Missouri RFRA because it "discriminate[s] against religion, or among religions."  § 1.302.1(1), RSMo.  That is so because the order requires officials to determine when removal of a mask "is necessary to perform" a religious service.  Ex. C § III.3.viii.  Thus, the County Mask Mandate facially requires officials to draw arbitrary and discriminatory lines between different religious practices and beliefs to determine if a service is necessary or not.

150.    Furthermore, because that exception requires officials to evaluate the sincerity of a religious belief, the County Mask Mandate violates the Free Exercise Clause of the United States and Missouri constitutions.  *See Thomas v. Review Bd. of the Ind. Emp't Sec. Division*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.").

151.    For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious, and possibly unlawful.  Religious institutions and those seeking to exercise their religion who are burdened by the Mask Mandates in St. Louis County and St. Louis City should not be subject to them.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.    Declare that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to schoolchildren (Counts Three and Four); that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious,

unreasonable, and invalid under Missouri law (Counts Five, Six, and Seven); declare that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to religious institutions and those whose religious exercise the Mask Mandate burdens (Count Eight);

b. Grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action, providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to schoolchildren (Counts Three and Four); grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action, providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law (Counts Five, Six, and Seven); grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action, providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to religious institutions and those whose religious exercise the Mask Mandate burdens (Count Eight);

c. Declare that Defendants' Mask Mandates are subject to § 67.265, RSMo, (Count One) and are not in effect under that section (Count Two);

d. Enter a final judgment in Plaintiff's favor on all Counts in this Complaint; and

Electronically Filed - St Louis County - July 26, 2021 - 05:50 PM

e.   Grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: July 26, 2021

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Justin D. Smith*
Justin D. Smith, #63253MO
Deputy Attorney General for Special Litigation
Jeff P. Johnson, #73249MO
Michael E. Talent, #73339MO
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for Plaintiff State of Missouri*

Electronically Filed - St Louis County - July 27, 2021 - 11:08 AM

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI, ex rel.    )
ERIC S. SCHMITT,    )
   )
       *Plaintiff*,    )
   )    Case No. 21SL-CC03334
     v.    )
   )
SAM PAGE, et al.,    )
   )
       *Defendants*.    )

## ENTRY OF APPEARANCE

COMES NOW Michael E. Talent, and hereby enters his appearance on behalf of Plaintiff.

Respectfully submitted,

**ERIC S. SCHMITT**
Missouri Attorney General

By:    *  /s/ Michael E. Talent            *
Michael E. Talent, #73339
815 Olive Street, Suite 200
St. Louis, MO  63101
Telephone: (314) 340-4869
Facsimile: (573) 751-0774
Michael.Talent@ago.mo.gov

*Counsel for Plaintiff*

Electronically Filed - St Louis County - July 27, 2021 - 11:08 AM

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2021, the foregoing was filed through the Missouri Case.net e-filing system, which will send notice to all counsel of record.

<div align="right">

*/s/ Michael E. Talent*
Counsel for Plaintiff

</div>

Electronically Filed - St Louis County - July 27, 2021 - 11:05 AM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI, ex rel.    )
ERIC S. SCHMITT,    )
    )
        *Plaintiff,*    )
    )   Case No. 21SL-CC03334
      v.    )
    )
SAM PAGE, et al.,    )
    )
        *Defendants.*    )

### ENTRY OF APPEARANCE

COMES NOW Jeff P. Johnson, and hereby enters his appearance on behalf of Plaintiff.

Respectfully submitted,

**ERIC S. SCHMITT**
Missouri Attorney General

By:   */s/ Jeff P. Johnson*
       Jeff P. Johnson, #73249
       815 Olive Street, Suite 200
       St. Louis, MO  63101
       Telephone: (314) 340-7366
       Facsimile: (573) 751-0774
       Jeff.Johnson@ago.mo.gov

       *Counsel for Plaintiff*

Electronically Filed - St Louis County - July 27, 2021 - 11:05 AM

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2021, the foregoing was filed through the Missouri Case.net e-filing system, which will send notice to all counsel of record.

_/s/ Jeff P. Johnson_
Counsel for Plaintiff



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN HANNIGAN RIBAUDO | Case Number:  21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner:<br> THE STATE OF MISSOURI EX REL. ERIC S. SCHMITT<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JUSTIN DANIEL SMITH<br>207 WEST HIGH ST.<br>JEFFERSON CITY, MO  65101 |
| Defendant/Respondent:<br>SAM PAGE | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Declaratory Judgment | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  **DEPARTMENT OF HEALTH FOR THE CITY OF ST. LOUIS**
Alias:

**1520 MARKET STREET**
**ROOM 4051**
**ST. LOUIS, MO  63103**



*COURT SEAL OF*

*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>  27-JUL-2021  </u>
        Date

        Further Information:
        MT

_____
                                                    Clerk

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____(title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____              _____
        Printed Name of Sheriff or Server                                        Signature of Sheriff or Server
                **Must be sworn before a notary public if not served by an authorized officer:**

|  | |
|---|---|
| *(Seal)* | Subscribed and sworn to before me on _____ (date).<br><br>My commission expires: _____ _____<br>                                                         Date                                   Notary Public |

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.   An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3)** **Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4)** **Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5)** **Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
## Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**

If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.


**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**


**Filing Pleadings/New Petitions**

If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**

Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

**For more information call: 314-615-8029**





# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN HANNIGAN RIBAUDO | Case Number:  21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner:<br> THE STATE OF MISSOURI EX REL. ERIC S. SCHMITT<br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JUSTIN DANIEL SMITH<br>207 WEST HIGH ST.<br>JEFFERSON CITY, MO  65101 |
| Defendant/Respondent:<br>SAM PAGE | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Declaratory Judgment | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to:  FREDRICK ECHOLS
                    Alias:

**1520 MARKET STREET**
**ROOM 4051**
**ST. LOUIS, MO  63103**

*COURT SEAL OF*



*ST. LOUIS COUNTY*

   You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
   **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

27-JUL-2021
Date

Further Information:
MT

_____
Clerk

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*   Subscribed and sworn to before me on _____ (date).

My commission expires: _____          _____
                                             Date                                    Notary Public

| **Sheriff's Fees, if applicable** | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| Total | $_____ | |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) <u>Early Neutral Evaluation ("ENE")</u>:** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) <u>Mini-Trial:</u>** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) <u>Summary Jury Trial:</u>** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.   The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms.  You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
## Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**
If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**
If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**
Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

**For more information call: 314-615-8029**





# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN HANNIGAN RIBAUDO | Case Number:  21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner:<br><br> THE STATE OF MISSOURI EX REL. ERIC S. SCHMITT<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>JUSTIN DANIEL SMITH<br>207 WEST HIGH ST.<br>JEFFERSON CITY, MO  65101 |
| Defendant/Respondent:<br>SAM PAGE | Court Address:<br>ST LOUIS COUNTY COURT BUILDING |
| Nature of Suit:<br>CC Declaratory Judgment | 105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105                    (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to:  TISHAURA JONES<br>Alias: | |
|---|---|
| **1200 MARKET STREET**<br>**CITY HALL, ROOM 200**<br>**ST. LOUIS, MO  63103** | |

*COURT SEAL OF*



*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

| <u>27-JUL-2021</u><br>Date | _____<br>Clerk |
|---|---|
| Further Information:<br>MT | |

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

| _____<br>Printed Name of Sheriff or Server | _____<br>Signature of Sheriff or Server |
|---|---|

**Must be sworn before a notary public if not served by an authorized officer:**

| *(Seal)* | Subscribed and sworn to before me on _____ (date). |
|---|---|
| | My commission expires: _____     _____ |
| | Date                                            Notary Public |

| **Sheriff's Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case.  However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.   **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.   An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
## Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**

If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**

If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**

Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

### For more information call: 314-615-8029





# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN HANNIGAN RIBAUDO | Case Number:  21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner:<br>THE STATE OF MISSOURI EX REL. ERIC S.<br>SCHMITT<br><div align="right">vs.</div> | Plaintiff's/Petitioner's Attorney/Address<br>JUSTIN DANIEL SMITH<br>207 WEST HIGH ST.<br>JEFFERSON CITY, MO  65101 |
| Defendant/Respondent:<br>SAM PAGE | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Declaratory Judgment | <div align="right">(Date File Stamp)</div> |

## Summons in Civil Case

| | |
|---|---|
| The State of Missouri to:  ST. LOUIS COUNTY DEPARTMENT OF PUBLIC HEALTH | |
| **Alias:** | |

**6121 NORTH HANLEY ROAD**
**BERKELEY, MO 63134**



***COURT SEAL OF***

***ST. LOUIS COUNTY***

         You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
         **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>27-JUL-2021</u>
Date

_____
Clerk

**Further Information:**
**MT**

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
        Printed Name of Sheriff or Server                               Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

|  | Subscribed and sworn to before me on _____ (date). |
|---|---|
| *(Seal)* | My commission expires: _____ _____ |
| | <div align="center">Date</div> <div align="right">Notary Public</div> |

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $     10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case.  However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.  A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.  Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.  Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) <u>Early Neutral Evaluation ("ENE"):</u>** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) <u>Mini-Trial:</u>** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) <u>Summary Jury Trial:</u>** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
## Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**
If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**
If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**
Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

**For more information call: 314-615-8029**





# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>ELLEN HANNIGAN RIBAUDO | Case Number:  21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner:<br>THE STATE OF MISSOURI EX REL. ERIC S. SCHMITT | Plaintiff's/Petitioner's Attorney/Address<br>JUSTIN DANIEL SMITH<br>207 WEST HIGH ST.<br>JEFFERSON CITY, MO  65101 |
| **vs.** | |
| Defendant/Respondent:<br>SAM PAGE | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Declaratory Judgment | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:  FAISAL KHAN**
**Alias:**

**6121 NORTH HANLEY ROAD**
**BERKELEY, MO 63134**

*COURT SEAL OF*



*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

        <u>27-JUL-2021</u>
        Date                                                      _____
                                                                                     Clerk
        **Further Information:**
        **MT**

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
        Printed Name of Sheriff or Server                                    Signature of Sheriff or Server
        **Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*          Subscribed and sworn to before me on _____ (date).

                 My commission expires: _____          _____
                                                     Date                                     Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $      10.00 |
| Mileage | $_____  (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7-99) SM30  (SMCC) *For Court Use Only:* **Document ID# 21-SMCC-6468**      1      (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
                                                                                                        54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.  A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.  Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.  Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
## Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**
If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**
If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**
Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

### For more information call: 314-615-8029





# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division: ELLEN HANNIGAN RIBAUDO | Case Number: 21SL-CC03334 |
|---|---|
| Plaintiff/Petitioner: THE STATE OF MISSOURI EX REL. ERIC S. SCHMITT **vs.** | Plaintiff's/Petitioner's Attorney/Address JUSTIN DANIEL SMITH 207 WEST HIGH ST. JEFFERSON CITY, MO 65101 |
| Defendant/Respondent: SAM PAGE | Court Address: ST LOUIS COUNTY COURT BUILDING 105 SOUTH CENTRAL AVENUE CLAYTON, MO 63105 |
| Nature of Suit: CC Declaratory Judgment | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** SAM PAGE
**Alias:**

41 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105



*COURT SEAL OF*

*ST. LOUIS COUNTY*

      You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
      **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

    27-JUL-2021
      Date                                         Clerk

    Further Information:
    MT

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____      _____
    Printed Name of Sheriff or Server               Signature of Sheriff or Server
      **Must be sworn before a notary public if not served by an authorized officer:**

      Subscribed and sworn to before me on _____ (date).

*(Seal)*

      My commission expires: _____    _____
                              Date                            Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case.  However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.  Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.   An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Ave., 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

# County Satellite Court Now Open in St. Ann
### Hours: Mon-Fri  8:30 a.m. to 5:00 p.m.   FREE PARKING

For the convenience of North County residents, a satellite branch of the St. Louis County Circuit Court is now open at the St. Louis County Government Center Northwest at the 715 Northwest Plaza Drive in St. Ann.

**Attending Court Hearings Remotely using E-Courts**
If you are scheduled to appear in court, you can access the courtroom remotely using the public computer stations (E-courts) in St. Ann and Clayton. These are available for use when courtroom access is restricted due to the pandemic.

**Please note:** Hearings for juvenile and paternity cases are confidential, and can only be accessed from the Clayton E-court at this time.

**Be sure to bring your paperwork with you; you will need your case number, as well as the date, time and number of the Division where you are scheduled to appear.**

**Filing Pleadings/New Petitions**
If you are representing yourself, you may file your paperwork at the St. Ann satellite court, in addition to the Clayton courthouse, using the secure drop box located inside the Court reception area.

**Filing Orders of Protection**
Starting March 1, you may file for an Order of Protection at the Adult Abuse office in the St. Ann satellite court, in addition to the Clayton courthouse.  Clerks will be available on-site to help you fill out and file the necessary paperwork.

### For more information call: 314-615-8029



Electronically Filed - St Louis County - July 27, 2021 - 10:13 AM

**In the**

# CIRCUIT COURT
**Of St. Louis County, Missouri**



┌                                                         ┐

For File Stamp Only

└                                                         ┘

  The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| Date |
| 21SL-CC03334 |
| Case Number |
| 18 |
| Division |

vs.

  Sam Page, et al.
Defendant/Respondent

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                      , pursuant

                  Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103       314-825-5512
Name of Process Server                              Address                                                      Telephone

Name of Process Server                              Address or in the Alternative                      Telephone

Name of Process Server                              Address or in the Alternative                      Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below named parties.  This appointment as special process server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVE:

  Department of Health for the City of St. Louis
Name
  1520 Market Street, #4051
Address
  St. Louis, MO  63103
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk


By ____ /s/Molly Thal _____
      Deputy Clerk

     07/27/2021
Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304          (573) 751-0774
Phone No.                              Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:13 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

CCADM62-WS      Rev. 07/19

Electronically Filed - St. Louis County - July 27, 2021 - 10:13 AM

**In the**

# CIRCUIT COURT

**Of St. Louis County, Missouri**



For File Stamp Only

The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

Date

**21SL-CC03334**
Case Number

**18**
Division

vs.

Sam Page, et al.
Defendant/Respondent

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now   Plaintiff                                                   , pursuant
                   Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                                   Address                                                    Telephone

Name of Process Server                                   Address or in the Alternative                    Telephone

Name of Process Server                                   Address or in the Alternative                    Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:

Department of Health for the City of St. Louis
Name

1520 Market Street, #4051
Address

St. Louis, MO  63103
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk

By _____
    Deputy Clerk

_____
Date

_____
Signature of Attorney/Plaintiff/Petitioner

63253
Bar No.

P.O. Box 899, Jefferson City, MO 65102
Address

(573) 751-0304            (573) 751-0774
Phone No.                          Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:13 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:12 AM

In the
# CIRCUIT COURT
## Of St. Louis County, Missouri



┌                                    ┐
                    For File Stamp Only



└                                    ┘

  The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| Date | |
| --- | --- |
| 21SL-CC03334 | |

vs.

| Case Number | |
| --- | --- |
| 18 | |

  Sam Page, et al.
Defendant/Respondent

| Division | |
| --- | --- |

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                    , pursuant
                Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
  Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                          Address                                              Telephone

_____
Name of Process Server                          Address or in the Alternative                   Telephone

_____
Name of Process Server                          Address or in the Alternative                   Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
  Dr. Fredrick Echols
Name
  1520 Market Street, Room 4051
Address
  St. Louis, MO  63103
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk


By _____
    Deputy Clerk


_____
Date

_____
Signature of Attorney/Plaintiff/Petitioner
  63253
Bar No.
  P.O. Box 899, Jefferson City, MO 65102
Address
  (573) 751-0304            (573) 751-0774
Phone No.                              Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:12 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:12 AM

In the
# CIRCUIT COURT
Of St. Louis County, Missouri



For File Stamp Only

 The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| Date | |
|---|---|
| **21SL-CC03334** | |
| Case Number | |
| **18** | |
| Division | |

vs.

 Sam Page, et al.
Defendant/Respondent

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                                    , pursuant
<div align="center">Requesting Party</div>

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                          Address                                        Telephone

Name of Process Server                          Address or in the Alternative              Telephone

Name of Process Server                          Address or in the Alternative              Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:                                                    SERVE:
 Dr. Fredrick Echols
Name                                                     Name
 1520 Market Street, Room 4051
Address                                                  Address
 St. Louis, MO  63103
City/State/Zip                                           City/State/Zip

SERVE:                                                    SERVE:

Name                                                     Name

Address                                                  Address

City/State/Zip                                           City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk

By         */s/Molly Thal*
     Deputy Clerk
         07/27/2021

Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304              (573) 751-0774
Phone No.                              Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:12 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

CCADM62-WS      Rev. 07/19

Electronically Filed - St. Louis County - July 27, 2021 - 10:11 AM

**In the**

# CIRCUIT COURT
**Of St. Louis County, Missouri**



For File Stamp Only

The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

Date

**21SL-CC03334**

Case Number

**18**

vs.

Sam Page, et al.
Defendant/Respondent

Division

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                                , pursuant
Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                                    Address                                                    Telephone

_____
Name of Process Server                                    Address or in the Alternative                Telephone

_____
Name of Process Server                                    Address or in the Alternative                Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:

 Faisal Khan
Name
 6121 North Hanley Road
Address
 Berkeley, MO  63134
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk

By      **/s/Molly Thal**
Deputy Clerk

        07/27/2021
Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304            (573) 751-0774
Phone No.                              Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:11 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)     Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)     The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)     Appointments may list more than one server as alternates.

(B)     The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)     Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)     No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)     Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)     This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:11 AM

**In the**

# CIRCUIT COURT

## Of St. Louis County, Missouri



⌐                                ¬

For File Stamp Only

L                                ⌐

The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| | |
|---|---|
| Date | |
| **21SL-CC03334** | |
| Case Number | |
| **18** | |
| Division | |

vs.

Sam Page, et al.
Defendant/Respondent

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now _Plaintiff_____, pursuant
                       Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

_Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103_____314-825-5512_
Name of Process Server                  Address                      Telephone

_____
Name of Process Server                  Address or in the Alternative         Telephone

_____
Name of Process Server                  Address or in the Alternative         Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
_Faisal Khan_____
Name
_6121 North Hanley Road_____
Address
_Berkeley, MO  63134_____
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

SERVE:
_____
Name
_____
Address
_____
City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk


_____
Signature of Attorney/Plaintiff/Petitioner
_63253_____
Bar No.
_P.O. Box 899, Jefferson City, MO 65102_
Address
_(573) 751-0304_____(573) 751-0774_
Phone No.                  Fax No.

By _____
    Deputy Clerk

_____
Date

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:11 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

CCADM62-WS      Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:09 AM

In the
# CIRCUIT COURT
**Of St. Louis County, Missouri**



┌                              ┐     For File Stamp Only

 The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| Date |
| --- |
| **21SL-CC03334** |
| Case Number |
| **18** |
| Division |

vs.

 Sam Page, et al.
Defendant/Respondent

└                              ┘

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                                       , pursuant
                          Requesting Party
to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103     314-825-5512
Name of Process Server                              Address                                                           Telephone

Name of Process Server                              Address or in the Alternative                      Telephone

Name of Process Server                              Address or in the Alternative                      Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
 Sam Page
Name
 41 South Central Avenue
Address
 Clayton, MO  63105
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk


By _____
    Deputy Clerk


_____
Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304           (573) 751-0774
Phone No.                            Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:09 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St. Louis County - July 27, 2021 - 10:09 AM

**In the**

# CIRCUIT COURT
## Of St. Louis County, Missouri



For File Stamp Only

_The State of Missouri ex rel. Eric S. Schmitt_
Plaintiff/Petitioner

| Date |
| --- |
| **21SL-CC03334** |

vs.

| Case Number |
| --- |
| **18** |

_Sam Page, et al._
Defendant/Respondent

| Division |
| --- |

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  _Plaintiff_                                                                 , pursuant
　　　　　　　　　　Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 _Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512_
Name of Process Server　　　　　　　　　　Address　　　　　　　　　　　　　　　　Telephone

_____
Name of Process Server　　　　　　　　　　Address or in the Alternative　　　　　　Telephone

_____
Name of Process Server　　　　　　　　　　Address or in the Alternative　　　　　　Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
 _Sam Page_
Name
 _41 South Central Avenue_
Address
 _Clayton, MO  63105_
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER**, Circuit Clerk


By ____ _/s/Molly Thal_ _____
　　Deputy Clerk

　　07/27/2021
Date

Signature of Attorney/Plaintiff/Petitioner
 _63253_
Bar No.
 _P.O. Box 899, Jefferson City, MO 65102_
Address
 _(573) 751-0304_          _(573) 751-0774_
Phone No.　　　　　　　　Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:09 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:07 AM

In the
# CIRCUIT COURT
Of St. Louis County, Missouri



                                                                    ⌐                    ⌐
                                                                         For File Stamp Only

  The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

| Date |
| --- |
| 21SL-CC03334 |

vs.

| Case Number |
| --- |
| 18 |

  Sam Page, et al.

Division

Defendant/Respondent

                                                                    ⌐_                    ⌐_

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                              , pursuant
                          Requesting Party
to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
  Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103     314-825-5512
Name of Process Server                          Address                                    Telephone

Name of Process Server                          Address or in the Alternative              Telephone

Name of Process Server                          Address or in the Alternative              Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
  St. Louis County Department of Public Health
Name
  6121 North Hanley Road
Address
  Berkeley, MO  63134
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk

Signature of Attorney/Plaintiff/Petitioner
  63253
Bar No.

By _____
      Deputy Clerk

  P.O. Box 899, Jefferson City, MO 65102
Address
  (573) 751-0304            (573) 751-0774
Phone No.                          Fax No.

_____
Date

CCADM62-WS    Rev. 07/19

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:07 AM

**In the**
# CIRCUIT COURT
**Of St. Louis County, Missouri**



For File Stamp Only

The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

Date
**21SL-CC03334**

Case Number
**18**

vs.

Sam Page, et al.
Defendant/Respondent

Division

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now ___Plaintiff_____, pursuant

                     Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

_Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103___314-825-5512_
Name of Process Server                           Address                                     Telephone

Name of Process Server                           Address or in the Alternative                      Telephone

Name of Process Server                           Address or in the Alternative                      Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
  _St. Louis County Department of Public Health_
Name
  _6121 North Hanley Road_
Address
  _Berkeley, MO  63134_
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk

By ___*/s/Molly Thal*_____
    Deputy Clerk

    07/27/2021
Date

Signature of Attorney/Plaintiff/Petitioner
 63253_
Bar No.
 P.O. Box 899, Jefferson City, MO 65102_
Address
 (573) 751-0304        (573) 751-0774_
Phone No.                       Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:07 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:05 AM

**In the**

# CIRCUIT COURT
## Of St. Louis County, Missouri



⌐                               ¬

For File Stamp Only

∟                               ⌐

The State of Missouri ex rel. Eric S. Schmitt
Plaintiff/Petitioner

Date
**21SL-CC03334**

Case Number
**18**

vs.

Sam Page, et al.
Defendant/Respondent

Division

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                              , pursuant
<div align="center">Requesting Party</div>

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                              Address                                           Telephone

Name of Process Server                              Address or in the Alternative                     Telephone

Name of Process Server                              Address or in the Alternative                     Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below named
parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:
 Tishaura Jones
Name
 1200 Market Street, City Hall Room 200
Address
 St. Louis, MO  63103
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER,** Circuit Clerk

By _____
    Deputy Clerk

_____
Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304           (573) 751-0774
Phone No.                           Fax No.

CCADM62-WS    Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:05 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 27, 2021 - 10:05 AM

In the
# CIRCUIT COURT
Of St. Louis County, Missouri

Plaintiff/Petitioner
The State of Missouri ex rel. Eric S. Schmitt

vs.

Defendant/Respondent
Sam Page, et al.

| | |
|---|---|
| Date | |
| Case Number | 21SL-CC03334 |
| Division | 18 |

For File Stamp Only

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  Plaintiff                                                              , pursuant
                        Requesting Party
to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Missouri Process Serving, 1430 Washington Avenue, Suite 220, St. Louis, MO 63103      314-825-5512
Name of Process Server                                    Address                                          Telephone

Name of Process Server                                    Address or in the Alternative                    Telephone

Name of Process Server                                    Address or in the Alternative                    Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below named parties.  This appointment as special process server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVE:
 Tishaura Jones
Name
 1200 Market Street, City Hall Room 200
Address
 St. Louis, MO  63103
City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

SERVE:

Name

Address

City/State/Zip

Appointed as requested:
**JOAN M. GILMER**, Circuit Clerk


By    */s/Molly Thal*
        Deputy Clerk

        07/27/2021
Date

Signature of Attorney/Plaintiff/Petitioner
 63253
Bar No.
 P.O. Box 899, Jefferson City, MO 65102
Address
 (573) 751-0304          (573) 751-0774
Phone No.                          Fax No.

CCADM62-WS     Rev. 07/19

Electronically Filed - St Louis County - July 27, 2021 - 10:05 AM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

**THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI**

| | |
|---|---|
| THE STATE OF MISSOURI ex rel. ERIC S. SCHMITT, | |
| *Plaintiff*, | |
| v. | No. 21SL-CC03334 |
| SAM PAGE, et al. | |
| *Defendants*. | |

**STATE OF MISSOURI'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST THE ENFORCEMENT <u>OF ST. LOUIS COUNTY'S MASK MANDATE</u>**

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

## INTRODUCTION

On July 26, 2021, Defendants Sam Page, Dr. Faisal Khan, and the St. Louis County Department of Public Health (along with County Counselor Beth Orwick, the "St. Louis County Defendants") imposed a county-wide mask mandate on the residents of St. Louis County.  Ex. A, § III.1 ("Mask Mandate").  This sweeping mandate included virtually all residents, both vaccinated and unvaccinated, and all children over four years old; and it applied to schools, places of worship, businesses, public transportation, and virtually all other public spaces.  *Id.*  The next day, July 27, 2021, the St. Louis County Council voted to terminate the Mask Mandate by a vote of five to two.  But the following morning, Page and Dr. Khan publicly stated that they would ignore the County Council's vote and continue to enforce their now-defunct Mask Mandate.

Page and Khan's refusal to withdraw their Mask Mandate is an act of stunning defiance of state law.  The Missouri General Assembly just passed a statute, effective June 15, 2021, for the very purpose of preventing such unilateral restrictions imposed by county health officers and county executives.  Section 67.265.2, RSMo, explicitly authorizes the St. Louis County Council to "terminate" any public health order issued by the county executive or county health officer, at any time, "upon a simple majority vote of the body." § 67.265.2, RSMo.  And that is exactly what the County Council did yesterday.  Under the statute's plain terms, the Mask Mandate is now defunct.  Defendants are bound by the plain and unambiguous terms of this state law, yet they wrongly insist otherwise.  This Court should promptly enjoin them to comply with state law.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

**FACTUAL BACKGROUND**

**I.      St. Louis County's COVID-19 Restrictions and the Passage of HB 271.**

After a year of lockdowns, mask mandates, and other restrictions on personal, religious, and economic liberty imposed on the residents of St. Louis County, on May 14, 2021, Defendant Dr. Faisal Khan lifted all COVID-19 orders and related restrictions.  *See* Rescission of St. Louis County Department of Public Health 2019 Novel Coronavirus ("COVID-19") Reopen STL Order (May 14, 2021), https://bit.ly/3x4Lz1j.

Meanwhile, the controversial nature of such sweeping restrictions—and the unilateral manner in which they were sometimes imposed, including in St. Louis County— led the Missouri General Assembly to enact House Bill 271 (2021) by overwhelming margins of 147-2 in the Missouri House and 29-3 in the Missouri Senate.  *See* Journal of the House, May 12, 2021, 2721-2722; Journal of the Senate, May 12, 2021, 1719-1720.[1] That law, codified at § 67.265, RSMo, "requires local leaders to be more transparent in their reasoning and accountable for their decisions when it comes to public health orders." Press Release, Missouri Governor Michael L. Parson, Governor Parson Signs HB 271 Regarding Local Public Health Orders and Vaccine Passports (June 15, 2021), https://bit.ly/3iaeMUd.  HB 271 contained an emergency clause that made new § 67.265, RSMo, effective upon its passage and approval.  HB 271 § B, 101st Gen. Assemb., Reg. Sess. (Mo. 2021).  Thus, § 67.265 became effective on June 15, 2021.

---

[1] The Court may take judicial notice of the official House and Senate Journals.  *Bullington v. State*, 459 S.W.2d 334, 338 (Mo. 1970); *Brown v. Morris*, 290 S.W.2d 160, 163 (Mo. banc 1956).

Electronically Filed - St. Louis County - July 28, 2021 - 05:00 PM

HB 271 strikes a balance between the need for public health orders to prevent the spread of communicable diseases, like COVID-19, and the need for transparency and accountability in restricting Missourians' fundamental freedoms.  And it strikes that balance by subjecting any order—meaning "a public health order, ordinance, rule, or regulation issued by a political subdivision, including by a health officer, local public health agency, public health authority, or the political subdivision's executive," § 67.265.1, RSMo—to termination upon "a simple majority vote" of "[t]he governing bod[y] of the political subdivision issuing" those orders, § 67.265.2, RSMo.

Section 67.265.1(1), RSMo, imposes further limits on any public health orders issued during an "emergency declared pursuant to chapter 44" that "directly or indirectly closes, partially closes, or places restrictions on the opening of or access to any one or more business organizations, churches, schools, or other places of public or private gathering or assembly" or "that prohibits or otherwise limits attendance at any public or private gatherings."  Such orders expire no later than thirty days after issuance, unless "the political subdivision's governing body" extends the order or approves a similar one.  § 67.265.1(1), RSMo.  There is an emergency declaration in place concerning COVID-19, *see* Executive Order No. 21-07 (Mar. 26, 2021).

## II.    The County Defendants Impose a New Mask Mandate.

On July 26, 2021, Dr. Khan issued the St. Louis County Department of Public Health 2019 Novel Coronavirus ("COVID-19") Face Covering Order (the "Mask Mandate") (attached as Exhibit A to the Affidavit of Jeff P. Johnson, filed with this Motion, and also available at https://stlcorona.com/dr-pages-messages/public-health-orders/all-

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

public-health-orders-archives/face-covering-order/) (hereinafter "Ex. A").    The Mask Mandate was a response to a perceived threat to public health from COVID-19, specifically the delta variant of the virus.  *See* Ex. A, § II ("The intent of this order is to reduce the transmission of COVID-19.").  The Mask Mandate claimed that it would not "directly, or indirectly, close, partially close, or place restrictions on the opening of or access to any business organization, church, school, or any other place of public or private gathering or assembly," and that it would "not, directly or indirectly, require any business organization, church, school, or owner, operator, or host of a place of public or private gathering or assembly to restrict, limit, or otherwise refuse access to any individual."  Ex. A, § I.A.

As for the Mask Mandate's terms, it provided that, with some limited exceptions not relevant here, all individuals over the age of five must wear a "Face Covering"—*i.e.*, a mask covering a person's nose and mouth—if they are "in indoor and enclosed public buildings and spaces and public transportation vessels in St. Louis County."  Ex. A, § III.1. That included "all indoor and enclosed spaces other than private dwellings or private transportation vessels."  *Id.*  The Mask Mandate then provided that the St. Louis County Counselor could "seek emergency injunctive relief or other civil relief to enforce" the mandate.  Ex. A, § IV.

Missouri then filed a Petition seeking a declaration that the Mask Mandate is invalid, an injunction barring its enforcement, and a declaration that the Mask Mandate is subject to § 67.265, RSMo, and not in effect under § 67.625.4, RSMo.  *See* Pet. at 35–37.

**III.    The County Council Terminates the Mask Mandate.**

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

The day after the Mask Mandate went into effect, the St. Louis County Council—the governing body of St. Louis County, *see*, *e.g.*, St. Louis, Mo., Charter Commission of 2019 § 2.180(14)—held a meeting where it considered, *inter alia*, whether to terminate the Mask Mandate.  *See generally St. Louis County Council Regular Meeting*, Youtube (July 26, 2021), https://www.youtube.com/watch?v=naLwKEx_OCY.[2]

Dr. Khan spoke about the Mask Mandate at the meeting.  He confirmed that the order applied to "[a]ll businesses and residences in St. Louis County."  *Id.* at 44:28–32.  But when asked about enforcement, Khan tried to duck the question—saying, for example, the County did not intend to police businesses, refusing to engage on what he viewed as legal issues, or directing councilmembers to the County Counselor.  Eventually, however, he was pressed to give an answer.  In doing so, he conceded that businesses would have to enforce the Mask Mandate by excluding patrons and customers who are not masked.  For example, he was asked if, in his opinion, "a Schnucks or a restaurant has an obligation to police or enforce the order—is that a fair characterization?"  *Id.* 44:55–45:07 (Councilman Trakas).    Khan's response:    "Yes, sir."    *Id.* at 45:07; *see also id.* at 39:25–39:40 (Councilman Harder: "If someone walks into a Schnucks, and is unmasked, who's responsibility is it to be masked?  Is it the business owner or the person themselves?" Khan:

---

[2] The Court may take judicial notice of the recording of the St. Louis County Council's meeting on July 27, 2021.  *See, e.g., Wrenn v. City of Kansas City*, 908 S.W.2d 747, 750 n.5 (Mo. App. W.D. 1995) (taking judicial notice of "the audiotaped recording of the … hearing before the Board," because "the facts to be noticed appear with such certainty that controversy is unlikely, and because the proceeding is clearly interconnected with this one").  For the Court's convenience, the State is preparing a certified transcript of the relevant portions of the meeting, which will be filed with the Court as soon as possible.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

"I would suggest both, sir."); *id.* at 44:40–44:55 (Councilman Trakas: "In your opinion, it was up to both your individual and . . . a restaurant or a Schnucks to police whether or not the mask mandate was adhered to, did I hear that correctly?" Khan: "Yes, sir.").  Khan then doubled-down on his understanding that business proprietors would be required to enforce the Mask Mandate upon their customers or patrons:

> Councilman Trakas: "I'm interested in whether or not you expect a Schnucks or restaurant to enforce [the] order?"
>
> Khan: "Yes."
>
> Councilman Trakas: "In doing so, are you not imposing upon a Schnucks or a restaurant an obligation to enforce your order?"
>
> Khan: "Yes."

*Id.* at 46:00–46:21.

Councilman Fitch publicly said that, in closed session, the County Counselor informed him that enforcement would work as follows:  People would report to DPH if a person was violating the Mask Mandate; DPH would go to the County Counselor's office and ask the Counselor to enforce the Mask Mandate; and the County Counselor would then get an injunction against the individual who violated the order mandating compliance and subjecting the individual to contempt proceedings for future violations.  *Id.* at 49:15–50:40.

The County Council voted to terminate the Mask Mandate by a vote of five to two. *See id.* at 3:26:20–28:45.

## IV.    The St. Louis County Defendants Defy State Law and the Council's Vote.

Notwithstanding the Council's vote to terminate the Mask Mandate, the next day, Page and Khan defiantly insisted that the Mask Mandate is still in effect.  *See*, *e.g.*, Annika

Electronically Filed - St. Louis County - July 28, 2021 - 05:00 PM

Merrilees, *Page Says St. Louis County Mask Mandate Stands, Despite Council's Vote to Overturn*, St. Louis Post-Dispatch (July 28, 2021), https://bit.ly/3ydmKRY ("Page on Wednesday said that the court will determine the status of the mask mandate, and 'until then, the law stands'"); Chris Regnier, *St. Louis County Mask Mandate in Limbo After Vote*, Fox2 Now (July 28, 2021), https://bit.ly/3fpF1V5 ("While the County Council voted to end the mandate . . . , County Executive Dr. Sam Page says it is still in effect."); *see also* Press Release, St. Louis Count Department of Public Health, *St. Louis County COVID-19 Update* (July 28, 2021), https://bit.ly/2VilQoC ("The Department of Public Health has no comment on what comes next regarding the legal status of the public health order on masking.  However, we are very clear on the science and the recommendations and firmly stand by the urgency and necessity of increasing mask compliance in St. Louis County.").[3]

On July 28, 2021, Missouri amended its petition to seek a declaration that that St. Louis County's Mask Mandate was terminated per the terms of § 67.265.2, RSMo, and moved for this Temporary Restraining Order and Preliminary Injunction.

## ARGUMENT

Missouri Supreme Court Rule 92.02 governs the issuance of temporary restraining orders and preliminary injunctions.  Granting a temporary restraining order requires a showing of "irreparable injury, loss, or damage will result in the absence of relief."  Mo.

---

[3] The out-of-court statements of Page and Khan are admissible against them as statements of a party opponent.  *State v. Jones*, 779 S.W.2d 668, 669 (Mo. App. E.D. 1989).  They also fall within the hearsay exception for statements of intention, not statements of fact. *See*, *e.g.*, *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 635 (Mo. App. W.D. 2006).

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

Sup. Ct. R. 92.02(a)(1).   Moreover, "[w]hen considering a motion for a preliminary injunction," Missouri courts "should weigh '[1] the movant's probability of success on the merits, [2] the threat of irreparable harm to the movant absent the injunction, [3] the balance between this harm and the injury that the injunction's issuance would inflict on other interested parties, and [4] the public interest.'" *State ex rel. Dir. of Revenue v. Gabbert*, 925 S.W.2d 838, 839 (Mo. banc 1996) (quoting *Pottgen v. Missouri State High Sch. Activities Assoc.*, 40 F.3d 926, 928 (8th Cir. 1994)).

**I.   The State Is Likely To Prevail on Its Claim That St. Louis County's Mask Mandate Has Been Terminated Under § 67.265.2, RSMo, by the Vote of the County Council.**

"The likelihood of success on the merits is '[t]he most important of the [preliminary-injunction] factors.'" *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam) (quoting *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998).   Here, the State is likely to succeed on its claim that the continued enforcement of the Mask Mandate violates state law, including Section 67.265.2, RSMo, because St. Louis County's governing body has terminated that Mask Mandate by a majority vote.

**A.   Section 67.265.2 authorizes the County Council to terminate public health orders like the Mask Mandate at any time by majority vote.**

In the most recent legislative session, the General Assembly adopted H.B. 271, effective June 15, 2021, which enacted Section 67.265 of the Missouri Revised Statutes. That Section specifically authorizes the governing body of any political subdivision in Missouri—here, the St. Louis County Council—to terminate any public health order issued by the county's health officer or its county executive by a simple majority vote.

9

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

Section 67.265.2, RSMo, states: "***The governing bodies of the political subdivisions issuing orders under this section shall at all times have the authority to terminate an order issued or extended under this section upon a simple majority vote of the body***." § 67.265.2, RSMo.  The statute places no further qualification on the authority of a political subdivision's governing body—it may terminate any public health "order" by "a simple majority vote of the body." *Id.*

The statute defines "order" broadly and clearly.  Section 67.265.1 provides: "For purposes of this section, the term **'order'** shall mean [1] ***a public health order***, ordinance, rule, or regulation [2] ***issued by a political subdivision, including by a health officer***, local public health agency, public health authority, or the political subdivision's executive, as such term is defined in section 67.750, [3] ***in response to an actual or perceived threat to public health for the purpose of preventing the spread of a contagious disease***." § 67.265.1, RSMo (first emphasis in original).  Thus, a "public health order" that is "issued by … a health officer," is subject to review and termination by the governing body of the subdivision, so long as the order was issued "in response to an actual or perceived threat to public health for the purpose of preventing the spread of contagious decision." *Id.*

St. Louis County's Mask Mandate plainly satisfies this definition of "order."  *Id. First*, it is a "public health order," *id.*, because it relates to public health and it repeatedly identifies itself as an "Order."  Ex. A, at 1.  *Second*, it was "issued by … a health officer" of a political subdivision, because it is signed by Dr. Faisal Khan, in his official capacity as the Director of the St. Louis County Department of Health.  Ex. A, at 8; *see also* Ex. A, at 1 (stating that "[t]he Director of DPH is the 'local health authority'" for St. Louis County

Electronically Filed - St. Louis County - July 28, 2021 - 05:00 PM

"under 19 CSR 20-20.050(1)," and describing Dr. Khan as both "a state **health officer**" and a "county **health officer**") (emphases added).  *Third*, St. Louis County's Mask Mandate was plainly issued "in response to an actual or perceived threat to public health for the purpose of preventing the spread of contagious disease." § 67.265.1, RSMo. The Order itself states that COVID-19 is a "contagious … disease," Ex. A, at 1; it describes the threat to public health of COVID-19, focusing on the delta variant, in detail, *id.* at 2-3; and it explicitly states that the Mask Mandate is intended to prevent the spread of contagious disease. *Id.* at 6 ("The intent of this Order is to reduce the transmission of COVID-19, including variants thereof…"); *see also id.* at 3-5. Thus, St. Louis County's Mask Mandate plainly satisfies the definition of "order" in Section 67.265.1.

Thus, the Mask Mandate is an "*order* issued … under this section," § 67.265.2, RSMo, and it may be "terminate[d]" at any time by "a simple majority vote of the governing body" of St. Louis County. *Id.* (providing that the governing body's authority to "terminate" a public health order applies "at all times"). It is well established that the St. Louis County Council is the "governing body" of St. Louis County. *See* St. Louis County Charter 2020,[4] § 2.010 ("All legislative power of the county shall be vested in the council"); *id.* § 2.180(14) (providing that "the council shall have … the power to … [e]xercise all powers and duties now or hereafter conferred upon … county governing bodies"); *see also, e.g., State ex rel. St. Louis County v. Jones*, 498 S.W.2d 294, 296 (Mo.

---

[4] The Court may take judicial notice of the contents of the St. Louis County Charter. *See* MO. CONST. art. VI § 18(j); *see also, e.g., Tonkin v. Jackson Cnty. Sys. Comm'n*, 599 S.W.2d 25, 31 (Mo. App. W.D. 1980) ("The trial court and this court may take judicial notice of the Jackson County Charter.") (citing MO. CONST. art. VI § 18(j)).

App. 1973) (noting that "the St. Louis County Council" is "the governing body of the County"); *Corbett v. Sullivan*, 353 F.3d 628, 629 (8th Cir. 2003) ("The St. Louis County Council is the governing body of St. Louis County."); § 67.030, RSMo (providing that "the governing body of each political subdivision" is the entity that has authority to alter, revise, increase, or decrease the subdivision's budget, which is the St. Louis County Council). Thus, "at all times," the St. Louis County Council had and has authority to "terminate" the Mask Mandate by "simply majority vote of the body." § 67.265.2, RSMo.

And that is exactly what the St. Louis County Council did. On July 27, 2021, the day after the Mask Mandate issued, the County Council voted to terminate the Mandate in its entirety by a vote of 5-2. *See supra* Statement of Facts, Part III; *St. Louis County Council Regular Meeting*, YOUTUBE (July 26, 2021), https://www.youtube.com/watch?v=naLwKEx_OCY at 3:26:20–28:45. Accordingly, the St. Louis County Mask Mandate has been "terminate[d]" under Section 67.265.2, and it is no longer in effect.

Nevertheless, on July 28, 2021, Defendants Page and Khan continued to state publicly that the Mask Mandate remains in effect and would be enforced. *See supra*, Statement of Facts, Part IV. Those public statements inevitably create the widespread perception that residents of St. Louis County *must* comply with the Mask Mandate. Indeed, the Order itself provides for broad enforcement authority vested in the St. Louis County Counselor. Ex. A, at 7 ("The St. Louis County Counselor can seek emergency injunctive relief or other civil relief to enforce any provision of this Order."). Defendants' stated

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

intent to continue imposing the defunct Mask Mandate on citizens, places of worship, businesses, and other organizations in St. Louis County is contrary to the law of Missouri.

**B.      The Mask Mandate identifies no authority that would allow it to survive the 5-2 termination vote by the St. Louis County Council.**

The Order recites that it supposedly "does not, directly, or indirectly, close, partially close, or place restrictions on the opening of or access to any business organization, church, school, or any other place of public or private gathering or assembly…" Ex. A, at 1.  This statement evidently attempts to remove the Order from the coverage of § 67.265.1(1), which provides that a public health order issued during an emergency shall expire within 30 days, unless ratified by majority vote of the governing body, if that order "directly or indirectly closes, partially closes, or places restrictions on the opening of or access to any one or more business organizations, churches, schools, or other places of public or private gathering or assembly…." § 67.265.1(1), RSMo.

For purposes of this motion, this statement is beside the point.  Unlike Section 67.265.1(1), the County Council's authority under Section 67.265.2 is not limited to orders that directly or indirectly close or place restrictions on access to churches, schools, businesses, and other organizations.  § 67.256.2, RSMo.  Instead, Section 67.265.2 explicitly authorizes the governing body of St. Louis County to "terminate" *any* "order issued … under this section," *id.*—not just those that close or restrict access to churches and businesses under *subparagraph 1(1)* of the section.  *Id.*  The definition of "order" in "this section"—*i.e.*, the definition of "order" at the beginning of § 67.265.1—is broader than the subset of such "orders" discussed in Section 67.265.1(1).  *See, e.g., Gross v.*

13

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

*Parson*, No. SC 98619, -- S.W.3d --, 2021 WL 2668318, at *4 (Mo. banc June 29, 2021) ("[T]o determine a statute's plain and ordinary meaning, the Court looks to a word's usage in the context of the entire statute, and statutes *in pari materia*.") (citations omitted); *R.M.A. ex rel. Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 429 (Mo. banc 2019). Thus, the County Council's authority to terminate public health orders under Section 67.265.2 is not limited to the limited subset of orders described in Section 67.265.1(1), but applies to all orders that meet the broader definition of "order" in Section 67.265.1.

In any event, the Mask Mandate's recitals that it supposedly does not "directly, or indirectly, close, partially close, or place restrictions on the … access to any business organization, church, school, or any other place of public or private gathering or assembly," and that it supposedly "does not, directly or indirectly, require any business organization, church, school, or … place of public or private gathering or assembly to restrict, limit, or otherwise refuse access to any individual," Ex. A, at 1, are plainly incorrect.  The Mask Mandate states that "Face Coverings are required to be properly worn by all individuals ages 5 and older while in indoor and enclosed public buildings and public transportation vessels in St. Louis County."  *Id.* at 6, § III.1.  This Mask Mandate plainly "places restrictions on … access to … places of public or private gathering," § 67.265.1(1), because the Mandate prohibits persons over age 5 who are not wearing masks to go into them.  Ex. A, at 6, § III.1.  The plain meanings of "restrict" and "access" are found in the dictionary. *See, e.g., Cox v. Dir. of Revenue*, 98 S.W.3d 548, 550 (Mo. 2003) ("This Court ascertains the legislature's intent by considering the plain and ordinary meaning of the words in the statute.  Absent a definition in the statute, the plain and ordinary meaning is derived from

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

the dictionary.").  To "restrict" means "to set bounds or limits to," as "to check free activity, motion, progress, or departure of," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1937 (2002); and "access" means "permission, liberty, or ability to enter, approach, communicate with, or pass to and from," *id.* at 11.  By prohibiting persons without masks from entering public spaces, the Mask Mandate plainly "set[s] bounds or limits to" and "check[s] free activity" of St. Louis County residents in their "liberty" and "ability to enter" public and private gathering spaces.  *Id.* at 11, 1937.  The Mask Mandate's recital that it supposedly does not restrict access to public places, therefore, contradicts Missouri law.

For the foregoing reasons, Defendants' actions are plainly unlawful, and the State is likely to prevail on its allegation that the Mask Mandate violates Section 67.265, RSMo.

## II.     The Other *Gabbert* Factors Favor Entering Injunctive Relief.

The other three *Gabbert* factors include "[2] the threat of irreparable harm to the movant absent the injunction, [3] the balance between this harm and the injury that the injunction's issuance would inflict on other interested parties, and [4] the public interest.'" *Gabbert*, 925 S.W.2d at 839.  These factors also favor the State.

### A.     Defendants' defiance of State law and their unlawful infringement on St. Louis County residents' liberty inflicts irreparable injury on the State.

The defiance to a duly enacted state statute by the county executive and the director of the Department of Health inflict *per se* irreparable injury on the State.  "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  When the State is blocked from implementing its statutes, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law."  *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).  By nullifying the plain meaning of Section 67.265.2 in St. Louis County, Defendants inflict ongoing irreparable harm on the State and its sovereign interest in seeing its laws obeyed and enforced.

In addition, the Attorney General, acting on behalf of the State, has *parens patriae* standing to represent the interests of the residents, churches, businesses, and other organizations in St. Louis County who are being subjected to the defunct and unlawful Mask Mandate.  *See, e.g.,* § 27.060, RSMo; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (holding that a State has a *parens patriae* interest in preventing an injury to a "substantial segment of its population," especially where "the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers").  The unlawful Mask Mandate restricts the personal liberty and freedom of action of St. Louis County's 1.1 million residents, and this deprivation of the fundamental freedom of action itself constitutes an irreparable injury that the State may vindicate.  "The United States Supreme Court has held being subject to an unconstitutional statute, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Rebman v. Parson*, 576 S.W.3d 605, 612 (Mo. banc 2019) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  The same is true of being subject to an unlawful mandate.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

**B.      An injunction preventing enforcement of the unlawful Mask Mandate will impose no cognizable injury on Defendants.**

By contrast, an injunction preventing the enforcement of the Mask Mandate, which has been lawfully terminated by majority vote of the St. Louis County Council, will impose no cognizable injury on Defendants. *See Gabbert*, 925 S.W.2d at 839 (directing the court to balance the irreparable harm to plaintiffs against "the injury that the injunction's issuance would inflict on other interested parties"). Defendants have no valid interest in enforcing a mandate on their citizens that has been terminated under state law. *See, e.g., Make Liberty Win v. Ziegler*, 478 F.Supp.3d 805, 812 n.6 (W.D. Mo. 2020) (holding that "a governmental entity 'has no legitimate interest in enforcing an unconstitutional ordinance'") (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)).

**C.      The public interest favors an injunction against Defendants' plainly unlawful actions.**

Finally, the public interest decisively favors an injunction here. The public interest is most directly reflected in the decisions of two democratically elected, legislative bodies: the Missouri General Assembly and the St. Louis County Council. As a duly enacted state statute, Section 67.265 "is in itself a declaration of public interest and policy." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). This point applies with particular force, given that HB 271 was based by near-unanimous majorities in both the Missouri House and the Missouri Senate. Likewise, the St. Louis County Council's supermajority vote to terminate the Mask Mandate is a declaration of the will of the people and the public policy of St. Louis County. *See id.* The actions of these two democratic bodies reflect the

Electronically Filed - St. Louis County - July 28, 2021 - 05:00 PM

public interest, not the unilateral actions of executive officials whose proper role is to enforce the law, not to make it.  Further, "[t]he loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373.  For these reasons, the public interest favors invalidating the Defendants unlawful action and enjoining them from enforcing the invalid, defunct, and unconstitutional Mask Mandate.

<div align="center">**CONCLUSION**</div>

For the reasons stated, the Court should enter a temporary restraining order and preliminary injunction preventing the St. Louis County Defendants—County Executive Sam Page, DPH Director Dr. Faisal Khan, County Counselor Beth Orwick, and St. Louis County Department of Public Health—from taking any action to enforce the St. Louis County Department of Public Health's 2019 Novel Coronavirus ("COVID-19") Face Covering Order dated July 26, 2021.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

Dated: July 28, 2021

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Justin D. Smith*
Justin D. Smith, #63253MO
Deputy Attorney General for Special Litigation
D. John Sauer, #58721MO
Jeff P. Johnson, #73249MO
Michael E. Talent, #73339MO
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov
*Counsel for Plaintiff*

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2021, a true and correct copy of the foregoing was filed with the Court's electronic filing system to be served by electronic methods on counsel for all parties entered in the case, and that a true and correct copy was also served by electronic mail and first-class mail upon counsel for the County Defendants.

*/s/ Justin D. Smith*

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

**THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI**

THE STATE OF MISSOURI ex rel.
ERIC S. SCHMITT,

       *Plaintiff,*

v.                                                                No. 21SL-CC03334

SAM PAGE, et al.

       *Defendants*.

**AFFIDAVIT OF JEFF P. JOHNSON**

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

## AFFIDAVIT OF JEFF P. JOHNSON

I, Jeff P. Johnson, being first duly sworn upon oath, deposes and states as follows:

1. I am over 18 years of age and am an attorney at the Office of the Attorney General for the State of Missouri.  I represent plaintiff in this case.

2. Attached as **Exhibit A** is a true and correct copy of the St. Louis County Department of Health 2019 Novel Coronavirus ("COVID-19") Face Cover Order, issued July 26, 2021.

3. I have read the State of Missouri's Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") and know the contents thereof, including the description of the meeting of the St. Louis County Council meeting, as shown on the video link, including the fact that they voted to terminate the St. Louis County Department of Health 2019 Novel Coronavirus ("COVID-19") Face Cover Order, issued July 26, 2021.

4. The statements and matters alleged in Missouri's Motion are true of my own personal knowledge, except as to those facts subject to judicial notice and, as to such matters, I believe them to be true.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

DATED this 28th day of July, 2021.

Jeff P. Johnson

Subscribed and sworn to before me this _28_ day of _July_, 2021

My Commissions expires:

James J. Simeri

JAMES J. SIMERI
Notary Public, Notary Seal
State of Missouri
St. Louis County
Commission # 11213012
My Commission Expires 02-15-2024

2

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

# Exhibit A

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

**Effective Date: Monday, July 26, 2021**

<div align="center">

**St. Louis County Department of Public Health**
**2019 Novel Coronavirus ("COVID-19")**
**Face Covering Order**

</div>

### I.     Background

The St. Louis County Department of Public Health ("DPH") has closely monitored the global pandemic caused by a viral respiratory illness called COVID-19.  Infections with COVID-19 have been reported around the world.  The first confirmed instance of person-to-person spread of COVID-19 in the United States was reported on January 30, 2020.  The first confirmed instance of COVID-19 in St. Louis County was reported on March 7, 2020.  A state of emergency was declared in St. Louis County on March 13, 2020, and has continued since then, during which time several executive orders and DPH orders, policies, and other rules have been issued, amended, and rescinded.

#### A. Authority

COVID-19 is considered an infectious, contagious, communicable, and dangerous disease for purposes of Sections 192.020-1 and 192.139, RSMo., 19 CSR 20-20.020, and other state and local laws.  The Director of DPH is the "local health authority" under 19 CSR 20-20.050(1) pursuant to 19 CSR 20-20.010(26), Section 4.130 of the Charter, and Section 600.010 SLCRO.  The Director of DPH has the powers conferred by state law of a state health officer as well as other powers granted by county ordinances and executive orders.  *See* SLCRO § 602.010, SLCRO § 602.020, and SLCRO § 600.030; Executive Orders 10-18.

Missouri law empowers and obligates county health officers to create and enforce orders to prevent the spread of infectious diseases. *See* §§ 192.260, 192.280 RSMo.; 19 CSR 20-20.010(26), 20-20.020, 20-20.040(2)(E), 20-20.040(2)(G), 20-20.040(2)(I). In creating such orders, DPH may make ordinances, rules, and regulations not inconsistent with the rules and regulations prescribed by the department of health and senior services which may be necessary to protect the public health.  *See* § 192.290, RSMo.

This Order does not, directly, or indirectly, close, partially close, or place restrictions on the opening of or access to any business organization, church, school, or any other place of public or private gathering or assembly and does not prohibit or otherwise limit attendance at any public or private gatherings.  This Order also does not, directly or indirectly, require any business organization, church, school, or owner, operator, or host of a place of public or private gathering or assembly to restrict, limit, or otherwise refuse access to any individual.  Rather, this Order merely regulates the conduct of certain individuals while in St. Louis County in the event that, and only after, they access an indoor or enclosed public building or space or public transportation vessel, as set forth herein.

<div align="center">1</div>

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

### B.  The Spread of COVID-19 and the Delta Variant in St. Louis County

There are about 549,451 residents of St. Louis County who have not yet completed vaccination against COVID-19, which is about 55.3% of the overall population of St. Louis County. (Missouri Department of Health and Senior Services, *available at* https://covidvaccine.mo.gov/data/, accessed July 22, 2021.) The unvaccinated population of St. Louis County includes eligible individuals who have not yet been vaccinated, as well as children under 12 years old who are not currently eligible to be vaccinated.

Transmission of COVID-19 in St. Louis County is increasing at a significant rate. The average number of new cases of COVID-19 diagnosed daily in St. Louis County has risen from 40 in the beginning of June 2021 to 212 in mid-July 2021.  The average COVID-19 positivity rate over the past week has similarly spiked to 9.4% from a low of 2.9% on June 1, 2021.  In total, there have been 105,603 cases of COVID-19 diagnosed in St. Louis County to date, with 2,291 cumulative deaths. (*See* Covid-19 Data – St. Louis County, Missouri, *available at* https://stlcorona.com/resources/covid-19-statistics/.)

Transmission of COVID-19 includes vaccine breakthrough cases, which the Centers for Disease Control and Prevention ("CDC") reports are "substantially undercount[ed]."  (Meseret Birhane, et al., *COVID-19 Vaccine Breakthrough Infections Reported to CDC- United States, January 1- April 30, 2021*, CDC Morbidity and Mortality Weekly Report 2021 May 28; 70(21): 792-793, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8158893/; *see also* Kanika Tyagi, *Breakthrough COVID19 Infections After Vaccinations in Healthcare and Other Workers in a Chronic Care Medical Facility in New Delhi, India*, Diabetes & Metabolic Syndrome Clinical Research and Reviews, May-June 2021, *available at* https://www.sciencedirect.com/science/article/abs/pii/S1871402121001399.)

Variants of COVID-19 that may spread more easily or cause more severe illness remain present and have increased in St. Louis County and throughout the state of Missouri. As of July 23, 2021, the CDC estimates that over 96% of COVID-19 infections in the region are the Delta variant. (Centers for Disease Control & Prevention. *COVID Data Tracker*, *available at* https://covid.cdc.gov/covid-data-tracker/#variant-proportions, accessed July 23, 2021.)  The Delta variant is far more transmissible as the original strain of COVID-19. (Strategic Advisory Group of Experts on Immunization, *Eighty-ninth SAGE meeting on COVID-19,* 13 May 2021, *available at* https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file /988403/S1236_Eighty-nineth_SAGE.pdf; Samuel Alizon, et al., *Rapid Spread of the SARS-CoV-2 Delta Variant in Some French Regions, June 2021*, EuroSurveillance, July 2021, *available at* https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.28.2100573?crawler=true; Jianpeng Xiao, et al., *Transmission Dynamics of an Outbreak of the COVID-19 Delta Variant B.1.617.2 – Guangdong Province, China, May-June 2021*, China CDC Weekly, July 2021, *available at* https://www.researchgate.net/profile/Jianpeng-Xiao/publication/352931648_Transmission_Dynamics_of_an_Outbreak_of_the_COVID-19_Delta_Variant_B16172_-_Guangdong_Province_China_May_-

2

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

_June_2021/links/60dfcde4a6fdccb745ffff20/Transmission-Dynamics-of-an-Outbreak-of-the-COVID-19-Delta-Variant-B16172-Guangdong-Province-China-May-June-2021.pdf.)

Surges are increasingly impacting younger adults and children. (*See, e.g.*, American Academy of Pediatrics, *Children and COVID-19: State-Level Data Report*, *available at* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ ("As of July 15, almost 4.09 million children have tested positive for COVID-19 since the onset of the pandemic. After decreases in weekly reported cases over the past couple of months, in July we began seeing increases in cases added to the cumulative total – over 23,500 child cases were added this week.").) We have also seen surges in other parts of the country and the world, increasingly impacting younger adults. (Pan American Health Organization. *Hospitalizations and deaths of younger people soar due to COVID-19*, *available at* https://www3.paho.org/en/news/5-5-2021-hospitalizations-and-deaths-younger-people-soar-due-covid-19-paho-director-reports.)  Accordingly, the American Academy of Pediatrics recommends face coverings for anyone over the age of 2. (American Academy of Pediatricians. *COVID-19 Interim Guidance: Face Masks, available at* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/cloth-face-coverings/ (updated May 26, 2021).)

Comprehensive research concerning the spread of the Delta variant is not yet available.  The current state of the science is that the Delta variant can spread to and infect even vaccinated individuals.  (Ezgi Hacisuleyman, et al., *Vaccine Breakthrough Infections with SARS-CoV-2 Variants*. New England Journal of Medicine, June 10, 2021, *available at* https://www.nejm.org/doi/full/10.1056/nejmoa2105000.) It is also likely that breakthrough infections like these result in vaccinated people then spreading the Delta variant to others. Recent research also suggests that currently-available vaccines are less effective to guard against the Delta variant than the original strain of COVID-19.  (Jamie Lopez Bernal, et al., *Effectiveness of COVID-19 Vaccines Against B.1.617.2 (Delta) Variant*, New England Journal of Medicine, July 21, 2021, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2108891.)

### C. The Impact of Wearing a Face Covering

SARS-CoV-2, the virus that causes COVID-19, spreads primarily through respiratory droplets exhaled when infected people breathe, talk, cough, or sneeze.  Most of these droplets are smaller than 10 μm in diameter, referred to as aerosols.  The amount of small droplets and particles increases with the rate and force of airflow during exhalation (e.g., shouting, vigorous exercise). Proximity, duration of contact, and lack of ventilation all increase risk of exposure.  (John T. Brooks, et al., *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, Journal of the American Medical Association, Feb. 10, 2021, *available at* https://jamanetwork.com/journals/jama/fullarticle/2776536.)

Wearing a face covering substantially reduces transmission of COVID-19.  Face coverings prevent infected persons from exposing others to SARS-CoV-2 by blocking exhalation of virus-containing droplets into the air (termed *source control*).  This is especially important because it is estimated that 50% or more of transmissions are from persons who are not exhibiting COVID-19 symptoms at the time.  (*See* Michael Johansson, et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Netw Open, Jan. 7, 2021, *available at*

3

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707; *see also* Jeremy Howard, *et al.*, *An evidence review of face masks against COVID*-19, Proceedings of the Natinoal Academy of Sciences of the United States of America, *available at* https://www.pnas.org/content/118/4/e2014564118 ("Public mask wearing is most effective at reducing spread of the virus when compliance is high. . . . We recommend that public officials and governments strongly encourage the use of widespread face masks in public, including the use of appropriate regulation."); Dhaval Adjodah, et al., *Association between COVID-19 outcomes and mask mandates, adherence, and attitudes,* PLOS ONE, *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0252315 ("We show that mask mandates are associated with a statistically significant decrease in new cases (-3.55 per 100K), deaths (-0.13 per 100K), and the proportion of hospital admissions (-2.38 percentage points) up to 40 days after the introduction of mask mandates both at the state and county level. These effects are large . . . Our results have policy implications for reinforcing the need to maintain and encourage mask-wearing by the public, especially in light of some states starting to remove their mask mandates."). The universal wearing of face coverings is particularly important when a surge of COVID-19, or a variant thereof, is impacting a community. (*See, e.g.*, Pien Huang, *Public Health Experts Call on CDC to Change its Mask Mandate*, NPR, *available at* https://www.npr.org/sections/health-shots/2021/07/22/1019311989/public-health-experts-call-on-cdc-to-endorse-masking-indoors ("'In my mind, it would be advisable for CDC to say, given the spread of the delta variant in our country, we would recommend that people go back to using masks indoors,' particularly in areas with huge spikes in cases." (quoting Dr. Carlos del Rio, an epidemiologist at Emory University)); *id.* ("Implementing indoor mask mandates for everyone, regardless of vaccination status, is 'the right and scientific thing to do[.]'" (quoting Ali Mokdad of the Institute for Health Metrics and Evaluation (IHME) at the University of Washington)); The New York Times, *W.H.O. Urges Masking for the Vaccinated, in Split with C.D.C.*, *available at* https://www.nytimes.com/live/2021/06/28/world/covid-vaccine-coronavirus-mask ("World Health Organization officials, concerned about the easing of precautions meant to stop the spread of the coronavirus even as the most contagious variant to date has emerged, have urged even fully vaccinated people to continue wearing masks and to keep taking other measures to prevent infection."); World Health Organization, COVID-19 Virtual Press Conference, June 25, 2021, *available at* www.who.int/publications/m/item/covid-19-virtual-press-conference-transcript---25-june-2021 ("As we have been saying, … vaccine alone won't stop the community transmission … People need to continue to use masks consistently, be in ventilated spaces, hand hygiene, respiratory etiquette, the physical distance, avoid crowding.")) Face coverings also protect uninfected wearers by forming a barrier to large respiratory droplets that could otherwise land on exposed mucous membranes of the eye, nose, and mouth and partially filtering out small droplets and particles from inhaled air.

Recent research has also demonstrated the utility of requiring people to wear face coverings instead of relying on people voluntarily wearing them. That research indicates that "mask mandates are associated with a 23.4 percentage point increase in mask adherence in four geographically, culturally and politically diverse states—Hawaii, Iowa, North Dakota and New Hampshire—and that mask adherence is itself associated with a significant decrease in COVID-19 cases and deaths in all 50 states and D.C. We also observe that the recent lifting of state mask mandates is associated with decreases in adherence and increases in cases." (Dhaval Adjodah, et al., *Association between COVID-19 outcomes and mask mandates, adherence, and attitudes,* PLOS ONE, *available at*

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0252315 (June 23, 2021); *see also* Miriam E. Van Dyke, *Trends in County-Level COVID-19 Incidence in Counties with and without a Mask Mandate – Kansas, June 1-August 23 2020*, CDC Morbidity and Mortality Weekly Report 2020 Nov 27; 69(47): 1771-1781, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7727605; Edward S. Knotek II, et al., *Consumers and COVID-19: Survey Results on Mask-Wearing Behaviors and Beliefs*, Economic Commentary, July 16, 2020, available at https://www.clevelandfed.org/newsroom-and-events/publications/economic-commentary/2020-economic-commentaries/ec-202020-survey-results-on-mask-wearing-behaviors-and-beliefs.aspx ("[M]ost respondents indicated that they were extremely likely to wear a mask if doing so were required by public authorities"); Cornelia Betsch, et al., *Social and Behavioral Consequences of Mask Policies during the COVID-19 Pandemic*, Proceedings of the National Academy of Sciences, Sept. 8, 2020, *available at* https://www.pnas.org/content/117/36/21851 ("[S]hould countries or communities want people to wear masks (e.g., to curb local outbreaks or to reduce transmission in future waves of the pandemic), introducing a mandatory policy along with explicit communication of the benefits of mask wearing (risk reduction, mutual protection, positive social signaling) and the benefits of the mandatory policy (fairness, less stigmatization, higher effectiveness) appears advisable.").)

Local evidence also suggests that St. Louis County's previous orders requiring face coverings limited the spread of COVID-19.  Dr. Enbal Shacham and colleagues at St. Louis University found that such orders in St. Louis County and St. Louis City slowed infection rates significantly compared to surrounding counties.  After 3 weeks, the average daily growth rate of cases was 44% lower than in counties without such mandates.  After 12 weeks, it was still 40% lower. (Enbal Shacham, et al., *Association of County-Wide Mask Ordinances with Reductions in Daily COVID-19 Incident Case Growth in a Midwestern Region over 12 Weeks,* MedRxiv, Oct. 30, 2020, *available at* https://www.medrxiv.org/content/10.1101/2020.10.28.20221705v1; *see also* Centers for Disease Control and Prevention, COVID-19 Science Update, Nov. 10, 2020, *available at* https://www.cdc.gov/library/covid19/111020_covidupdate.html; Bryce Gray, *Where Masks Aren't Mandatory in St. Louis Region, Virus Cases Boom*, St. Louis Post-Dispatch, Nov. 20, 2020, *available at* https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/where-masks-arent-mandatory-in-st-louis-region-virus-cases-boom/article_a9c1940d-727e-50d5-b8bf-1b99f0d9ac42.html.)  Dr. Shacham and his colleagues' overall conclusions were summarized as follows:

> These data demonstrate that county-level mask mandates were associated
> with significantly lower incident COVID-19 case growth over time,
> compared to neighboring counties that did not implement a mask mandate.
> The results highlight the swiftness of how a mask [mandate] can impact
> the trajectory of infection rate growth.  Another notable finding was that
> following implementation of mask mandates, the disparity of infection rate
> by race and population density was no longer significant, suggesting that
> regional-level policies can not only slow the spread of COVID-19, but
> simultaneously create more equal environment.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

## II.    Purpose

The intent of this Order is to reduce the transmission of COVID-19, including variants thereof, in St. Louis County with the least restrictive effective measure. As the CDC has recognized, "Adopting universal masking policies can help avert future lockdowns, especially if combined with other non-pharmaceutical interventions such as social distancing, hand hygiene, and adequate ventilation." (*See* Centers for Disease Control and Prevention, *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2,* May 7, 2021, *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.)

This recommendation is consistent with the guidance of the U.S. Surgeon General, the St. Louis Metropolitan Pandemic Task Force, and many independent experts, who support mask mandates to combat local surges of COVID-19. (*See, e.g.,* Tara Haelle, *Scientists Urge Local Mask Mandates as Delta Sweeps the U.S.,* National Geographic, July 23, 2021, *available at* https://www.nationalgeographic.com/science/article/scientists-urge-local-mask-mandates-as-delta-sweeps-the-us; *Fauci: Bringing Back Mask Mandates is 'Under Active Consideration,' CNN,* available at https://grabien.com/story.php?id=343999 ("Even if you are vaccinated, you should wear a mask. That's a local decision that's not incompatible with the CDC's overall recommendations that give a lot of discretion to the locals. And we're seeing that in L.A. We're seeing it in Chicago. We're seeing that in New Orleans, because the officials there, many of them are saying even if you're vaccinated it's prudent to wear a mask indoors. That's a local decision."); Davone Morales, *'Very Reasonable' for Local Officials to Reimplement Mask Mandates Amit Delta Surge: Dr. Vivek Murthy,* ABC News. July 18, 2021, available at https://abcnews.go.com/Politics/delta-variant-surge-unvaccinated-deeply-dr-vivek-murthy/story?id=78902909; KMOV Staff, *St. Louis Pandemic Task Fore Urges Return to Public Masking to Avoid Drastic Measures*, July 20, 2021, *available at* https://www.kmov.com/news/st-louis-pandemic-task-force-urges-return-to-public-masking-to-avoid-drastic-measures/article_9f5b35a6-e97a-11eb-913a-9fcfc2b8d049.html.)

## III.    Policy

1. Face Coverings are required to be properly worn by all individuals ages 5 and older while in indoor and enclosed public buildings and spaces and public transportation vessels in St. Louis County.  For purposes of clarity, "indoor and enclosed public buildings and spaces" include all indoor and enclosed spaces other than private dwellings or private transportation vessels.  "Face Coverings" for the purpose of Sections II and III of this Order means a device, usually made of cloth, that covers the nose and mouth.
2. Face Coverings are recommended in indoor private settings and crowded outdoor settings where there is close contact with other people who may not be fully vaccinated. This is particularly important if an individual is not fully vaccinated.
3. Face Coverings are not required to be worn by:

    i.    Children under the age of 2;
    ii.   Children between the ages of 2-5 who are strongly encouraged, but not required, to wear a Face Covering while under the direct supervision of an adult;

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

iii. Persons with health conditions that prohibit wearing a Face Covering. Nothing in this Order shall require the use of a Face Covering by any person for whom doing so would be contrary to their health or safety because of a medical condition;

iv. Persons who have trouble breathing, or are unconscious, incapacitated, or otherwise unable to remove the Face Covering without assistance;

v. Persons who are deaf or hard of hearing, or someone who is communicating with a person who is deaf or hard of hearing, where the ability to see the mouth is essential for communication;

vi. Persons who are alone in a separate room, office, or interior space;

vii. Persons who are consuming food or drink, including for religious purposes; and

viii. Persons who are obtaining a service, including a religious service, involving the nose or face for which temporary removal of the Face Covering is necessary to perform the service.

## IV. Application and Enforcement

To the extent not otherwise explicitly modified or rescinded in this Order or otherwise, all other orders and guidelines of the Director of DPH remain in effect and this Order shall not supplant, supersede, replace, rescind, amend, or modify any other County Executive Order, law, ordinance, rule, regulation, or permit condition or requirement. This Order is to be construed and applied only to the extent permitted by the U.S. Constitution, the Missouri Constitution, and all other applicable laws. The St. Louis County Counselor can seek emergency injunctive relief or other civil relief to enforce any provision of this Order.

## V. Effective Date

This Order shall become effective at 8:00 A.M. on Monday, July 26, 2021, and continue in effect until amended or rescinded.

## VI. Savings Clause

If any provision of this Order or its application is held to be invalid, then the remainder of this Order shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

## VII. Authorization

This Order is authorized pursuant to Executive Orders 10 through 18, which are incorporated herein by reference, and to Missouri and St. Louis County law, including the Missouri Constitution, §§ 192.006, 192.200, 192.260, 192.280, and 192.290 RSMo., Chapter 44 RSMo., 19 CSR 20-20.010, 20-20.040, and 20-20.050 of the Rules of the Department of Health and Senior Services, the St. Louis County Charter, and the St. Louis County Revised Ordinances.

Electronically Filed - St Louis County - July 28, 2021 - 05:00 PM

So Ordered this 26th day of July 2021.

By:

Dr. Faisal Khan
Director
St. Louis County Department of Public Health

Electronically Filed - St Louis County - July 28, 2021 - 03:50 PM

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI, ex rel.   )
ERIC S. SCHMITT,   )
   )
         *Plaintiff*,   )
   )   Case No. 21SL-CC03334
      v.   )
   )
SAM PAGE, et al.,   )
   )
         *Defendants*.   )

## ENTRY OF APPEARANCE

COMES NOW D. John Sauer, and hereby enters his appearance on behalf of Plaintiff.

Respectfully submitted,

**ERIC S. SCHMITT**
Missouri Attorney General

By:    */s/ D. John Sauer*
D. John Sauer, #58721
P.O. Box 899
Jefferson City, MO  65102-0899
Telephone: (573) 751-8870
Facsimile: (573) 751-0774
John.Sauer@ago.mo.gov

*Counsel for Plaintiff*

Electronically Filed - St Louis County - July 28, 2021 - 03:50 PM

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2021, the foregoing was filed through the Missouri Case.net e-filing system, which will send notice to all counsel of record.

<div align="right">

*/s/ D. John Sauer*
Counsel for Plaintiff

</div>

Electronically Filed - St Louis County - July 29, 2021 - 11:42 AM

MISSOURI CIRCUIT COURT
TWENTY-FIRST CIRCUIT
(St. Louis County)

STATE of MISSOURI ex rel.      )
ERIC S. SCHMITT, ATTORNEY GENERAL, )
                                  )
     Plaintiff,           )
                                  )
v.                          )    No. 21SL-CC03334
                                  )    Div. 18
SAM PAGE, etc., et al.,      )
                                  )
     Defendants.          )

ENTRY OF APPEARANCE

Undersigned counsel hereby enters appearance as counsel for defendants Tishaura Jones, Fredrick Echols, and City of St. Louis Department of Health, reserving all objections to jurisdiction and venue.

Respectfully submitted,

MATT MOAK, CITY COUNSELOR

/s/Robert H. Dierker MBE 23671
Associate City Counselor
dierkerr@stlouis-mo.gov
314 City Hall
1200 Market St.
St. Louis, MO 63103
314-622-3361/FAX 622-4596

Certificate of Service

The undersigned counsel certifies that the foregoing was filed with the Court on the 29 day of July, 2021, to be served by means of the court's electronic filing system on counsel for all parties.

/s/Robert H. Dierker

Electronically Filed - St Louis County - July 29, 2021 - 10:03 AM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI, ex rel.)
ERIC S. SCHMITT,        )
            )
       Plaintiff,    )
            )    Case No. 21SL-CC03334
     v.        )
            )
SAM PAGE, et al.,     )
            )
      Defendants.   )

## <u>NOTICE OF HEARING</u>

COMES NOW Plaintiff, by and through counsel, and will call up for hearing it's Motion for a Temporary Restraining Order and Preliminary Injunction Against the Enforcement of St. Louis County's Mask Mandate, on Friday, July 30, 2021 at 2:30 p.m., via WebEx at: https://mocourts.webex.com/meet/vcdiv18mtg - Meeting Number: 146 118 7149

Dial In (if internet audio unavailable): (408) 418-9388 :: Meeting: 146 118 7149, or as soon thereafter as counsel may be heard.

Electronically Filed - St Louis County - July 29, 2021 - 10:03 AM

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Justin D. Smith*
Justin D. Smith, #63253MO
Deputy Attorney General for Special Litigation
D. John Sauer, #58721MO
Jeff P. Johnson, #73249MO
Michael E. Talent, #73339MO
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-0304
Fax: (573) 751-0774
Justin.Smith@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2021, the foregoing was filed on the Missouri CaseNet e-filing system, which will send notice to all counsel of record.

*/s/ Justin D. Smith*
Justin D. Smith

## THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI ex rel.
ERIC S. SCHMITT,

     *Plaintiff*,

    v.

SAM PAGE, in his official capacity as
St. Louis County Executive;

FAISAL KHAN, in his official capacity
as Director of the St. Louis County
Department of Public Health;

ST. LOUIS COUNTY DEPARTMENT
OF PUBLIC HEALTH;

BETH ORWICK, in her official
capacity as St. Louis County Counselor;

TISHAURA JONES, in her official
capacity as St. Louis City Mayor;

FREDRICK ECHOLS, in his official
capacity as Acting Director, Department
of Health for the City of St. Louis; and

DEPARTMENT OF HEALTH FOR
THE CITY OF ST. LOUIS

     *Defendants*.

No. 21SL-CC03334

## FIRST AMENDED PETITION

1

## **NATURE OF THE ACTION**

1.     St. Louis County and St. Louis City seek expanded government power that has failed to protect Missouri citizens living within their boundaries in the past and is not based on sound facts and data.

2.     Missouri Attorney General Eric S. Schmitt seeks to protect the liberty and constitutional rights of the people of Missouri.

3.     During the previous year, no government in Missouri restricted liberty more than St. Louis County and St. Louis City.

4.     Despite having the most restrictive and unconstitutional orders in Missouri, St. Louis County and St. Louis City suffered some of the highest COVID-19 case rates and death rates in Missouri.

5.     Even though the most effective defense to COVID-19 is through vaccination, St. Louis City is below the statewide average for vaccination rates.

6.     At the time they issued these new Mask Mandates, St. Louis County and St. Louis City trailed below state averages in COVID-19 cases and deaths for the previous seven days.

7.     At the time they issued these new Mask Mandates, the Centers for Disease Control had not changed the guidance in effect on masks at the time that St. Louis County and St. Louis City lifted all COVID-19 restrictions on May 14, 2021.

8.     Attorney General Schmitt brings this action to prevent unlawful, unconstitutional, arbitrary, capricious, and unreasonable conduct by St. Louis County Executive Sam Page; Director of the St. Louis County Department of Public Health Dr.

Faisal Khan; the St. Louis County Department of Public Health; St. Louis City Mayor Tishaura Jones; Acting Director of the Department of Health of St. Louis City Dr. Fredrick Echols; and the Department of Health for the St. Louis City ("Defendants").

## HISTORY OF UNCONSTITUTIONAL RESTRICTIONS IN ST. LOUIS COUNTY AND ST. LOUIS CITY

9.      Attorney General Schmitt has previously stopped St. Louis County from violating fundamental liberties with its COVID-19 restrictions.

10.      Starting on November 17, 2020, St. Louis County began enforcing its "Safer at Home" Order, which was so overbearing and restrictive that it only allowed St. Louis County residents to leave their home for nine enumerated reasons and only allowed in-person contact with up to 10 other individuals in a "support bubble."

11.      On April 9, 2021, all adult Missourians became vaccine-eligible.  Also on April 9, 2021, the Supreme Court of the United States struck down government COVID-19 restrictions that violated fundamental liberties.  *See Tandon v. Newsom*, 141 S. Ct. 1294 (2021).

12.      On April 20, 2021, Attorney General Schmitt demanded answers from Dr. Khan about serious constitutional and legal issues the Fifth Amended Safer at Home Order in effect at that time.  *See* Ex. A (letter from Attorney General Schmitt to Dr. Khan detailing those issues with respect to St. Louis County's Fifth Amended Safer at Home Order).

13.      On April 27, 2021, counsel for St. Louis County, instead of Dr. Khan, responded to the Attorney General's letter.  Counsel's letter ignored numerous issues raised

by the Attorney General and failed to satisfactorily answer others.  Ex. B (letter from St. Louis County Counselor Beth Orwick to Attorney General Eric Schmitt).

14.     The next day, while facing potential litigation from the Missouri Attorney General's Office, County Executive Page announced that St. Louis County planned to lift some COVID-19 restrictions as early as the following Monday, May 3, 2021.

15.     On May 3, 2021, St. Louis County rescinded its Fifth Amended Safer at Home Order and replaced it with a new order, referred to as the "Reopen STL Order."

16.     Because the new order continued to violate constitutional liberties and was arbitrary and capricious, Attorney General Schmitt filed suit against County Executive Page, Dr. Khan, and the St. Louis County Department of Health on May 11, 2021.  Petition, *Missouri ex rel. Schmitt v. Page* (No. 21SL-CC02111).

17.     Just three days later, on May 14, 2021, St. Louis County and St. Louis City lifted all COVID-19 restrictions.

## COVID-19 DATA IN ST. LOUIS COUNTY AND ST. LOUIS CITY

18.     St. Louis County and St. Louis City were the first governmental entities in Missouri to mandate the wearing of face masks, beginning on July 3, 2020.

19.     St. Louis County and St. Louis City kept COVID-19 orders in place until May 14, 2021.

20.     St. Louis County and St. Louis City had the most restrictive COVID-19 orders in Missouri from July 3, 2020 until the orders were lifted on May 14, 2021.

21.     Despite these restrictive orders, dozens of Missouri counties had lower COVID-19 case rates and death rates than St. Louis County and St. Louis City.

22.     As of July 25, 2021, St. Louis County had a COVID-19 case rate of 10,649.90 per 100,000 people.  *COVID-19 Data and Reports*, SAINT LOUIS CNTY., https://stlcorona.com/resources/covid-19-statistics (last visited July 25, 2021).

23.     As of July 26, 2021, more than 90 of Missouri's 114 counties had fewer cumulative cases per 100,000 people than St. Louis County's reported rate of 10,649.90 per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

24.     As of July 25, 2021, St. Louis County reported 229.60 cumulative COVID-19 deaths per 100,000 people.  *COVID-19 Data and Reports*, SAINT LOUIS CNTY., https://stlcorona.com/resources/covid-19-statistics (last visited July 25, 2021).

25.     As of July 26, 2021, more than 90 of Missouri's 114 counties had fewer cumulative deaths per 100,000 people than St. Louis County's reported rate of 229.60 per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

26.     As of July 25, 2021, St. Louis City had a COVID-19 cumulative case rate of 7,603.90 per 100,000 people.  *COVID-19 Data*, CITY OF ST. LOUIS, https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/data/index.cfm (last visited July 25, 2021).

27.     As of July 26, 2021, more than 30 of Missouri's 114 counties had fewer cumulative cases per 100,000 people than St. Louis City's reported rate of 7,603.90 per

100,000 people. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

28.     As of July 25, 2021, St. Louis City reported 172.8 COVID-19 cumulative deaths per 100,000 people. *COVID-19 Data*, CITY OF ST. LOUIS, https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/data/index.cfm (last visited July 25, 2021).

29.     As of July 26, 2021, more than 60 of Missouri's 114 counties had fewer cumulative deaths per 100,000 people than St. Louis City's reported rate of 172.8 per 100,000 people. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

30.     St. Louis County and St. Louis City COVID-19 case infection rates for the seven days before they issued their new orders on July 26, 2021—when they had no mask mandates—were below state averages.

31.     In the seven days before St. Louis County and St. Louis City issued these orders on July 26, 2021, Missouri reported 183 new COVID-19 cases per 100,000 people, ranking 25th in the country for new cases. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR   SERVS.,   https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

32.     In the seven days before St. Louis County issued its new mask order on July 26, 2021, it reported 121 new cases per 100,000 people. According to the state dashboard,

69 other jurisdictions had higher cases per 100,000 people than St. Louis County. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

33.    In the seven days before St. Louis City issued its new mask order on July 26, 2021, it reported 138 new cases per 100,000 people.  According to the state dashboard, 64 other jurisdictions had higher cases per 100,000 people than St. Louis City.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

34.    St. Louis County's and St. Louis City's COVID-19 death rates for the seven days before they issued their orders on July 26, 2021—when they had no mask requirements—fall below state averages.

35.    In the seven days before St. Louis County and St. Louis City issued these orders on July 26, 2021, Missouri reported 18 new COVID-19 deaths for a rate of 0.30 deaths per 100,000 people, which ranked the state 25th in the country for new deaths. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

36.    In the seven days before St. Louis County issued this new order on July 26, 2021, St. Louis County reported two deaths for a rate of 0.20 deaths per 100,000 people. *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS.,

https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

37.     In the seven days before St. Louis City issued this new order on July 26, 2021, St. Louis City reported zero deaths for a rate of 0 deaths per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

38.     Unlike St. Louis County and St. Louis City, many counties never imposed mask mandates.

39.     For example, neighboring St. Charles County never imposed a government mask mandate.  As of July 26, 2021, St. Charles County had a lower COVID-19 cumulative case rate than St. Louis County's 9,022 per 100,000 people, and a lower COVID-19 cumulative death rate than St. Louis County's 119 per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

40.     As another example, Reynolds County never imposed a government mask mandate.  As of July 26, 2021, Reynolds County had the lowest COVID-19 case rate and death rate in the state, reporting 4,593 cumulative cases per 100,000 people and 48 deaths per 100,000 people.  *COVID-19 in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/statewide.php (last visited July 26, 2021).

## VACCINE DATA IN ST. LOUIS

41.     Just 41.9% of people in St. Louis City have had the first vaccination dose (compared to 47.1% of Missourians) and only 35.3% of people in St. Louis City have completed vaccination (compared to 40.8% of Missourians).  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  St. Louis County is slightly above the state percentage rate with 51.2% and 45.0%, respectively.  *Id.*

42.     Counties such as Atchison (42.9%), Boone (52.7%), Cole (43.9%), Franklin (45.6%), Gasconade (42.0%), Jackson (44.3%), and St. Charles (49.5%) have higher first vaccination dose rates than St. Louis City.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/ communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  The City of Joplin has a 52.9% rate.  *See id.*

43.     Counties such as Atchison (39.5%), Boone (46.6%), Cole (38.7%), Franklin (40.6%), Gasconade (37.6%), Greene (35.6%), Jackson (39.1%), Nodaway (35.8%), and St. Charles (44.6%) have higher vaccination completion rates than St. Louis City.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).  The City of Joplin has a 44.8% rate.  *See id.*

44.     St. Louis City's vaccination rate is about the same as Shelby County's 35.2% vaccination rate.  *COVID-19 Vaccinations in Missouri*, DEP'T OF HEALTH & SENIOR SERVS., https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/data/public-health/vaccine.php (last updated July 26, 2021).

## JUSTIFICATIONS FOR LIFTING RESTRICTIONS IN MAY 14, 2021

45.     When St. Louis County and St. Louis City lifted all COVID-19 restrictions on May 14, 2021, they relied on several data points that do not support new entry of a mask mandate now.

46.     St. Louis County and St. Louis City removed their original mask mandates because the CDC announced that fully vaccinated people could stop wearing masks outdoors in crowds and in most indoor settings.  Sam Clancy and Dori Olmos, *Mask mandates lifted in St. Louis as city, county align with CDC guidance*, KSDK (May 13, 2021), https://www.ksdk.com/article/news/health/coronavirus/st-louis-county-updated-health-guidelines/63-d081f91a-8fc6-4a0c-bbcc-ea3bf36ed0cb.

47.     County Executive Page said that the St. Louis County and St. Louis City health departments would "make sure all of our recommendations are in line with the CDC guidance."  Gregg Palermo, Zara Barker, & Blair Ledet, *St. Louis City & County announce new COVID guidelines*, FOX2NOW (May 13, 2021). https://fox2now.com/news/st-louis-city-county-set-friday-announcement-on-covid-guidelines-following-new-cdc-mask-guidance/.

48.     County Executive Page previously said that "St. Louis County certainly plans to adopt CDC recommendations into our public health protocols, and we'll have an

announcement soon." Sarah Fentem, *St. Louis, St. Louis County Could Lift Some Coronavirus Restrictions Next Week*, ST. LOUIS PUBLIC RADIO (Apr. 28, 2021), https://news.stlpublicradio.org/coronavirus/2021-04-28/st-louis-st-louis-county-plan-to-lift-some-coronavirus-restrictions.

49.     The CDC has not changed its guidance since May 14, 2021, and as of July 26, 2021, advises that fully vaccinated people can "resume activities without wearing masks or physically distancing," unless required by law or a business.  CDC, *Interim Public Health Recommendations for Fully Vaccinated People* (updated July 21, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.

50.     Neither the St. Louis County nor St. Louis City Mask Mandates issued July 26, 2021 exempt fully vaccinated people from compliance.

51.     The Mask Mandates issued by St. Louis County and St. Louis City on July 26, 2021 are not consistent with current CDC guidance for fully vaccinated people.

52.     After receiving Attorney General Schmitt's letter, County Executive Page said that "[t]he easing of restrictions is made possible as more people get vaccinated, and I urge everyone to get vaccinated as early as possible."  Sarah Fentem, *St. Louis, St. Louis County Could Lift Some Coronavirus Restrictions Next Week*, ST. LOUIS PUBLIC RADIO (Apr. 28, 2021), https://news.stlpublicradio.org/coronavirus/2021-04-28/st-louis-st-louis-county-plan-to-lift-some-coronavirus-restrictions.

53.     When St. Louis County and St. Louis City removed their COVID-19 restrictions, St. Louis County had vaccination rates of 41.9% with the first vaccination dose and 33.2% fully vaccinated, and St. Louis City had vaccination rates of 33.1% with the

first vaccination dose and 26% fully vaccinated.  Sam Clancy & Dori Olmos, *Mask mandates lifted in St. Louis as city, county align with CDC guidance*, KSDK (May 13, 2021)    https://www.ksdk.com/article/news/health/coronavirus/st-louis-county-updated-health-guidelines/63-d081f91a-8fc6-4a0c-bbcc-ea3bf36ed0cb.

54.     St. Louis County and St. Louis City both have higher first vaccination dose rates and fully vaccinated rates on July 26, 2021 than they did on May 14, 2021.

<u>**THE NEW MASK MANDATES**</u>

55.     On July 26, 2021, Defendants issued the "Mask Mandates," which require all individuals aged five and older to wear masks while indoors regardless of vaccination status with very limited exceptions.

56.     But there is no evidence that Defendants considered the underlying data, science, and evidence that fail to justify issuing mask mandates at this time.

57.     Similarly, Defendants imposed the Mask Mandates on schoolchildren, ignoring that those children are less likely to get COVID-19, less likely to get seriously ill if they do get it, and are less likely to transmit the disease while, at the same time, suffering disproportionately from masking requirement.

58.     The Defendants' Mask Mandates are a continuation of a series of arbitrary, capricious, unlawful, and unconstitutional COVID-19 related restrictions.  There is no reason to allow such orders to continue.

<u>**JURISDICTION AND VENUE**</u>

59.     This Court has jurisdiction under Mo. Const. art V, § 14(a), § 536.150, RSMo, §§ 527.010 et seq., RSMo, and other applicable law.

60.     Venue is proper in this Court under § 508.010.2(2) RSMo.

## PARTIES

61.     Plaintiff State of Missouri is a sovereign State of the United States of America.

62.     Eric S. Schmitt is the 43rd Attorney General of the State of Missouri. Attorney General Schmitt is authorized to "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." § 27.060, RSMo.

63.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in controlling the exercise of sovereign power over individuals and entities within its borders; Missouri's sovereign interest in ensuring the enforcement of Missouri law within Missouri's borders; and Missouri's quasi-sovereign and *parens patriae* interest in the freedom, health, and physical, psychological, educational, and economic well-being of a significant segment of its populace, including but not limited to their rights to religious freedom.  This interest includes, but is not limited to, preventing the spread of the COVID-19 virus within the state.

64.     Attorney General Schmitt sues to vindicate Missouri's sovereign interest in ensuring that its municipal authorities do not exercise authority vested in them under state law in a fashion that violates the Missouri Constitution or Missouri law.

65.     Attorney General Schmitt sues to vindicate Missouri's interest in ensuring that the children of the State receive an appropriate education.

66.     Dr. Sam Page ("Page") is the County Executive of St. Louis County.  He is sued in his official capacity.

67.     Dr. Faisal Khan ("Khan") is the Director of the St. Louis County Department of Public Health.  He is a "local health authority" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(26).  He is sued in his official capacity.

68.     The St. Louis County Department of Public Health ("County DPH") is an agency of St. Louis County acting under the direction of Defendants Page and Khan. County DPH constitutes a "local public health agency" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(27).

69.     Beth Orwick ("Orwick") serves as the County Counselor for St. Louis County and is charged with enforcing the County's Mask Mandate.   She is sued in her official capacity.

70.     Together, Page, Khan, Orwick, and County DPH are the "County Defendants."

71.     Mayor Tishaura Jones ("Jones") is the Mayor of the City of St. Louis.  She is sued in her official capacity.

72.     Dr. Fredrick Echols ("Echols") is the Acting Director of the Department of Health for the City of St. Louis.  He is a "local health authority" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(26).  He is sued in his official capacity.

14

73.     The Department of Public Health for the City of St. Louis ("City DPH") is an agency of St. Louis City acting under the direction of Defendants Jones and Echols. City DPH constitutes a "local public health agency" under Missouri Department of Health and Senior Services' regulation 19 CSR 20-20.010(27).

74.     Together, Jones, Echols, and City DPH, are the "City Defendants."

## FACTUAL ALLEGATIONS

75.     Missouri incorporates by reference the allegations in all preceding paragraphs.

76.     St. Louis County is a charter county of the State of Missouri.  St. Louis City is a charter city of the State of Missouri.

77.     Defendants cite some legal authority to support the Mask Mandates, but to the extent any authority is provided, the authority is not unlimited.

78.     First, the authority cited by Defendants provides only for "creation and enforcement of adequate orders to prevent the spread of the disease and other measures . . . as appropriate disease control measures based upon the disease . . . and any other available information related to . . . the disease or infection."   19 C.S.R. 20.040(2)(G).

79.     Second, any restrictions cannot be "unconstitutional, unlawful, unreasonable, arbitrary, or capricious . . . .  § 536.150.1, RSMo.  Government action is arbitrary, capricious, and unreasonable when it is based on *post hoc* rationalization, when it fails to consider an important part of the problem it is addressing, and when it fails to consider less restrictive alternatives before infringing on citizens' liberty.  *See*, *e.g.*, *Dep't*

*of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905, 1909 (2020); *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015).  "[A]n agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously."  *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo. App. W.D. 1995) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).  In addition, agencies must consider whether there are less restrictive policies that would achieve their goals.  *See Regents of the Univ. of Calif.*, 140 S. Ct. at 1912 (quoting *State Farm Mut. Auto.*, 463 U.S. at 51).

80.     The County Defendants have a history of transgressing those limits, as well as other constitutional prohibitions against religious discrimination, in their orders related to the COVID-19 emergency.  *See* Ex. A (detailing those issues); Petition, *Missouri ex rel. Schmitt v. Page* (No. 21SL-CC02111) (pointing out similar deficiencies in St. Louis County's Reopening STL Order); *cf.* Ex. B (failing to address the points Attorney General Schmitt raised with respect to the Fifth Amended Safer at Home Order).

81.     The City Defendants have moved in lock-step with the County Defendants and engaged in a similar history of transgressing statutory and constitutional bounds in the COVID-19 orders they have issued.

82.     Indeed, on information and belief, the County Defendants and the City Defendants worked together to alter or rescind their COVID-19 restrictions to avoid scrutiny and to avoid lawsuits by the Attorney General.

83.     The Defendants' Mask Mandates are no different.  They exceed Defendants' statutory and constitutional authority and trample the rights of their citizens.

16

## I.      The Mask Mandates

84.      The County Defendants' and City Defendants' Mask Mandates are slightly different (the "County Mask Mandate," attached as Exhibit C, and the "City Mask Mandate," attached as Exhibit D).   They both coincide, however, on their main requirement:  Everyone over the age of five must wear a mask when indoors, even if they are vaccinated.

85.      Specifically, each order requires individuals over the age of five to wear a "face covering" while "in indoor and enclosed public buildings and spaces and public transportation vessels."  *See* Ex. C § III.1; Ex. D § 1.

   a.   The County Mask Mandate defines "face covering" as "a device, usually made of cloth, that covers the nose and mouth." Ex. C, § III.1. The City Mask Mandate does not define "face covering," but on information and belief, it defines "face covering" no differently.

   b.   The County Mask Mandate clarifies that "indoor and enclose public buildings and spaces" "include[s] all indoor and enclosed spaces other than private dwellings or private transportation vehicles."  Ex. C, § III.1.  The City Mask Mandate has no similar clarification, but it also does not suggest that the order has a more limited scope.  Thus, both Mask Mandates have wide application; they cover schools and places of worship as well as restaurants, bars, public transportation, grocery stores, hospitals, and more.

   c.   The Mask Mandates apply regardless of whether social distancing is

17

possible in the indoor area.

86.     Both Mask Mandates provide for similar exceptions.

a.      Both Mask Mandates exempt those who have trouble breathing with a mask, or who "are unconscious, incapacitated, or otherwise unable to remove" the mask.  Ex. C § III.3.iv; Ex. D § 2.c.

b.      Both Mask Mandates exempt those consuming food and drink.  Ex. C, § III.3.vii; Ex. D § 2.b.  The County Mask Mandate specifically excludes consumption for religious purposes.  Ex. C § III.3.vii.

c.      Both Mask Mandates exempt those who need to remove masks for "obtaining a service" that involves "the nose or face."  Ex. C. § III.3.viii; Ex. D § 2.d.  The County Mask Mandate specifically includes instances where removal "is necessary to perform the service."  § Ex. III.3.viii.

87.     However, the two Mask Mandates' exemptions do differ in some ways.

a.      The County Mask Mandate exempts those "with health conditions that prohibit wearing a Face Covering."  Ex. C § III.3.iii.  By contrast, the City Mask Mandate requires "an official order or documentation from a medical or behavioral health provider" that they should not wear face coverings to be exempt.  Ex. D § 2.a.

b.      The County Mask Mandate exempts deaf and hard-of-hearing individuals, and those communicating with such individuals, "where the ability to see the mouth is essential for communications."  Ex. C

18

§ III.3.v.  There is no equivalent exemption in the City Mask Mandate.

c.  The County Mask Mandate exempts people "who are alone in a separate room, office, or interior space."  Ex. C § III.3.vi.  There is no equivalent exemption in the City Mask Mandate.

88.  Neither Mask Mandate has a sunset provision.

89.  The County Mask Mandate expressly says it does not meet the requirements of § 67.265.1(1), RSMo.  Ex. C § I.A.  The City Mask Mandate makes no such claim.

90.  The County Mask Mandate was signed on July 26, 2021.

91.  The City Mask Mandate was signed on July 23, 2021.

## II.  Justification for the Mask Mandates

92.  The City Mask Mandate provides no explicit justification for its order.  To be sure, the order points to "a resurgence of COVID-19 cases;" increased transmission, hospitalization, and deaths; and the fact that less than half of St. Louis City has been vaccinated.  Ex. D.  But the City Mask Mandate does not then discuss how the order would ameliorate any of those issues.

93.  The County Mask Mandate purports to justify the order, first, by discussing the spread of COVID-19 cases in the county.  *See* Ex. C § I.B.  The order highlights claims that the COVID-19 variants, particularly the delta variant, could spread more easily.  *See id.*  It also claims that "[s]urges are increasingly impacting [*sic*] younger adults and children."  *Id.*  The order does not discuss hospitalizations or death rates.

94.  The County Mask Order then claims that masks prevent transmission of COVID-19 in two ways.  One is through "source control," which refers to the alleged

ability of masks to "prevent infected persons from exposing others to [COVID-19] by blocking exhalation of virus-containing droplets into the air." Ex. C § I.C. The other is by protecting uninfected wearers by "forming a barrier to large respiratory droplets . . . and partially filtering out small droplets and particles from inhaled air." *Id.* The County Mask Order then points to studies it claims supports those conclusions. *See id.*

95.     Both Mask Mandates claim, as their purpose, the goal of slowing the spread of COVID-19. *See* Ex. C § II; Ex. D. The County Mask Mandate also notes that its recommendation is supposedly consistent with federal and local experts. *See* Ex. C § II.

## III.    Authorization

96.     The City Mask Mandate relies on the Charter of St. Louis City and 19 C.S.R. § 20-20.050(c) to authorize its restrictions. *See* Ex. D. However, 19 C.S.R. § 20-20.050(c) does not exist; and 19 C.S.R. § 20-050 only provides for isolating or closing certain areas of assembly.

97.     The County Mask Mandate relies on more authorities than the City Mask Mandate. But those authorities do not authorize the County's Mask Mandate. Notably, the County Mask Mandate does not cite § 192.300, RSMo (providing when county health officials may make additional health rules), as authorizing the order.

## IV.    ST. LOUIS COUNTY COUNCIL TERMINATES THE COUNTY MASK MANDATE.

98.     On Tuesday, July 27, 2021, the St. Louis County Council held a regular meeting.

99.     At that meeting, Council Member Tim Fitch requested that Khan answer questions about the County Mask Mandate and for the Council to consider whether to

terminate the County Mandate. *See generally* St. Louis County Council Regular Meeting, YOUTUBE (July 26, 2021), https://www.youtube.com/watch?v=naLwKEx_OCY.

100. During the meeting, Khan confirmed that the County Mask Mandate applied to "[a]ll businesses and residences in St. Louis County." *Id.* at 44:28–32.

101. He agreed that the order places "an obligation to police or enforce the order" on businesses. *Id.* 44:55–45:07 ("Yes, sir."); *see also id.* at 46:00–21 (Councilman Trakas: "In doing so, are you not imposing upon a Schnucks or a restaurant an obligation to enforce your order." Khan: "Yes."). He also explained that the order imposed a responsibility on individuals to be masked indoors. *Id.* 39:25–39:40; *id.* at 44:18-27.

102. Council Member Fitch noted that this enforcement mechanism did not align with what the County Counselor had told the Council in closed session. He described that the County Counselor's Office had told the Council that it could seek injunctions only against individuals for violating the Mask Mandate if a resident failed to wear a mask in a Schnucks or a restaurant. *See id.* at 49:15–50:40.

103. Khan noted that he would "defer to the County Counselor." *Id.* at 50:39-42.

104. In two hours of spirited public comments, St. Louis County residents, business owners, and parents informed the County Council of the devastating toll the last year of public health orders had imposed. They discussed the negative effect of the orders, including masking mandates, on their children's education, development, and overall well-being; how lockdowns led to friends falling into addiction and committing suicides; how much their small businesses were struggling; the discouragement—including discouragement from receiving the vaccine—that stemmed from the public health orders

and the Mask Mandate; and forcing children to wear masks throughout an entire school day detracted from their children's learning environment.

105. At the July 27, 2021, Regular Meeting, the County Council voted to terminate the Mask Mandate by a vote of five to two. *See id.* at 3:26:20–28:45 ("The motion carries, the public health order is terminated.").

106. The next morning Page told reporters that the County Mask Mandate was still in effect. Annika Merrilees, *Page Says St. Louis County mask mandate stands, despite council's vote to overturn*, St. L. Post-Dispatch (July 28, 2021), https://bit.ly/3yaCpS4.

107. The Mask Mandates inflict ongoing irreparable injury on the State because they interfere with the proper enforcement of state law.

108. The Mask Mandates inflict ongoing irreparable injury on the citizens of Missouri and their places of worship, businesses, schools, and other organizations by interfering with their freedoms and imposing other injuries to their physical and mental health, well-being, and economic interests without lawful authority.

## <u>COUNT ONE – DECLARATION THAT THE MASK MANDATES ARE SUBJECT TO § 67.265.1(1), RSMo</u>

109. Missouri incorporates by reference the allegations in all preceding paragraphs.

110. Missouri seeks a declaration that the Mask Mandates are subject to the requirements of § 67.265.1(1), RSMo.

111. There is an emergency order declared pursuant to chapter 44, RSMo.

112.    Both the County Mask Mandate and the City Mask Mandate are orders that "directly or indirectly closes, partially closes, or places restrictions on the opening of or access to any one or more business organizations, churches, schools, or other places of public or private gathering or assembly, including any order, ordinance, rule, or regulation of general applicability or that prohibits or otherwise limits attendance at any public or private gathering . . . ."  § 67.265.1(1), RSMo.

113.    First, both Mask Mandates place restrictions on access to "business organizations, churches, schools, or other places of public or private gathering or assembly," § 67.265.1(1), RSMo, because they limit access to those entities only to masked individuals or individuals who fall under an exception to the mask requirement.

114.    Second, both Mask Mandates will indirectly close those "business organizations, churches, schools, or other places of public or private gathering or assembly," § 67.265.1(1), RSMo, that wish to provide personal choice to their customers about whether they wear a mask or not.  Furthermore, the Mask Mandates will also close those entities where masking is impossible or so uncomfortable as to be impossible.

115.    As a result, both Mask Mandates are subject to § 67.265.1(1), RSMo, and expire after thirty days absent authorization by a majority vote of St. Louis County's or St. Louis City's governing body.

## COUNT TWO – DECLARATION THAT THE MASK MANDATES ARE NOT IN EFFECT PER § 67.265.4, RSMo

116.    Missouri incorporates by reference the allegations in all preceding paragraphs.

117.    As discussed above, both Mask Mandates are subject to § 67.265.1(1), RSMo.

118.    Missouri also seeks a declaration that the County Mask Mandate and the City Mask Mandate are not in effect per the terms of § 67.265, RSMo.

119.    Specifically, under § 67.265.4, RSMo, "the health officer, local public health agency, public health authority, or executive shall provide a report to the governing body containing information supporting the need for such order."

120.    On information and belief, neither Page, Khan, Jones, nor Echols provided the required report under § 67.265.4, RSMo.

121.    As a result, the Mask Mandates are not effective, as that information must be provided "[p]rior to or concurrent with" the issuance of any order subject to § 67.265.1(1), RSMo.

122.    In addition, the authority cited by both the County Mask Mandate and the City Mask Mandate is insufficient to support those orders.

123.    Neither the County nor the City cited to § 192.300, RSMo, because they improperly sought to avoid being subject to § 67.265 through § 192.300.5.

**COUNT THREE – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS AS APPLIED TO SCHOOLCHILDREN, § 536.150.1, RSMo**

124.    Missouri incorporates by reference the allegations in all preceding paragraphs.

125.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious."  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

126.    The Mask Mandates impose a duty on all elementary schoolchildren (defined as all children who are of the age to attend K-12 school) in St. Louis County and the City of St. Louis to wear a mask with few exceptions when they are at school.  They are therefore an agency decision that determines "legal rights, duties, or privileges."  § 536.150.1, RSMo.

127.    The schoolchildren of St. Louis County and the City of St. Louis are not validly subject to the Mask Mandates because they are "unreasonable, arbitrary, or capricious," § 536.150.1, RSMo, for a number of reasons.

128.    First, the masking requirement for schoolchildren is unreasonable, arbitrary, and capricious.  Schoolchildren are generally not at risk of serious illness even if they get COVID-19, thus reducing the need for harsher non-pharmaceutical intervention.  *See*, *e.g.*, Marty Makary, Opinion, *The Flimsy Evidence Behind the CDC's Push to Vaccinate Children*, WALL ST. J. (July 19, 2021) ("Our report found a mortality rate of zero among children without a pre-existing medical condition such as leukemia.").  On information and belief, Defendants failed to consider that fact in deciding to promulgate the Mask Mandates.

129.    Second, on information and belief, Defendants failed to consider a number of important factors relating to masking for schoolchildren:

a.     To start, the Mask Mandates fail to account for the fact that children are less likely to contract COVID-19 and, if they do contract it, display less severe symptoms. *See*, *e.g.*, Nicholas G. Davies, *Age-Dependent Effects in the Transmission and Control of COVID-19 Epidemics*, 26 NATURE MED. 1205, 1205 (2020) (concluding that susceptibility of infection in those under twenty is half that for those over twenty and that those under twenty do not manifest clinical symptoms as often). That suggests that children are also less likely to transmit the virus, *see id.* at 1208–09, which appears to be the consensus position.[1] There is thus a much less pressing need for masking among young children. That includes within schools. One study found "an infection rate of 0.13% among students and 0.24% among staff" after analyzing in-school infection data from over 47 states. Patrick Boyle, *Kids, School, and COVID-19: What We Know—and What We Don't*, AAMC (Nov. 5, 2020). Rather, schools are more likely to be affected

---

[1] *See*, *e.g.*, Eun Young Cho et al., Letter to the Editor, *Interpreting Transmissibility of COVID-19 in Children*, 26 EMERGING INFECTIOUS DISEASES 3106, 3107 (2020) (interpreting data); Patrick Boyle, *Kids, School, and COVID-19: What We Know—and What We Don't*, AAMC (Nov. 5, 2020), https://bit.ly/3kQDvyG ("Several studies have found that children transmit the virus, but perhaps not as often as adults, especially in younger age groups. It's not clear why."); Eli Somekh et al., *The Role of Children in the Dynamics of Intra Family Coronavirus 2019 Spread in Densely Populated Areas*, 39 PEDIATRICS INFECTIOUS DISEASE J. 202, 203–04 (2020) (noting studies indicating that children are less likely to get COVID-19, and finding similar results).

by COVID-19 rates in the community than be sites of super-spreader events.  *See id.*[2]

b.　　But while the risks schoolchildren face from COVID-19, as well as the risk that they transmit the virus, are relatively low, there is a significant cost to forcing them to mask.  For one, masks hinder "verbal and non-verbal communication."  Jonas F. Ludvigsson, Editorial, *Little Evidence for Facemask Use in Children Against COVID-19*, 110 ACTA PAEDITRICA 742, 742 (2021); *see* Harris, *supra* ("Some child development researchers also worry that widespread mask-wearing may hamper children's linguistic and emotional development.").  Indeed, one of the studies the County Mask Mandates cites says as much.  *See* John T. Brooks, et al., *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Feb. 10, 2021, at 7 (finding that "children were less accurate with faces that wore a mask compared to faces that were not covered," but not cited for that

---

[2] *See also*, *e.g.*, CDC, *Science Brief: Transmission of SARS-CoV-2 in K-12 Schools and Early Care and Education Programs—Updated* (updated July 9, 2021), https://bit.ly/3rxQeaR; *Questions and Answers on COVID-19: Children Aged 1–18 Years and the Role of Schools Settings*, European Centre for Disease Prevention & Control (updated Jan. 25, 2021), https://bit.ly/3j3yHDJ.  *But see* Zoe Hyde, Perspectives, *COVID-19, Children and Schools: Overlooked and at Risk*, 213 MED. J. AUSTL. 444, 446 (2020) (arguing that schools play a bigger role in transmission than assumed, but conceding that "[w]hether young and older children transmit the virus similarly is unknown and requires urgent clarification").

proposition, *see* Ex. C § I.C).  And the same risks associated with mask use in adults—namely, that the masks may create a false sense of security and improper use of face masks, especially touching of the masks will eliminate any, if not exceed, any benefit achieved by having students wear masks.  *See id.*

c.      There are also common-sense concerns with having schoolchildren wear a face mask all day while at school, such as general discomfort. *See* Harris, *supra* ("In a self-selected survey of German schoolchildren, more than half of the participants reported headaches.").

d.      Finally, children with special needs may find it especially difficult to wear masks, thus jeopardizing their ability to be in public places under the Mask Mandate.  *See The Challenge of Face Masks*, *supra*.  While the Mask Mandate's exempts those who are not able to wear a mask, that exemption is vague.  It is therefore unclear whether it would exempt all special needs children—for example, all of those on the autism spectrum.  *See id.*

130.    On information and belief, Defendants failed to consider those factors in applying the Mask Mandates to schoolchildren.  They therefore failed to engage in reasoned decision-making, and, as a result, subjected schoolchildren in the St. Louis area to unnecessary, burdensome, and harmful mask mandates.

131.    For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious and the schoolchildren of St. Louis County and St. Louis City should not be subject to them.

## COUNT FOUR – DECLARATION THAT THE MASK MANDATES ARE UNLAWFUL AS TO SCHOOLCHILDREN, § 536.150.1, RSMo

132.    Missouri incorporates by reference the allegations in all preceding paragraphs.

133.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unlawful" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

134.    By law, local health authorities may create and enforce only orders "adequate . . . to prevent the spread of [a] disease and other measures considered by the . . . local health authority as appropriate disease control measures based upon the disease . . . ."  19 C.S.R. § 20-20.040.2(G).

135.    For the reasons discussed in Count Three, the Mask Mandates are not an appropriate disease control measure for schoolchildren and are not adequate to prevent the spread of COVID-19 in that group.

136.    For those reasons, the Mask Mandates are an unlawful order and the schoolchildren of St. Louis County and St. Louis City should not be subject to them.

## COUNT FIVE – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS, § 536.150.1, RSMo

137.    Missouri incorporates by reference the allegations in all preceding paragraphs.

138.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious." § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

139.    The Mask Mandates impose a duty on all citizens in St. Louis County and the City of St. Louis to wear a mask with few exceptions when they are in a public space. It therefore is an agency decision that determines "legal rights, duties, or privileges." § 536.150.1, RSMo.

140.    The citizens of St. Louis County and the City of St. Louis are not validly subject to the Mask Mandates because they are "unreasonable, arbitrary, or capricious," § 536.150.1, RSMo, for a number of reasons.

141.    To start, the City Mask Mandate clearly fails the requirement of reasoned decision-making.  It provides no discussion of why the mandate addresses the harms it identifies.  *See* Ex. D.  The City Mask Mandate therefore suggests that the City Defendants failed to grapple at all with *any* relevant science, data, statistics, studies, or alternatives, or that they were aware of such things.

142.    Both Mask Mandates are arbitrary and capricious because they fail to account for over a year of data that showed the previous St. Louis County and St. Louis City restrictions were less effective than counties that had no restrictions.

143.   The Mask Mandates are arbitrary and capricious because they require vaccinated individuals to wear masks, despite the CDC guidance that this is not necessary. The Mask Mandates fail to address this issue.

144.   On information and belief, Defendants failed to consider whether the Mask Mandates—because they treat vaccinated individuals like unvaccinated ones—discourage people from receiving the vaccine by implying that vaccines have limited efficacy.  *Cf.* Rachel Holloway et al., *Updated Preparedness and Response Framework for Influenza Pandemics*, MORBIDITY & MORTALITY WEEKLY REPORT, Sept. 26, 2014, at 6 (saying vaccine availability is a consideration when determining what actions to take during a pandemic).

145.   For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious and the people of St. Louis County and St. Louis City should not be subject to them.

## COUNT SIX – DECLARATION THAT THE MASK MANDATES ARE UNLAWFUL, § 536.150.1, RSMo

146.   Missouri incorporates by reference the allegations in all preceding paragraphs.

147.   The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unlawful" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

148.   By law, local health authorities may create and enforce only orders "adequate . . . to prevent the spread of [a] disease and other measures considered by the . . . local health authority as appropriate disease control measures based upon the disease . . . ."  19 C.S.R. § 20-20.040.2(G).

149.   For the reasons discussed in Count Five, the Mask Mandates are not an appropriate disease control measure and are not adequate to prevent the spread of COVID-19.

150.   For those reasons, the Mask Mandates are an unlawful order and the people of St. Louis County and St. Louis City should not be subject to them.

## COUNT SEVEN – DECLARATION THAT THE MASK MANDATES ARE UNCONSTITUTIONAL AS VOID FOR VAGUENESS, § 536.150.1, RSMo

151.   Missouri incorporates by reference the allegations in all preceding paragraphs.

152.   The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that the Mask Mandates are "unconstitutional" and therefore the people of St. Louis County and St. Louis City cannot be lawfully subjected to them.  § 536.150.1, RSMo.  The Mask Mandates are not subject to administrative review.  *Id.*

153.   The Missouri Constitution prohibits government restrictions that are unconstitutionally vague.  "The test in enforcing the doctrine is whether the language conveys to a person of ordinary intelligence a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  *Feldhaus v. State*, 311 S.W.3d 802, 806 (Mo. banc 2010).  And "[t]here must be sufficient guidance

provided by the statute so as to avoid arbitrary and discriminatory applications." *State v. Stokely*, 842 S.W.2d 77, 81 (Mo. banc. 1992).

154.    The County Mask Mandate is vague and self-contradictory on many points, including but not limited to the following:

a.      The County Mask Mandate exempts "private dwellings" from the definition of "public building and spaces," but it does not define "dwelling."  Ex. C § III.1.  Thus, it is ambiguous whether the order applies to non-public buildings that are not dwellings—for example, private office spaces or clubs.  Such places are not "public" but they are not traditionally considered "dwellings" either.

b.      The order does not define what health conditions permit an individual to avoid wearing a mask, or even provide exemplars beyond suggesting (without being clear the suggestion is part of the exemption) that the health condition must be "contrary to [the individual's] health and safety."  *See* Ex. C § III.3.iii.  As a result, the order is vague and vests too much discretion in officials to make on-the-spot determinations of whether a health condition falls within the exemptions scope.

c.      The order does not define when, for deaf and hard-of-hearing people and those communicating with them, "the ability to see the mouth is essential for communication."  Ex. C § III.3.v.  As a result, the order is vague and vests too much discretion in officials to make on-the-spot

33

determinations of whether seeing a communicator's mouth is essential for communication.

d.    The order does not define when a person is alone in "an interior space." Ex. C § III.3.vi. That phrase is ambiguous; for example, it could cover, or not cover, two people, at opposite ends of a 100-foot hall.

155.    The City Mask Mandate is vague and self-contradictory on many points, including but not limited to the following:

a.    What is an "indoor and enclosed public building[ ] or space[ ]" is not defined in the order. Ex. D § 1. As a result, the order's scope is vague and ambiguous. For example, that phrase could be read to cover all indoor and enclosed spaces, which would mean it applies to private dwellings; alternatively, it could be read only to cover buildings open to the public; or, alternatively, it could be read to cover all spaces, public or private, that are not dwellings.

b.    The City Mask Mandate does not define what form an order or documentation from a medical or behavioral health provider must look like in order to be exempt from the masking requirement. Ex. D § 2.a. Nor does it say how an individual is to prove they have such documentation. As a result, the scope of this exemption is unconstitutionally vague and ambiguous, and it vests significant

enforcement discretion in officials to determine what documentation is sufficient.

c.   What is a "disability" that "[p]revent[s a person] from wearing or taking off face coverings" or "prevent[s them] from communicating while wearing face coverings" is not defined. Ex. D § 2.e.  As a result, the scope of that exception is vague and ambiguous.  For example, it could be read as covering certain individuals—especially children— who fall on the autism spectrum, and therefore have trouble wearing masks.  *See*, *e.g.*, *The Challenge of Face Masks*, ORG. FOR AUTISM RES. (Nov. 12, 2020), https://bit.ly/3eVYRa3.  Alternatively, it could be read to cover only those for whom it is impossible to wear or communicate with masks—which would also indicate that the exception is, in part, superfluous with the exception for those who are "unable to remove the Face Covering without assistance."  Ex. D § 2.c.  It could also mean that people may remove their masks simply to communicate better or more effectively; or it could only cover instances where communication is impossible.

d.   What is "actively engaged in consuming food or drink" is also not defined in the order. Ex. D. § 2.b.  But the scope of that exception is also incredibly vague.  It is unclear, for example, whether it requires masking between bites or sips, or whether it permits people to remain unmasked throughout the meal, or something in between.

35

156.    For those reasons, the Mask Mandates are unconstitutional and the people of St. Louis County and St. Louis City should not be subject to them.

## COUNT EIGHT – DECLARATION THAT THE MASK MANDATES ARE ARBITRARY AND CAPRICIOUS AS TO RELIGIOUS INSTITUTIONS AND THOSE WHOSE RELIGIOUS EXERCISE THE MASK MANDATES BURDEN, § 536.150.1, RSMo

157.    Missouri incorporates by reference the allegations in all preceding paragraphs.

158.    The State of Missouri challenges the validity of the Mask Mandates, and seeks a declaration that they are "unreasonable, arbitrary, or capricious," as well as "unlawful" and "unconstitutional," as to those individuals whose religious exercise the mandate burdens.   § 536.150.1, RSMo.   The Mask Mandates are not subject to administrative review.  *Id.*

159.    By law, Defendants "may not restrict a person's free exercise of religion, unless: (1) The restriction is in the form of a rule of general applicability, and does not discriminate against religion, or among religions; and (2) The governmental authority demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances."  § 1.302.1, RSMo (Missouri RFRA).

160.    On information and belief, Defendants did not consider whether the Mask Mandates would restrict religious exercise, furthers a compelling government interest, and is not unduly restrictive considering the relevant circumstances.  That, they had to do, or to otherwise provide an exemption for religious exercise; their failure was arbitrary and

unlawful.  *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2395–96 (2020) (Alito, J., concurring) (discussing this point in the context of the federal Religious Freedom and Restoration Act).

161.   The County Mask Mandate also violates Missouri RFRA because it "discriminate[s] against religion, or among religions."  § 1.302.1(1), RSMo.  That is so because the order requires officials to determine when removal of a mask "is necessary to perform" a religious service.  Ex. C § III.3.viii.  Thus, the County Mask Mandate facially requires officials to draw arbitrary and discriminatory lines between different religious practices and beliefs to determine if a service is necessary or not.

162.   Furthermore, because that exception requires officials to evaluate the sincerity of a religious belief, the County Mask Mandate violates the Free Exercise Clause of the United States and Missouri constitutions.  *See Thomas v. Review Bd. of the Ind. Emp't Sec. Division*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith.").

163.   For those reasons, the Mask Mandates are unreasonable, arbitrary, and capricious, and possibly unlawful.  Religious institutions and those seeking to exercise their religion who are burdened by the Mask Mandates in St. Louis County and St. Louis City should not be subject to them.

**COUNT NINE – DECLARATION THAT THE ST. LOUIS COUNTY MASK
MANDATE HAS BEEN TERMINATED PER § 67.265.2, RSMo
(PERTAINS TO PAGE, KHAN, ORWICK, AND COUNTY DPH)**

164.    Missouri incorporates by reference the allegations in all preceding paragraphs.

165.    The State of Missouri challenges the validity of the County Mask Mandate, and seeks a declaration that it has been terminated by the County Council's vote on July 27, 2021.  § 67.265.2, RSMo.

166.    Section 67.265.2 provides that "[t]he governing bodies of the political subdivisions issuing orders under this section shall at all times have the authority to terminate an order issued or extended under this section upon a simple majority vote of the body."

167.    According to Khan, the County Mask Mandate applies to "[a]ll businesses and residences in St. Louis County."  *See generally* St. Louis County Council Regular Meeting, YOUTUBE at 44:28–32. (July 26, 2021), https://www.youtube.com/watch?v=naLwKEx_OCY.

168.    The County Mask Mandate places "an obligation to police or enforce the order" on businesses.  *Id.*  44:55–45:07 ("Yes, sir."); *see also id.* at 46:00–21 (Councilman Trakas: "In doing so, are you not imposing upon a Schnucks or a restaurant an obligation to enforce your order." Khan: "Yes.").  The order also imposes a responsibility on individuals to be masked indoors.  *Id.* 39:25–39:40; *id.* at 44:18-27.

169.    Council Member Fitch stated that the County Counselor's Office had told the Council that it could seek injunctions against individuals for violating the Mask Mandate if a resident failed to wear a mask in a Schnucks or a restaurant.  *See id.* at 49:15–50:40.

170.    The County Council voted to terminate the Mask Mandate by a vote of five to two.  *See id.* at 3:26:20–28:45.

171.    The St. Louis County Council is the governing body of St. Louis County. *Corbett v. Sullivan*, 353 F.3d 628, 629 (8th Cir. 2003).

172.    A majority of the County Council is four of seven votes.

173.    By its terms, the Mask Mandate is an "order" per § 67.265.1, RSMo.

174.    Additionally, the Mask Mandate is an order that "directly or indirectly closes, partially closes, or places restrictions on the opening of or access to any one or more business organizations, churches, schools, or other places of public or private gathering or assembly, including any order, ordinance, rule, or regulation of general applicability or that prohibits or otherwise limits attendance at any public or private gatherings." § 67.265.1(1), RSMo.

175.    The St. Louis County Council's vote terminated the County Mask Mandate. § 67.265.2, RSMo.

176.    On information and belief, Page's insistence that the County Mask Mandate remains in effect fails to accept the decision of the County Council's vote and defies Missouri law.  Insisting that the Mask Mandate remains in effect violates Missouri law and will continue to cause businesses and St. Louis residents to believe that they must wear a mask or face sanctions and legal action.

177.    For these reasons, the Court should declare that the County Mask Mandate violates § 67.265.2, RSMo, and enjoin the County Defendants from enforcing it.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Declare that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to schoolchildren (Counts Three and Four); that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law (Counts Five, Six, and Seven); declare that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to religious institutions and those whose religious exercise the Mask Mandate burdens (Count Eight);

b.  Grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action, providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to schoolchildren (Counts Three and Four); grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action, providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law (Counts Five, Six, and Seven); grant relief by injunction, certiorari, mandamus, prohibition, or other appropriate action,

providing that Defendants' Mask Mandates are unconstitutional, unlawful, arbitrary, capricious, unreasonable, and invalid under Missouri law as to religious institutions and those whose religious exercise the Mask Mandate burdens (Count Eight);

c. Declare that Defendants' Mask Mandates are subject to § 67.265, RSMo, (Count One) and are not in effect under that section (Count Two);

d. Declare that the County Mask Mandate violates § 67.265.2, RSMo, and enjoin the County Defendants from enforcing it (Count Nine);

e. Enter a final judgment in Plaintiff's favor on all Counts in this Complaint; and

f. Grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: July 28, 2021                                   Respectfully submitted,

                                                      **ERIC S. SCHMITT**
                                                      **Attorney General of Missouri**

                                                      */s/ Justin D. Smith*
                                                      Justin D. Smith, #63253MO
                                                      Deputy Attorney General for Special Litigation
                                                      Jeff P. Johnson, #73249MO
                                                      Michael E. Talent, #73339MO
                                                      Missouri Attorney General's Office
                                                      Post Office Box 899
                                                      Jefferson City, MO 65102
                                                      Tel: (573) 751-0304
                                                      Fax: (573) 751-0774
                                                      Justin.Smith@ago.mo.gov

*Counsel for Plaintiff State of Missouri*



### ATTORNEY GENERAL OF MISSOURI
### ERIC SCHMITT

April 20, 2021

Dr. Faisal Khan
Director, St. Louis County Department of Public Health
6121 North Hanley Road
Berkeley, Missouri 63134
(314) 615-0600
administration.doh@stlouisco.com

**VIA ELECTRONIC MAIL AND OVERNIGHT DELIVERY**

**Re:    Request for Information Relating to Fifth Amended Safer at Home Order**

Dear Dr. Khan:

As the chief legal officer of the State of Missouri, I write to request information relating to the St. Louis County Department of Public Health's "2019 Novel Coronavirus ('COVID-19') Fifth Amended Safer at Home Order, dated April 9, 2021 ("Fifth Amended Safer at Home Order") (attached as Exhibit A). Given the public importance of the issues discussed herein, I respectfully request that you provide a complete response to this letter by April 27, 2021.

During the current pandemic, Missourians have tolerated extraordinary restrictions on their personal freedom, including their religious, economic, and personal liberty. In doing so, they have endured lost jobs, lost wages, lost economic opportunities, broken dreams, shattered businesses, lost opportunities to exercise religious freedom, extensive social isolation, isolation from family, separation from dying loved ones, and an explosion of bureaucratic restrictions and governmental micromanagement of their daily lives. Missourians have tolerated such restrictions to protect their health and the health of others. But our society is founded on principles of personal liberty and economic freedom. The restrictions of the pandemic were designed and intended as temporary measures, not an endless new world of extraordinary government intrusion on the lives of individual Missourians.

Our society has now developed crucial tools to fight the pandemic. Thanks to President Trump's Operation Warp Speed, several effective vaccines for COVID-19 were developed in record time, and were approved starting in December 2020. Over a month ago, on March 18, 2021, Governor Parson announced that all adult Missourians would be eligible for vaccines beginning on April 9, 2021. *See Governor Parson Announces Timeline for Activation of Phase 2 and 3 of Missouri's COVID-19 Vaccination Plan* (March 18, 2021), *at* https://governor.mo.gov/press-releases/archive/governor-parson-announces-timeline-activation-phase-2-and-3-missouris-covid. Eleven days ago, on April 9, 2021, all Missourians over age 16 became vaccine-eligible. *Id.*

**Supreme Court Building**
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-0774
www.ago.mo.gov

<div style="border:1px solid black; display:inline-block; padding:4px;">

**EXHIBIT**

**A**

</div>

During the pandemic, Missourians have tolerated the unprecedented restrictions on their freedom in good faith, cognizant of the importance of protecting their own health and the health of others in their communities. Public officials repeatedly promised that such restrictions were temporary measures needed to "flatten the curve" or stem a "surge" of recent cases. Yet, thirteen months into the pandemic—and several days after all adult Missourians have become eligible for multiple coronavirus vaccines—such restrictions show little sign of relenting. Indeed, St. Louis County's Fifth Amended Safer at Home Order, which became effective the same day as universal vaccine-eligibility in Missouri, made only modest changes to the pre-existing restrictions imposed on residents of St. Louis County. *See* Ex. A, Fifth Amended Safer at Home Order. Accordingly, my Office is conducting a careful review of coronavirus restrictions in Missouri, including in St. Louis County, to ensure that the extraordinary limits on personal freedom are justified by equally compelling reasons.

This review aims to ensure that current restrictions withstand scrutiny under Missouri law. As you are no doubt aware, Missouri law imposes significant limitations on the authority of a local health officer to impose county-wide restrictions in response to the outbreak of a communicable disease such as COVID-19. Section 536.150 provides that the actions of "any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance," when there is no other provision for administrative review, "may be reviewed by suit for injunction, certiorari, mandamus, prohibition, or other appropriate action." § 536.150.1, RSMo. In such an action, the court may determine whether any action of such a local health officer "is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion." *Id.* Thus, Missouri law prohibits actions taken in response to a pandemic that are "arbitrary," "capricious," "unreasonable," or "involve[] an abuse of discretion," and it also prohibits actions that are "unconstitutional" or "unlawful." *Id.*

There is a well-established body of case law that addresses whether and when such administrative actions are "arbitrary" or "capricious." That standard requires the agency to engage in "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (citation omitted). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* at 1907 (quoting *Michigan v. EPA*, 135 S. Ct. 2699 (2015)). "An agency must defend its actions based on the reasons it gave when it acted." *Id.* at 1909. Thus, agency action may not rely on "impermissible *post hoc* rationalizations" that the agency did not consider at the time it made its decision. *Id.* Furthermore, "[a]gency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015). Agency action that "failed to consider important aspects of the problem" is arbitrary and capricious. *Regents of the Univ. of Calif.*, 140 S. Ct. at 1910 (citation omitted). "[A]n agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously." *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo. Ct. App. 1995) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In addition, agencies must consider whether there are less restrictive policies that would achieve their goals. Agency action is arbitrary and capricious if it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Calif.*, 140 S. Ct. at 1912 (quoting *State Farm Mut. Auto.*, 463 U.S. at 51).

Our review of St. Louis County's Fifth Amended Safer at Home Order and the voluminous binding "Guidelines" that the St. Louis County Department of Health has imposed on St. Louis County's near-million residents raises a series of grave concerns about the legality of these orders.

We request that you promptly provide information and records, as stated below, to address these concerns. As used herein, "you" and "your" refer to the St. Louis County Department of Health, its Director, and any previous Director(s), co-Director(s), and/or Acting Director(s). The "Safer at Home Orders" refers to the Fifth Amended Safer at Home Order and all its predecessor Safer at Home Orders. The "Guidelines" refers to any and all binding Guidelines currently posted on stlcorona.com.

**1. Religious Freedom.** In a series of cases, the U.S. Supreme Court has held that coronavirus restrictions that impose greater restrictions on the free exercise of religion than on comparable secular activity are unconstitutional. *See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67-68 (2020) (per curiam). Most recently, on April 9, 2021, the Supreme Court entered an injunction pending appeal against California's restrictions on residential gatherings as they applied to in-home religious services. *See Tandon v. Newsom*, No. 20A151, 2021 WL 1328507, at *1 (U.S. Apr. 9, 2021). Your Fifth Amended Safer at Home Order, dated the same day as the Supreme Court's decision in *Tandon*, appears to impose restrictions on residential gatherings that are at least as restrictive as the California restrictions that the Supreme Court enjoined in *Tandon v. Newsom*. *See, e.g.,* Ex. A, at III.C.1 ("No person shall organize or attend a Gathering of more than 20 people indoors...."); *id.* at III.B.1 ("You must not leave or be outside your Residence for … [t]he purpose of meeting people socially who are not members of your household or in your Support Bubble...."); *id.* at III.B.2 ("You must not leave or be outside your Residence for … [t]he purpose of meeting socially indoors with family or friends unless they are part of your household or Support Bubble...."); *see also id.* at IV.l (defining "Support Bubble" to include "no more than ten individuals").

In fact, your restrictions on in-home religious exercise appear to be more onerous than California's unconstitutional restrictions, because you list only "attend[ing] a place of worship" as an approved "purpose" for leaving the home, and do not list any other religiously-motivated purpose to leave the home—thus apparently forbidding all religious activities outside the home *other* than attending a place of worship. *See* Ex. A, at III.A.8. In light of these concerns, please provide the following information:

(a) Please identify whether and when you intend to amend the Fifth Amended Safer at Home Order to comply with the Supreme Court's directives on religious liberty as set forth in *Tandon v. Newsom* and related cases.

(b) Please identify every step the St. Louis County Department of Health and its Director(s) have taken to ensure that the Fifth Amended Safer at Home Order, its predecessor Safer at Home Orders, and its binding Guidelines, would accommodate the free exercise of religion to the greatest extent possible.

(c) Please identify every study, communication, expression of concern, person, or other source you considered or consulted with in taking the right to free exercise of religion into account in crafting the Safer at Home Orders and Guidelines.

(d) Please identify every less restrictive alternative on religious freedom, if any, that you considered in formulating the Fifth Amended Safer at Home Order and the other Safer at Home Orders, if any, and explain why these less restrictive alternative(s) were not adopted.

**2. Psychological Impact of Lockdowns, Especially on Troubled Youth.** A burgeoning body of evidence indicates that the physical restraint and social isolation of COVID-19 lockdowns imposes serious psychological stress and strain on individuals subjected to the lockdowns. *See,*

*e.g.,* Nirmita Panchal et al., *The Implications of COVID-19 for Mental Health and Substance Use* (Kaiser Family Foundation Feb. 10, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/ ("There are a variety of ways the pandemic has likely affected mental health, particularly with widespread social isolation resulting from necessary safety measures. A broad body of research links social isolation and loneliness to both poor mental and physical health."). This evidence is particularly acute for young children and adolescents, for whom the loss of an entire year of social interactions represents a gaping hole in the ordinary social development of youth. *See, e.g., id.* ("[M]any parents with school-aged children are now more concerned about their children's emotional well-being than prior to the pandemic."); Shweta Singh et al., *Impact of COVID-19 and Lockdown on Mental Health of Children and Adolescents: A Narrative Review of Recommendations*, PSYCHIATRY RES., Nov. 2020, at 2–5 (discussing the research on the negative effects of the COVID lockdowns on different groups of students). And evidence shows an increase in suicide ideation and risk among youths as a result of lockdowns. *See, e.g.*, Ryan M. Hill et al., *Suicide Ideation and Attempts in a Pediatric Emergency Department Before and During COVID-19*, PEDIATRICS, Mar. 2021, at 5 ("Rates of positive suicide-risk screen results for youth seeking care in pediatric ED during the 2020 COVID-19 pandemic were statistically elevated compared with the same period in the previous year.").

Our review of your Fifth Amended Safer Home Order indicates that it continues to impose severe restrictions on the freedom of individuals, especially youth, to engage in social interaction for the purpose of joy, friendship, and human companionship. For example, avoiding isolation and seeking friendship and companionship are not among the nine enumerated, government-approved "purposes" for which one is allowed to leave one's home under the restrictions. *See* Ex. A, at III.A.1-9 (commanding all St. Louis County residents that "you must not leave or be outside your Residence except for specific purposes," and identifying only nine government-approved purposes for leaving one's home). This order seems tailor-made to perpetuate the social isolation that may impose a grave psychological toll on Missourians, especially youth.

In light of these concerns and many similar concerns, please provide the following information:

(a) Please identify every academic study, publication, medical journal article, expert, or other source that you consulted with or relied upon in considering the psychological impact of restrictions on personal freedom in drafting the Fifth Amended Safer at Home Order, the other Safer at Home Orders, and the Guidelines.

(b) Please identify every step you took to address or mitigate the anticipated psychological injuries to St. Louis County residents, especially to youth and adolescents, in crafting the Fifth Amended Safer at Home Order, the other Safer at Home Orders, and the Guidelines.

(c) Please identify every less restrictive alternative, if any, that you considered, that would impose less social isolation on residents of St. Louis County, in formulating the Fifth Amended Safer at Home Orders, the other Safer at Home Orders, and the Guidelines, and explain why you rejected each such less restrictive alternative.

**3. Economic Impact of Lockdowns, Especially on Low-Income Workers and Small Businesses.** The adverse economic impact of lockdowns on working families, communities, and small businesses is also well-documented. *See, e.g.*, LAUREN BAUER ET AL., THE HAMILTON PROJECT, TEN FACTS ABOUT COVID-19 AND THE U.S. ECONOMY 2, 7 (2020) (noting that lockdowns "precipitated a severe economic downturn" and discussing the negative affect on small

4

businesses); Robert Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence from the First Three Months After Widespread Social-Distancing Restrictions*, 29 J. ECON. & MGMT. STRATEGY 727, 737 (2020) ("The first estimates of the effects of COVID-19 on the number of business owners from nationally representative April-June 2020 CPS data indicate dramatic early-stage reductions in small business activity."). The economic devastation wrought by the pandemic and the associated restrictions has been staggering. The International Monetary Fund estimated that the COVID-19 pandemic resulted in a 3.3% decline in global economic output in 2020. *See* INT'L MONETARY FUND, WORLD ECONOMIC OUTLOOK 8 tbl.1.1 (Apr. 2021). Indeed, "[g]lobal output declined about three times as much [during the pandemic] as during the global financial crisis in half the time." *Id.* at 43. One study estimated that COVID-19 would cost the U.S. $16 trillion. David M. Cutler & Lawrence H. Summers, *The COVID-19 Pandemic and the $16 Trillion Virus*, 324 JAMA 1495, 1496 (2020). An estimate of $16 trillion impact on the U.S. economy entails an impact on Missouri totaling hundreds of billions of dollars.

Poor and working families have been the hardest hit by the economic shutdowns. *See* Steve Cicala, *The Incidence of Extreme Economic Stress: Evidence from Utility Disconnections* 2 (Nat'l Bureau of Econ. Research, Working Paper No. 28422, 2021) ("This paper reinforces recent work that has found the economic burden of the COVID-19 pandemic has fallen disproportionally on low-income and minority communities . . . ."). In fact, the financial devastation from economic restrictions has had a grossly disproportionate impact on minorities, working-class families, and the poor. *See id.*; *see also*, *e.g.*, BAUER ET AL., *supra*, at 4 ("The COVID-19 pandemic and associated economic shutdown created a crisis for all workers, but the impact was greater for women, non-white workers, lower-wage earners, and those with less education."); Robert Fairlie, *COVID-19, Small Business Owners, and Racial Inequality*, NBER REP., Dec. 2020, at 13 & fig.2 ("Losses for businesses owned by women, racial minorities, and immigrants were especially severe . . . ."). The worldwide economic effects of the shutdowns have led to devastating impact on the most vulnerable populations worldwide, as malnutrition of children in third-world countries has increased, along with the attendant vulnerabilities to disease and mortality. WORLD BANK GRP., POVERTY AND SHARED PROSPERITY: REVERSALS OF FORTUNE 161 (2020) ("'Stay-at-home' orders, for example, can be devastating for the poor: because most cannot work from home, they may earn far less income and thus struggle to feed their families, especially if food prices rise as a result of disruptions to supply chains.").

Our review of your Fifth Amended Safer at Home Order and Guidelines indicates that they continue to impose significant restrictions on economic activity, including business-capacity limitations and detailed restrictions on most or all forms of ordinary economic activity. In light of these concerns, please provide the following information:

(a) Please identify every study, expert, or other source or person you relied on or consulted in considering the economic and financial impact of economic restrictions in formulating the Safer at Home Orders and the Guidelines.

(b) Please identify every study, expert, or other source or person you consulted or relied on regarding the disparate impact of economic restrictions on poor, minority, low-income, and working families in formulating the Safer at Home Orders and the Guidelines.

(c) Please identify every less restrictive alternative that you considered in formulating the restrictions on economic activity in the Safer at Home Orders and the Guidelines, and explain why you did not adopt each such less restrictive alternative.

**4. Educational Impact of Restrictions on Elementary and High-School Students, Especially Low-Income Students and Those With Special Needs.** Compelling evidence also demonstrates a disturbing association between remote learning and other restrictions on schools, and negative educational outcomes for students. *See* MEGAN KUHFELD ET AL., NWEA, LEARNING DURING COVID-19: INITIAL FINDINGS ON STUDENTS' READING AND MATH ACHIEVEMENT AND GROWTH 2 (2020) (noting lower student gains in math during the shutdown than in prior years; similar lower gains in reading; and cautioning that the data on vulnerable student groups is more likely to be missing); *see also, e.g.*, George Psacharopoulos et al., *Lost Wages: The COVID-19 Cost of School Closures*, 7, 9 (IZA Inst. of Labor Econ., IZA DP No. 13641, Aug. 2020) (assuming "only 10 percent of students suffer learning loss due to distance learning opportunities," COVID-19 school shutdowns could result in an estimated $11–$15 trillion in foregone lifetime earnings for students globally); Megan Kuhfeld et al., *Projecting the Potential Impacts of COVID-19 School Closures on Academic Achievement* 10 (Annenberg Brown Univ., EdWorkingPaper No. 20-226, May 2020) ("Prior comparisons of online and traditional public schools show that students in online schools lose between 0.1 and 0.4 [standard deviations] on standardized tests compared to students in traditional schools.") (gathering sources).

This is especially true for elementary-school pupils who are at a critical stage of developing the fundamental building blocks for future learning, such as basic reading and math skills. *See* Jeff Grabmeier, *School Absenteeism Has Surprising Consequences for Adults*, SCI. DAILY (July 1, 2020), https://www.sciencedaily.com/releases/2020/07/200701084757.htm ("Researchers found that those who were more regularly absent in these early years of school were less likely to vote, reported having greater economic difficulties and had poorer educational outcomes when they were 22 to 23 years old."). Unsurprisingly, the risk of such negative outcomes are heightened for children who are lower income and who come from less stable family situations. *See* WORLD BANK GRP., *supra*, at 161 ("The places where the poorest work and live are least likely to be able to accommodate . . . remote learning during sustained school closures."), Rachel Garfield & Priya Chidambaram, *Children's Health and Well Being During the Coronavirus Pandemic*, KAISER FAM. FOUND (Sept. 24, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/childrens-health-and-well-being-during-the-coronavirus-pandemic/ (noting that "[c]hildren in lower-income families are less likely to have access to" tools necessary for virtual learning). Extended educational restrictions impose the risk that an entire generation of children, especially socially disadvantaged children, are being left behind. Closed schools and remote learning, moreover, are linked with the under-reporting of child abuse, neglect, and child sexual abuse. *See, e.g.*, F. Caron et al., Letter to the Editor, *Was Child Abuse Underdetected During the COVID-19 Lockdown?*, 27 ARCHIVES DE PÈDIATRIE 399, 399 (2020) (discussing the drop in reports of abuse in France during the lockdowns and noting that it "reflects a lack of screening rather than a decrease in actual abuse"); Melissa Jonson-Reid, et al., *Child Abuse Prevention Month in the Context of COVID-19*, WASH. U: CENT. FOR INNOVATION IN CHILD MALTREATMENT POL'Y, RES. & TRAINING (Apr. 14, 2020), https://cicm.wustl.edu/child-abuse-prevention-month-in-the-context-of-covid-19/ (calling declines in calls about child abuse and neglect "worrisome" in the context of COVID-19 restrictions).

Furthermore, educational restrictions and remote learning impose perhaps the greatest disadvantages on students with disabilities and special needs. *See, e.g.*, KRISTIN BLAGG ET AL., URBAN INST. MAPPING STUDENT NEEDS DURING COVID-19 (2020) ("When learning at home, [students with disabilities] may lose access to the learning assistance supports they received, as well as other services . . . ."). Research indicates negative outcomes for such students, who are

among the most vulnerable to falling behind educationally. *See*, *e.g.*, Nathan Jones et al., *Academic Supports for Students with Disabilities*, ANNENBERG INST. 2 (June 2020), https://www.annenberginstitute.org/sites/default/files/EdResearch_for_Recovery_Brief_2.pdf ("Students with disabilities are one of the student populations likely to have regressed the most during COVID-related distance learning."). Once again, prolonged restrictions impose the greatest burden on the most vulnerable in our society.

Notwithstanding these concerns, your school reopening guidelines continue to encourage schools to limit in-person instruction. *See Return to School Guidance*, ST. LOUIS COUNTY CARES (July 7, 2020), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/st-louis-county-return-to-school-guidance-07072020-0.pdf (encouraging schools to address "class size" by, *inter alia*, "requiring attendance on alternative days"); *see id.* (suggesting closing the school for certain periods of time based on positive test cases, or for cleaning—thus interrupting in-person learning). In light of these concerns, please provide the following information:

(a) Please identify every study, expert, and source or person you consulted with or relied on in formulating the restrictions on educational activity in the Safer at Home Orders and the Guidelines.

(b) Please identify every study, expert, and source or person you consulted with or relied on in considering the adverse educational impact of educational restrictions on poor, minority, low-income, and marginalized students in formulating the educational restrictions in the Safer at Home Orders and the Guidelines.

(c) Please identify every study, expert, and source or person you consulted with or relied upon in considering the increased exposure of children to undetected or unreported child abuse, neglect, and/or sexual abuse in formulating the Safer at Home Orders and the Guidelines.

(d) Please identify every less restrictive alternative to the restrictions on educational activity in the Safer at Home Orders and the Guidelines that you considered, and explain why each such less restrictive alternative was not adopted.

**5. Criteria for Lifting Restrictions and Terminating Limitations on Personal Freedom.** As noted above, all adult Missourians became vaccine-eligible on April 9, 2021, and thus all adult Missourians now have a powerful tool to protect themselves from infection if they so desire. Yet your Fifth Amended Safer at Home Order, which was promulgated on the same day that adult vaccines became universally available in Missouri, made only modest changes to the restrictions in its predecessor Safer at Home Order. Indeed, it continues to impose extraordinary intrusions into the private, daily, and personal lives of Missourians, including restricting the purposes for which persons may leave home to nine enumerated government-approved purposes, while forbidding almost one million people from leaving home for any other purpose, *see* Ex. A, at III.A.1-9; and restricting personal interactions to members of one's household or one's "Support Bubble," defined narrowly to include only 10 individuals or less, *see id.* at IV.l. Based on these restrictions, it appears that going outside one's home to pray, worship outside, enjoy the fresh air, experience nature, meet new people, or socialize with a group of friends (while masked and socially distanced) are illegal in St. Louis County. *Id.*

Despite the extraordinary nature of these restrictions, we have been unable to locate any sunset date or any other identified criteria for lifting restrictions on personal, religious, and economic freedom in St. Louis County identified in the Fifth Amended Safer at Home Order, the prior Safer at Home Orders, or the Guidelines. In light of these concerns, we request that you provide the following information:

(a) Please identify on what date, if any, you currently expect restrictions on personal, religious, and economic activity in St. Louis County to be lifted.

(b) Please identify what objective criteria, if any, you have formulated for the lifting of restrictions on personal, religious, and economic activity in St. Louis County. For each such criterion, please identify which forms of restriction it applies to.

(c) Please identify any current plan(s) for lifting restrictions on personal, religious, and economic activity in St. Louis County.

(d) For any such criteria, please identify any set of less restrictive circumstances for lifting restrictions that you considered, and explain why each such less restrictive criteria were not adopted.

**6. Justification of Individual Restrictions.** Your Fifth Amended Safer at Home Order indicates that numerous "Guidelines" promulgated by St. Louis County continue to have the binding effect of law in St. Louis County. *See* Ex. A, §§ III.D.1.b, III.D.2.d, III.D.3.d, III.D.4, III.D.6 (incorporating certain Guidelines); *see also id.* § V.1 (continuing "any general and business-specific operating standards, guidelines, and/or protocols" authorized by past orders); *id.* § V.2 (noting that "additional precautions and guidelines" that are "*required* by general and business-specific operating standards, guidelines and protocols published by DPH," are available on stlcorona.com); *see also* "Dr. Page's Messages -- COVID-19 Safe Operating Guidelines," *at* https://stlcorona.com/dr-pages-messages/covid-19-safe-operating-protocols/ (providing at least 25 categories of mandatory "Guidelines," covering virtually every aspect of economic, educational, and everyday life). Our review of these voluminous "Guidelines" has identified a series of individual restrictions on St. Louis County residents and businesses that warrant explanation or justification. These individual restrictions are listed below. For each such restriction, please (1) identify every study, expert, source or person you consulted to formulate the restriction; (2) explain the scientific rationale for the restriction; (3) identify every less restrictive alternative you considered for the restriction; and (4) explain why each such less restrictive alternative was not adopted.

- From the Youth Sports Guidelines:
    - o "At most, each athlete shall be allowed two Spectators to observe gameplay; however, they must comply with St. Louis County's face covering and social/physical distancing requirements." § 4.
    - o For "high frequency of contact sports," which includes water polo, players must wear a mask if playing indoors. § 5.
    - o "Chanting is allowed for cheerleaders as long as 6 feet of distance is maintained between each cheerleader; they are in a single line and they are wearing facial coverings." § 5.
    - o "Team huddles, handshakes, fist bumps, and other unnecessary physical contact are not allowed." § 7. *See also* Adult Sports Guidelines (same).
- From the Food Establishment, Banquet Facility and Drinking Establishment Operating Guidelines:
    - o "Customers who are seated at the bar must be seated 6 feet from other parties, parties at the bar must be limited to 2 individuals and there must be a physical barrier between the server/bartender at the bar and the customers."

8

- o "No more than 10 people may be seated at a table.  If a party is larger than 10 persons and is seated at separate tables, they must remain seated at the table to which they were initially seated and not physically interact with the other table."
- o "All businesses must establish record-keeping systems to assist public health officials with contact tracing if necessary. … Customers who are unwilling to comply with this requirement will be asked to leave the establishment."
- o "Businesses must operate outdoor dining with the table restrictions as outlined above for indoor dining and drinking businesses."
- From the Public Water Recreation Facilities Guidelines:
  - o "Avoid use of shared objects, such as pool noodles, kickboards and floatation devices. If shared objects must be used, disinfect using an EPA List N disinfectant after each use."
- From the Personal Services Guidelines:
  - o "Any children's play area or activity area should remain closed."
- From the Gym and Fitness Center Guidelines:
  - o "Face coverings should be worn at all times" during *outdoor* fitness or training classes.
  - o "Drinking fountains shall be inoperable except for the bottle filling function."
  - o "All cardio equipment used by members and guests should be separated by 10-12 feet. This includes cardio equipment such as treadmills, ellipticals, standing bicycles, and rowing machines. Cardio equipment that cannot be separated by 10-12 feet but can be separated by 6-8 feet must be separated by a barrier of Plexiglas or similar material."
- From the Retail Operations Guidelines:
  - o "Prohibit customers from bringing outside containers, including reusable bags or boxes, into the facility."
  - o "The use of fitting rooms should be limited or suspended."
- From the Face Covering Guidelines:
  - o "Anyone over the age of 5 should wear a face covering whenever they leave their home."
  - o "Children attending an educational institution in grades kindergarten through 12th grade (K-12) must wear a face covering."
  - o "You must wear a face covering while working out at a gym or other fitness facility even while physically exerting yourself."
  - o "You must wear a face covering while playing or practicing a sport indoors even while physically exerting yourself."
  - o Requires face coverings when "[d]riving or riding in a taxi or rideshare vehicle (even by yourself)."
  - o Requires face coverings when "[w]alking outside on a sidewalk or path where other people may also be walking."
- From the Summer Camp Guidelines:
  - o "Parents/Guardians will drop off & pick up children at the main entry and will not allowed in the camp area or if the camp provides curbside pick-up or drop off

> parents/guardians will remain in the car, and staff will open the car door to receive the child."
> - o "As groups travel from rooms and playgrounds, travel must be scheduled so that groups do not interact or pass each other as they travel."
- From the Transportation Operations Guidelines:
  - o For public transportation, "Riders who are 2 years of age and over must wear a face covering and avoid direct contact with others not traveling with them."
- From the Child Care Program Guidelines:
  - o "Consider creating a separate classroom or group for the children of healthcare workers and other first responders. If your program is unable to create a separate classroom, consider serving only the children of health care workers and first responders."
  - o "Cancel or postpone all special events such as festivals, holiday events, and special performances."

I look forward to receiving your complete response to these requests for information no later than April 27, 2021.  Thank you in advance for your cooperation in this investigation.

Sincerely,

Eric S. Schmitt
Attorney General of Missouri

Encl.



*Sam Page*
*County Executive*

*Beth Orwick*
*County Counselor*

April 27, 2021

**VIA ELECTRONIC AND U.S. MAIL**

Eric Schmitt, Esq.
Attorney General of Missouri
Supreme Court Building
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102

Dear General Schmitt:

As you know, I am the chief legal officer of St. Louis County. In that capacity, I represent St. Louis County's Department of Public Health ("DPH") and Dr. Faisal Khan, DPH's Director. I am writing in response to your letter dated April 20, 2021, regarding DPH's 2019 Novel Coronavirus ("COVID-19") Fifth Amended Safer at Home Order dated April 9, 2021 (the "Fifth Amended Safer at Home Order").

From the beginning of the COVID-19 pandemic, Governor Mike Parson recognized the disparate impact COVID-19 has on different regions within the State of Missouri. Governor Parson declared a State of Emergency on March 13, 2020, activating emergency powers under Chapter 44 of the Revised Statutes of the State of Missouri, specifically including §§ 44.100 and 44.110, which confer upon political subdivisions certain responsibilities during an emergency.[1] Executive Order 20-02, which declared a State of Emergency, was executed shortly after the first case of COVID-19 was identified in St. Louis County and has been extended since then.[2]

Governor Parson has emphasized that local governments have the primary authority and responsibility to craft the right local responses to COVID-19, including the power to enact stricter coronavirus-related regulations than those that are in place elsewhere in the state.[3]

---

[1] Executive Order 20-02, March 13, 2020, *available at* https://www.sos.mo.gov/CMSImages/Library/Reference/Orders/2020/20-02.pdf.

[2] *See* Executive Order 20-09, April 24, 2020, *available at* https://www.sos.mo.gov/CMSImages/Library/Reference/Orders/2020/20-09.pdf; Executive Order 20-19, Nov. 19, 2020, *available at* https://www.sos.mo.gov/CMSImages/Library/Reference/Orders/2020/20-19.pdf; Executive Order 21-07, March 26, 2021, *available at* https://www.sos.mo.gov/CMSImages/Library/Reference/Orders/2021/21-07.pdf.

[3] *See e.g.*, Jason Rosenbaum, *Parson Defends Decision to Give Local Government More Power on Coronavirus* Restrictions, KWMU, May 29, 2020, available at https://news.stlpublicradio.org/politics-issues/2020-05-29/parson-defends-decision-to-give-local-government-more-power-on-coronavirus-restrictions ("I don't want to be telling these cities and counties exactly how to run their business."); Jennifer Moore, *Despite Pleas from Hospital*

EXHIBIT
B

St. Louis County has taken its role on the front lines of the pandemic seriously, exercising its legal authority to craft COVID-19 policies that are based on sound science and data and that are carefully balanced to limit their impact on St. Louis County residents and its economy as much as possible. As testament to the success St. Louis County has had in this regard, the State of Missouri acknowledged the County's leadership on the COVID-19 pandemic by selecting St. Louis County to lead the Department of Health and Senior Services's ("DHSS") Regional Implementation Team ("RIT") for distributing the COVID-19 vaccine throughout the region.

In addition to Governor Parson's public pronouncements and DHSS's acknowledgement of St. Louis County's leadership, we appreciate the support your office has provided in defending the authority of local governments and their public health departments to issue COVID-19 public health orders. Last month, your office correctly observed in a court filing in *Shannon Robinson, et al. v. Missouri Department of Health and Senior Services, et al.*, Case No. 20AC-CC00515 (19th Jud. Cir. Ct.), that a local health authority's power to enact public health orders to respond to COVID-19 is broad and that local health authorities have "significant authority . . . to respond to outbreaks of [a] communicable disease" such as COVID-19.

The State's position in the *Robinson* case is, of course, entirely consistent with the decisions of both state and federal courts over the past year in response to myriad legal challenges, all of which upheld DPH's public health orders issued in response to COVID-19. *See, e.g.*, *SH3 Health Consulting, LLC v. Page*, 459 F. Supp. 3d 1212, 1217 (E.D. Mo. 2020); *Hawse v. Page*, No. 4:20CV588 RLW, 2020 WL 2322999, at *3-5 (E.D. Mo. May 11, 2020); *In re: Lauren Hawse, et al.*, Appeal No. 20-1920, May 8, 2020 Judgment (8th Cir.); *Hawse v. Page*, Appeal No. 20-1960, May 19, 2020 Order (8th Cir.); *St. Louis Cty. v. House of Pain Gym Servs.*,

---

*Leaders, Parson Cites 'Local Control' in Avoiding Mandates*, KSMU, Nov. 2, 2020, available at https://www.ksmu.org/post/despite-pleas-hospital-leaders-parson-cites-local-control-avoiding-mandates#stream/0 ("I'm a firm believer in local control. I've been that through my entire administration, that I believe in those things."); *Audio: Governor Parson Says 'It's About Local Control,' Holidays Must be Different,* KTTN News, Nov. 22, 2020, available at https://www.kttn.com/audio-governor-parson-says-its-about-local-control-holidays-must-be-different/ ("What I am opposed of is mandates from this position to the people of this state. People on the local level should have a voice. . . What we did in this state is I do truly believe in local control and I will continue to support the decisions that they make."); Brian Hauswirth, *Missouri's Governor Reiterates Opposition to Statewide Mask Mandate; Promotes Show Me You Care Campaign*, Missourinet, Nov. 18, 2020, available at https://www.missourinet.com/2020/11/18/missouris-governor-reiterates-opposition-to-statewide-mask-mandate-promotes-show-me-you-care-campaign-audio/ ("'I'm a fan of local control. I think that's where it needs to be,' says Parson."); Peggy Lowe, *Leaders Beg Missouri Governor to Order COVID-19 Restrictions*, KCUR, March 20, 2020 available at https://www.kcur.org/politics-elections-and-government/2020-03-20/leaders-beg-missouri-governor-to-order-covid-19-restrictions-missouri-must-act-now ("Parson has 'fully supported' the decisions by local leaders in the state's larger cities, like St. Louis, Kansas City, Springfield and Columbia, [Parson's Chief of Staff Aaron] Willard wrote. But Missouri has 'many very diverse communities' within its 114 counties and not every community has the 'resources and assets' that St. Louis has, he wrote."); Tessa Weinberg, *Targeting St. Louis County, Republican Lawmakers Seek to Curb Local Control Over COVID-19 Health Orders*, Call Newspapers, Jan. 26, 2021, available at https://callnewspapers.com/targeting-st-louis-county-republican-lawmakers-seek-to-curb-local-control-over-covid-19-health-orders/ ("'What we did in this state is that I do truly believe in local control and will continue to support the decisions that they make,' Parson said."); Emily Manley, *Gov. Parson Says Statewide Mask Mandate Could Possibly Lead to Vaccine Mandate*, Fox4, Nov. 17, 2020, available at https://fox4kc.com/news/gov-parson-says-statewide-mask-mandate-could-possibly-lead-to-vaccine-mandate/ ("'I'm always going to allow those local levels to make those decisions and I think for the most part they are, all across the state, they understand the situation and they are implementing policy,' Parson said.").

No. 4:20CV655 RLW, 2020 WL 2615746, at *2-4 (E.D. Mo. May 22, 2020); *St. Louis Cty. v. House of Pain Gym Servs.*, No. 4:20CV655 RLW, ECF. No. 38 (E.D. Mo. May 22, 2020); *Church of the Word v. St. Louis County Executive Dr. Sam Page, et al.*, Case No. 4:20-cv-00671-SEP, ECF No. 17 (E.D. Mo. May 31, 2020); *Missouri Restaurant Association, et al. v. St. Louis County, et al.*, Case No. 20SL-CC05653, Nov. 20, 2020 Order (21st Jud. Cir. Ct.); *Missouri Restaurant Association, et al. v. John R. Lasater, Associate Circuit Judge*, Appeal No. ED109312, December 10, 2020 Order (Mo. Ct. App.).  These courts have repeatedly refused to overturn DPH's public health orders in the face of various constitutional and other challenges. The opinions in those cases address many of the concerns and questions you raised in your letter.

These court rulings also solidify the local authority to issue public health orders to limit the spread of COVID-19.  Of course, St. Louis County is not alone in its decision to exercise that authority.  Indeed, local governments throughout the State of Missouri have issued similar orders.[4]

Given the growing number of St. Louis County residents who have received a COVID-19 vaccine, the County's public health policies, and the hard work and sacrifice of so many, the situation on the ground in St. Louis County has improved to the point that DPH has recently been considering amending its health orders.  In fact, just before your letter arrived, DPH leaders began discussing these anticipated amendments with some stakeholders, conversations of which

---

[4]        *See      e.g.*,      Greene      County:      Order      No.      POL-20.4.06,      *available      at* https://www.greenecountymo.gov/files/PDF/file.pdf?id=35404; Greene County: Order No. POL-20.4.30, *available at* https://greenecountymo.gov/files/files.php?id=35494; City of Branson: Ordinance No. 2020-0123, *available at* https://www.taneycohealth.org/wp-content/uploads/2020/10/10-14-2020_face_covering_mandate_Ordinance_2020-0123.pdf; City of Springfield: Ordinance No. 2021-089, *available at* https://www.springfieldmo.gov/AgendaCenter/ViewFile/Item/16004?fileID=214706; City of Springfield: Ordinance No. 2020-301, *available at* https://www.springfieldmo.gov/DocumentCenter/View/51598/2020-301; City of Springfield:       Ordinance       2020-061,       *available       at* https://www.springfieldmo.gov/DocumentCenter/View/48235/Public-Gatherings?bidId; City of St. Louis: Health Commissioner's       Order       No.       16,       *available       at*       https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/orders/upload/Order-16-9MAR21.pdf; City of St. Louis: Health Commissioner's Order No. 15, *available at* https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/orders/upload/City-of-St-Louis-Health-Commissioner-s-Order-No-15-12NOV20.pdf; City of St. Louis: Health Commissioner's Order No. 13, *available at* https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/orders/upload/Health-Commissioner-s-Order-No-13-Signed-PDF.pdf; St. Charles County: Executive Order, March 16, 2020, *available at* https://www.sccmo.gov/DocumentCenter/View/15337/Executive-Order-20-02-Gatherings-of-More-than-50-People-PDF; St. Charles County: Executive Order, March 17, 2020, *available at* https://www.sccmo.gov/DocumentCenter/View/15339/Executive-Order-20-03-Food-and-Beverage-PDF; St. Charles County: Executive Order, March 23, 2020, *available at* https://www.sccmo.gov/DocumentCenter/View/15365/20-06-Executive-Order-PDF; St. Charles County: Amended Executive Order 2020-09, *available at* https://www.sccmo.gov/DocumentCenter/View/15904/Executive-Order-2020-09-Employee-Mask-Requirement; City of Kansas City: Thirteenth Amended Order 20-01, *available at* https://www.kcmo.gov/Home/ShowDocument?id=6374; City of Kansas City: Twelfth Amended Order 20-01, *available at* https://www.kcmo.gov/Home/ShowDocument?id=6266; City of Kansas City: Eleventh Amended Order 20-01, *available at* https://www.kcmo.gov/Home/ShowDocument?id=6088; City of Kansas City: Tenth Amended Order 20-01, *available at* https://www.kcmo.gov/home/showdocument?id=5225; Jefferson County: Health Director Order No 20-11-25-01, *available at* https://www.jeffcomo.org/DocumentCenter/View/10927/20-109-Mask-Order?bidId; City of Columbia and Boone County: Order No. 2020-19C, *available at* https://www.como.gov/wp-content/uploads/County-Order-No-2020-19C-Signed.pdf; City of Columbia and Boone County: Order No. 2020-15.1C, available at https://www.como.gov/CMS/pressreleases/downloadfile.php?id=2565.

you are apparently well aware.  While continuing to closely review the science, to monitor trends, and to consider recent court decisions, DPH anticipates that the amended orders would include amending the Fifth Amended Safer at Home Order in a manner that would materially change many of its provisions.  DPH's public health orders are available online at https://stlcorona.com/dr-pages-messages/public-health-orders/ and the new order will be available there when it is issued.

I also invite you to meet with DPH's leaders and me to discuss the remarkable progress that has been made—and continues to be made daily—in combating the spread of COVID-19 in St. Louis County.  DPH has maintained constant channels of communication with County residents and stakeholders—including groups of parents, teachers, restaurant owners, small business owners, coaches, business leaders, and religious organizations—throughout this public health crisis.  We remain eager to address the concerns of residents and stakeholders, and we have done our best to strike a fair and reasonable balance between the competing interests involved.

In your letter, you asked that DPH provide the sources it consulted in crafting a variety of aspects of its COVID-19 public health orders.  I am not personally an expert in public health research, but in this letter I am sharing many of the sources that DPH has provided me and that it relies upon in its development of public health orders.  Given the myriad scientific studies and articles reviewed over the course of the past year, and the evolving scientific understanding regarding this novel coronavirus, it is not feasible to provide an exhaustive list in the limited time frame you have provided us between receiving your letter and your requested response date.  Nevertheless, attached to this letter is a compendium summarizing and citing many of those studies and sources, in the hopes that it will provide a good starting point for further discussions about St. Louis County's policies.  I hope you accept the invitation to meet and discuss your concerns about these issues.

Sincerely,

Beth Orwick
County Counselor

c:    D. John Sauer, Esq. (via email, John.Sauer@ago.mo.gov)
      Michael Talent, Esq. (via email, Michael.Talent@ago.mo.gov)

# COMPENDIUM

As the pandemic spread, several realities became clear.  First, the virus may cause severe illness and death.  As of this morning, 96,995 St. Louis County residents have tested positive for COVID-19.  The number of deaths, 2,168, in St. Louis County, is also extraordinary.

The virus's novelty meant a lack of both immunity and proven treatments.  Moreover, transmission dynamics exhibited exponential growth where the rate of growth accelerates over time if left unchecked.[1]  We also know that there are widespread prediction biases which interrelate and interplay with the exponential growth modeling and which effect compliance with public health measures.[2]  The image to the right demonstrates the exponential growth dynamics at play here.[3]



Obviously, time is of the essence when facing a threat that grows exponentially.[4]  By the time the need for drastic action is obvious, though, growth has accelerated to such an extent that viral suppression demands severe measures.  DPH's Director determined that strong policies were necessary not only due to the factors above, but also because of another unique characteristic of COVID-19, i.e., that people who are not experiencing any symptoms can transmit the disease.  In fact, more than half of transmissions are estimated to have occurred from people who are not obviously sick.[5]  As a result, practices such as staying away from others when feeling ill or only wearing a mask when feeling ill will not contain the virus.

---

[1]     Steven Sanche, et al., *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus 2*, 26 Emerging Infectious Diseases 7 (2020), *available at* https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.

[2]     *See, e.g.*, Ritwik Banerjee, *Exponential-Growth Prediction Bias and Compliance with Safety Measures in the Times of COVID-19*, Institute for Labor Economics Discussion Paper Series (2020), *available at* http://ftp.iza.org/dp13257.pdf; Martin Schonger, *How to Better Communicate Exponential Growth of Infectious Diseases*, PLOS One, Dec. 9, 2020, *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0242839.

[3]     Nigel Hawtin, *Exponential Growth Bias: The Numerical Error behind Covid-19*, BBC Future, August 12, 2020, *available* at https://www.bbc.com/future/article/20200812-exponential-growth-bias-the-numerical-error-behind-covid-19.

[4]     *See* Richard J. Hatchett, *Public Health Interventions and Epidemic Intensity During the 1918 Influenza Pandemic, Proceedings of the National Academy of Sciences*, April 6, 2007, available at https://www.pnas.org/content/104/18/7582 (finding that "aggressive early intervention was significantly associated with a lower peak of excess mortality").

[5]     *See* Michael Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Netw Open, Jan. 7, 2021, *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707.

Several months into 2021, case rates are lower than they were at their peak at the end of 2020. However, infections and hospitalization rates have plateaued at high levels over the past two months. Cases per day have averaged 120 to 160, which is right on the border between what CDC considers high burden (orange) and extremely high burden (red) (see below). Hospitalizations show a similar pattern in that significant declines at the start of the year have leveled off for the past couple of months. While it is a positive development that cases have declined from their peak, the CDC still considers incidence to be high.



**Figure 2**: New Cases per Day, Rolling 7-Day Average, Overlaid with CDC Case Rate Thresholds

Importantly, St. Louis County regularly tracks how case rates change after new public health orders are implemented.  As can be seen in Figure 3 below, case rates tend to fall within a couple of weeks of restrictions being announced. In particular, after the Safer at Home order was announced in November, case rates fell precipitously from their peak.



**Figure 3**: New Cases per Day, Rolling 7-Day Average, Overlaid with Timing of Public Health Orders

**Masks**

High levels of community spread and the associated hospitalizations and deaths are not inevitable. We know from examples around the world and periods of stricter public health measures here at home that prevention and mitigation measures work to lower the risk of disease transmission.

St. Louis County has designed and adjusted prevention and mitigation measures based on evolving scientific consensus of how the virus is transmitted.  SARS-CoV-2, the virus that causes COVID-19, spreads primarily through respiratory droplets exhaled when infected people breathe, talk, cough, or sneeze.  Most of these droplets are smaller than 10 μm in diameter, referred to as aerosols.  The amount of small droplets and particles increases with the rate and force of airflow during exhalation (e.g., shouting, vigorous exercise).  Proximity, duration of contact, and lack of ventilation all increase risk of exposure.[6]

---

[6]     John T. Brooks et al., *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, Journal of the American Medical Association, Feb. 10, 2021, *available at* https://jamanetwork.com/journals/jama/fullarticle/2776536.

Community mask wearing substantially reduces transmission of the virus. Masks prevent infected persons from exposing others to SARS-CoV-2 by blocking exhalation of virus-containing droplets into the air (termed *source control*). This aspect of mask wearing is especially important because it is estimated that 50% or more of transmissions are from persons who are not exhibiting COVID-19 symptoms at the time.[7] Masks protect uninfected wearers. Masks form a barrier to large respiratory droplets that could land on exposed mucous membranes of the eye, nose, and mouth and partially filter out small droplets and particles from inhaled air.

Other local evidence also suggests that St. Louis County's mask mandate has limited the spread of COVID-19. Dr. Enbal Shacham and colleagues at St. Louis University found that mask mandates in St. Louis County and St. Louis slowed infection rates significantly compared to surrounding counties. After 3 weeks, the average daily growth rate of cases was 44% lower than in counties without the policy. After 12 weeks, it was still 40% lower.[8] Dr. Shacham and his colleagues' overall conclusions were summarized as follows:

> These data demonstrate that county-level mask mandates were associated with significantly lower incident COVID-19 case growth over time, compared to neighboring counties that did not implement a mask mandate. The results highlight the swiftness of how a mask [mandate] can impact the trajectory of infection rate growth. Another notable finding was that following implementation of mask mandates, the disparity of infection rate by race and population density was no longer significant, suggesting that regional-level policies can not only slow the spread of COVID-19, but simultaneously create more equal environment.

## Stay-at-Home Orders

Stay-at-Home, Safer at Home, and other similar public health policies aim to decrease disease transmission and safeguard public health by drastically limiting opportunities for infectious individuals to expose others. Limitations on occupancy and gathering size as well as enforcing social distancing all serve this goal. This is the case irrespective of institution or gathering type (*e.g.*, retail, religious institutions, entertainment venues). A growing body of research supports the effectiveness of such orders, primarily by decreasing mobility outside of the home.[9] Similarly,

---

[7]     *See* Michael Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Netw Open, Jan. 7, 2021, *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707.

[8]     Enbal Shacham et al., *Association of County-Wide Mask Ordinances with Reductions in Daily COVID-19 Incident Case Growth in a Midwestern Region over 12 Weeks,* MedRxiv, Oct. 30, 2020, *available at* https://www.medrxiv.org/content/10.1101/2020.10.28.20221705v1; *see also* Centers for Disease Control and Prevention, *COVID-19 Science Update*, Nov. 10, 2020, *available at* https://www.cdc.gov/library/covid19/111020_covidupdate.html; Bryce Gray, *Where Masks Aren't Mandatory in St. Louis Region, Virus Cases Boom*, St. Louis Post-Dispatch, Nov. 20, 2020, https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/where-masks-arent-mandatory-in-st-louis-region-virus-cases-boom/article_a9c1940d-727e-50d5-b8bf-1b99f0d9ac42.html.

[9]     *See, e.g.,* Renan C. Castillo et al., *The Effect of State-Level Stay-at-Home Orders on COVID-19 Infection Rates*, American Journal of Infection Control, Aug. 2020, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7246016/; Guihau Wang, *Stay at Home to Stay Safe: Effectiveness of Stay-At-Home Orders in Containing the COVID-19 Pandemic*, SSRN, April 18, 2020, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3581873.

4

research comparing the spread in multiple states before stay-at-home mandates against actual rates after the enaction of stay-at-home orders shows that stay-at-home orders were effective in reducing community spread.[10]  Even after the first wave, stay-at-home orders have been shown to be effective at reducing infection rates.[11]  Stay-at-Home orders have been shown to reduce cases and fatalities, with one study projecting approximately 50% reductions in case counts and 60% reductions in deaths.[12]

Particularly strict measures are needed in environments where individuals are within close proximity and cannot wear masks.  As Dr. Deborah Birx, former President Trump's Coronavirus Response Coordinator, said "we know where that is: that is bars and indoor restaurants."[13]  Adults who test positive for COVID-19 are twice as likely to have dined in a restaurant in the 14 days before becoming ill than those who tested negative.[14]  Another study looked at 13 risk and importance indices and ranked indoor dining the highest on the "cumulative danger index".[15] Numerous other studies corroborate these findings.[16]

**Approach to Modifying Orders and Guidelines**

To make determinations about the level of restrictions needed to slow the spread of COVID-19, preserve hospital capacity, and protect life, DPH assesses metrics of disease burden and health system capacity including the absolute level of new cases, trends in the level of new cases, the test positivity rate, and new hospital admissions, and available ICU beds, among others.

In addition to these disease burden and health system capacity metrics, the County also monitors emerging threats and warning signs. For example, after a period of a plateau in new cases,

---

[10]     *E.g.*, Soumya Sen et al., *Association of Stay-at-Home Orders With COVID-19 Hospitalizations in 4 States*, Journal of the American Medical Association, May 27, 2020, *available at* https://jamanetwork.com/journals/jama/fullarticle/2766673.

[11]     *E.g.*, Caroline Q. Pratt et al.*, Use of Stay-at-Home Orders and Mask Mandates to Control COVID-19 Transmission — Blackfeet Tribal Reservation, Montana, June–December 2020*, Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report, Apr. 9, 2021, *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7014a3.htm.

[12]     James H. Fowler et al., *The Effect of Stay-at-Home Orders on COVID-19 Cases and Fatalities in the United States*, MedRxiv, May 12, 2020, available at https://www.medrxiv.org/content/10.1101/2020.04.13.20063628v3.

[13]     *Transcript: Deborah Birx on Face the Nation*, Nov. 29, 2020, *available at* https://www.cbsnews.com/news/transcript-deborah-birx-on-face-the-nation-november-29-2020.

[14]     Kiva A. Fisher et al., *Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥18 Years in 11 Outpatient Health Care Facilities — United States*, Centers for Disease Control and Prevention: Morbidity and Mortality Weekly Report, September 11, 2020, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6936a5.htm.

[15]     Seth G. Benzell et al., *Rationing Social Contact During the COVID-19 Pandemic: Transmission Risk and Social Benefits of US Locations*, Proceedings of the National Academy of Sciences, June 30, 2020, *available at* https://www.pnas.org/content/117/26/14642.

[16]     *See, e.g.*, Amelia Lucas, *This Chart Shows the Link Between Restaurant Spending and New Cases of Coronavirus,* CNBC, June 26, 2020, *available at* https://www.cnbc.com/2020/06/26/this-chart-shows-the-link-between-restaurant-spending-and-new-coronavirus-cases.html; Anne Riley Moffat, *JPMorgan Sees Restaurant Spending as Predictor of Virus's Spread*, June 25, 2020, *available at* https://www.bnnbloomberg.ca/jpmorgan-sees-restaurant-spending-as-predictor-of-virus-s-spread-1.1456467.

case rates started to increase again nationally at the end of March.[17]  The trend was particularly visible across the Midwest, and hospitalizations followed as they have each time cases have increased.[18]

Moreover, the longer the virus circulates in our communities, the higher the likelihood that variants can arise and spread. We now have confirmation that variants are starting to infiltrate the St. Louis region, with the highly transmissible UK variant B.1.1.7 as well as the Southern California variant present in the state's latest sewershed analysis, particularly in the Coldwater Creek and Union West areas.

Vaccination is also important to consider. While we have made excellent progress, with about a third of County residents having received their first dose, we are nowhere close to the levels of vaccination required to stem the spread of infection.  St. Louis County's low-moderate income communities have not been vaccinated at nearly the same rate as the county at large.  While every adult within the St. Louis County community is now eligible to be vaccinated, it will take time to ensure widespread coverage.  As vaccinations increase, we certainly have reason to be hopeful that we will soon turn the corner.  However, as Dr. Anthony Fauci and CDC Director Dr. Rochelle Walensky noted at the COVID-19 Response press briefing on March 29, we are in a race against time between vaccination and the spread of variants that are more transmissible and deadly.  Caution is warranted regarding relaxing measures while disease burden remains high, variants spread rapidly, and most people still await vaccination.[19]

The County strives to take a balanced approach to mitigation measures.  Premature return to pre-pandemic activities could only prolong the pandemic, increase the need for stronger mitigation measures, and lead to avoidable illness and death.  At the same time, the success of strong mitigation measures and the associated decrease burden of disease have allowed St. Louis County to reduce restrictions several times since the Safer at Home order was issued in November 2020.  Amendments in February 2021 changed occupancy restrictions for restaurants and other businesses.  Amendments in March 2021 expanded gathering maximums from 10 people to 20 people indoors or 30 people outdoors.  Further amendments in April removed the midnight curfew for restaurants, bars, and casinos, among other adjustments.  As orders are amended, guidelines are adjusted accordingly.

**Economic Impacts**

There is no doubt that the COVID-19 pandemic significantly impacted the economy in St. Louis County, in the State of Missouri, and around the world.  It is critical, however, to understand that the pandemic had a much greater impact on the economy than did public health policies like DPH's Stay at Home and Safer at Home orders.  There are several studies showing that the

---

[17]     *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, March 29, 2021, *available at*  http://www.whitehouse.gov/briefing-room/press-briefings/2021/03/29/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-21.

[18]     Rob Stein, *Rising Coronavirus Numbers in Some States Spark Fear of Third Wave*, March 26, 2021, *available at* https://www.npr.org/2021/03/26/981486732/rising-coronavirus-numbers-in-some-states-spark-fear-of-third-wave.

[19]     *Press Briefing by White House COVID-19 Response Team and Public Health Officials*, March 29, 2021, http://www.whitehouse.gov/briefing-room/press-briefings/2021/03/29/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-21.

pandemic caused significant economic disruption, but extant literature on the impact of public health orders suggests that only a small share of the economic impact was a result of public health orders.[20]

Nevertheless, St. Louis County invested over $24 million in economic relief during 2020, most of which provided liquidity relief to small businesses in order to help them cope with additional costs associated with COVID-19.  This policy choice too is consistent with economic literature.[21]  Because of St. Louis County's policy decisions in 2020, the unemployment rate in St. Louis County largely tracked that of the State of Missouri as a whole and fared far better than other parts of the state, including the City of St. Louis.[22]  Surveys show that more families have received food assistance than the proportion of those who experienced food insecurity.[23]

It is also important to emphasize that strong public health policies can coexist with a strong economy.  In fact, much of the economic toll of the pandemic stems from the morbidity and mortality associated with COVID-19 itself.  The study you cited in your letter which estimated that the overall economic impact of COVID-19 in the United States would be roughly $16 trillion included in its calculations $4.4 trillion due to premature deaths, $2.6 trillion due to long-term disability, and $1.6 trillion due to the short and long-term mental health impacts of COVID-19.[24]  Similarly, another study estimated a cost of over $3,045 for every symptomatic COVID case with the possibility for far higher costs in the case of hospitalization.[25]  Accordingly, the data strongly support the conclusion that the more the virus can spread, the more significant the potential economic impacts will be.

DPH has operated with the understanding that there is an interdependency between public health and economic activity.  Healthy economies depend on healthy people.  And we know that countries that have instituted measures to contain the virus have had somewhat less severe

---

[20]     *See, e.g.*, Austan Goolsbee and Chad Syverson, *Fear, Lockdown, and Diversion: Comparing Drivers of Pandemic Economic Decline 2020*, National Bureau of Economic Research Working Paper 27432, *available at* https://www.nber.org/papers/w27432; Chaewon Baek et al., *Unemployment Effects of Stay-at-Home Orders: Evidence from High Frequency Claims Data*, Institute for Research on Labor and Employment, April 29, 2020, *available at* https://irle.berkeley.edu/files/2020/07/Unemployment-Effects-of-Stay-at-Home-Orders.pdf; Sergio Correia et al., *Pandemics Depress the Economy, Public Health Interventions Do Not: Evidence from the 1918 Flu*, June 11, 2020, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3561560; William Maloney and Temel Taskin, *Determinants of Social Distancing and Economic Activity During COVID-19: A Global View*, World Bank Policy Research Working Paper No. 9242, May 2020, *available at* https://openknowledge.worldbank.org/handle/10986/33754.

[21]     *See* Miguel Faria-e-Castro, *Fiscal Policy During a Pandemic*, Federal Research Bank St. Louis, February 2021, *available at* https://s3.amazonaws.com/real.stlouisfed.org/wp/2020/2020-006.pdf (explaining that "liquidity assistance programs are the most effective if the policy objective is to stabilize employment").

[22]     *See* Federal Reserve Bank St. Louis Economic Database, *available at* https://fred.stlouisfed.org/.

[23]     *See* Elvin Geng et al., *Pre-publication Results of St. Louis County COVID-19 Prevalence Study*.

[24]     David M. Cutler and Lawrence H. Summers, *The COVID-19 Pandemic and the $16 Trillion Virus*, Journal of the American Medical Association, Oct. 12, 2020, *available at* https://jamanetwork.com/journals/jama/fullarticle/2771764.

[25]     Sarah M. Bartsch, *The Potential Health Care Costs and Resource Use Associated with COVID-19 in the United States*, Health Affairs, April 23, 2020, available at https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.00426.

economic downturns that those that have not.[26]  We hope that the strong public health policies in St. Louis County will lay the foundation for sustainable and equitable economic growth in the years to come.[27]

**Health and Mental Health**

Increased health care needs due to widespread COVID-19 infections as well as disruptions in non-COVID-19 medical and mental health care services have posed challenges in ensuring residents can access the care they need.  In addition to providing its routine primary care services as a safety net provider, DPH also allocated millions in CARES Act funding to health care response efforts to increase health care access across the County. Through a participatory budgeting process, community members from the County's most vulnerable communities voiced which services were most needed and selected projects to fund.  Projects from twenty-four organizations across the region received funding to provide a range of services including counseling, psychiatric care, addiction treatment, primary care services, and dentistry.

**Schools**

St. Louis County did not order schools to close at any point but did provide guidelines and recommendations in consultation with area superintendents to help schools make decisions to protect their students and staff.  Recommendations to shift to hybrid or remote learning are supported by research indicating that in-person learning is associated with an increase in case growth rates.[28]  This association is even stronger where masks are not required, further supporting the County's mask mandate.

**Collaboration with a Range of Stakeholders**

DPH has worked extensively with its Health Advisory Board, the St. Louis Metropolitan Pandemic Task Force, health departments across the state, and other stakeholders in this strong response to COVID-19.  DPH also interfaces regularly with constituent groups such as school superintendents, business associations, immigrant advisory groups, and a youth sports task force to ensure that the public health response addresses the region's public health, economic, and communal needs.  These workgroups provide an opportunity for constituents to understand the

---

[26]     Michael Smithson, Data from 45 Countries Show Containing COVID vs Saving the Economy is a False Dichotomy, The Conversation, Nov. 2020, *available at* https://theconversation.com/data-from-45-countries-show-containing-covid-vs-saving-the-economy-is-a-false-dichotomy-150533.

[27]     *See, e.g.*, Elizabeth Brainerd, *The Economic Effects of the 1918 Influenza Epidemic*, Centre for Economic Policy Research Discussion Paper, Feb. 2003, *available at* https://cepr.org/active/publications/discussion_papers/dp.php?dpno=3791; Francois Velde, *What Happened to the US Economy During the 1918 Influenza Pandemic? A View Through High-Frequency Data*, Federal Reserve Bank of Chicago Working Paper No. 2020-11, April 2020, *available at* https://www.chicagofed.org/publications/working-papers/2020/2020-11; Andrew Lilley et al., *Public Health Interventions and Economic Growth: Revisiting the Spanish Flu Evidence*, July 8, 2020, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstractid=3590008 ("we find that cities which implemented NPIs for longer grew faster after the pandemic than those which did not").

[28]     *See, e.g.*, Victor Chernozhukov, *The Association of Opening K-12 Schools and Colleges with the Spread of Covid-19 in the United States: County-Level Panel Data Analysis*, Center for Economic Studies Working Paper No. 8929 (2021), *available at* https://www.cesifo.org/en/publikationen/2021/working-paper/association-opening-k-12-schools-and-colleges-spreadschools
-covid-19.

public health considerations behind various measures and provide insight into how these measures affect them.

Effective Date: Monday, July 26, 2021

## St. Louis County Department of Public Health
## 2019 Novel Coronavirus ("COVID-19")
## Face Covering Order

### I.    Background

The St. Louis County Department of Public Health ("DPH") has closely monitored the global pandemic caused by a viral respiratory illness called COVID-19.  Infections with COVID-19 have been reported around the world.  The first confirmed instance of person-to-person spread of COVID-19 in the United States was reported on January 30, 2020.  The first confirmed instance of COVID-19 in St. Louis County was reported on March 7, 2020.  A state of emergency was declared in St. Louis County on March 13, 2020, and has continued since then, during which time several executive orders and DPH orders, policies, and other rules have been issued, amended, and rescinded.

### A. Authority

COVID-19 is considered an infectious, contagious, communicable, and dangerous disease for purposes of Sections 192.020-1 and 192.139, RSMo., 19 CSR 20-20.020, and other state and local laws.  The Director of DPH is the "local health authority" under 19 CSR 20-20.050(1) pursuant to 19 CSR 20-20.010(26), Section 4.130 of the Charter, and Section 600.010 SLCRO.  The Director of DPH has the powers conferred by state law of a state health officer as well as other powers granted by county ordinances and executive orders.  *See* SLCRO § 602.010, SLCRO § 602.020, and SLCRO § 600.030; Executive Orders 10-18.

Missouri law empowers and obligates county health officers to create and enforce orders to prevent the spread of infectious diseases. *See* §§ 192.260, 192.280 RSMo.; 19 CSR 20-20.010(26), 20-20.020, 20-20.040(2)(E), 20-20.040(2)(G), 20-20.040(2)(I). In creating such orders, DPH may make ordinances, rules, and regulations not inconsistent with the rules and regulations prescribed by the department of health and senior services which may be necessary to protect the public health. *See* § 192.290, RSMo.

This Order does not, directly, or indirectly, close, partially close, or place restrictions on the opening of or access to any business organization, church, school, or any other place of public or private gathering or assembly and does not prohibit or otherwise limit attendance at any public or private gatherings.  This Order also does not, directly or indirectly, require any business organization, church, school, or owner, operator, or host of a place of public or private gathering or assembly to restrict, limit, or otherwise refuse access to any individual.  Rather, this Order merely regulates the conduct of certain individuals while in St. Louis County in the event that, and only after, they access an indoor or enclosed public building or space or public transportation vessel, as set forth herein.

1

**EXHIBIT**

**C**

### B. The Spread of COVID-19 and the Delta Variant in St. Louis County

There are about 549,451 residents of St. Louis County who have not yet completed vaccination against COVID-19, which is about 55.3% of the overall population of St. Louis County. (Missouri Department of Health and Senior Services, *available at* https://covidvaccine.mo.gov/data/, accessed July 22, 2021.) The unvaccinated population of St. Louis County includes eligible individuals who have not yet been vaccinated, as well as children under 12 years old who are not currently eligible to be vaccinated.

Transmission of COVID-19 in St. Louis County is increasing at a significant rate. The average number of new cases of COVID-19 diagnosed daily in St. Louis County has risen from 40 in the beginning of June 2021 to 212 in mid-July 2021.  The average COVID-19 positivity rate over the past week has similarly spiked to 9.4% from a low of 2.9% on June 1, 2021.  In total, there have been 105,603 cases of COVID-19 diagnosed in St. Louis County to date, with 2,291 cumulative deaths. (*See* Covid-19 Data – St. Louis County, Missouri, *available at* https://stlcorona.com/resources/covid-19-statistics/.)

Transmission of COVID-19 includes vaccine breakthrough cases, which the Centers for Disease Control and Prevention ("CDC") reports are "substantially undercount[ed]."  (Meseret Birhane, et al., *COVID-19 Vaccine Breakthrough Infections Reported to CDC- United States, January 1-April 30, 2021*, CDC Morbidity and Mortality Weekly Report 2021 May 28; 70(21): 792-793, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8158893/; *see also* Kanika Tyagi, *Breakthrough COVID19 Infections After Vaccinations in Healthcare and Other Workers in a Chronic Care Medical Facility in New Delhi, India*, Diabetes & Metabolic Syndrome Clinical Research and Reviews, May-June 2021, *available at* https://www.sciencedirect.com/science/article/abs/pii/S1871402121001399.)

Variants of COVID-19 that may spread more easily or cause more severe illness remain present and have increased in St. Louis County and throughout the state of Missouri. As of July 23, 2021, the CDC estimates that over 96% of COVID-19 infections in the region are the Delta variant. (Centers for Disease Control & Prevention. *COVID Data Tracker*, *available at* https://covid.cdc.gov/covid-data-tracker/#variant-proportions, accessed July 23, 2021.)  The Delta variant is far more transmissible as the original strain of COVID-19. (Strategic Advisory Group of Experts on Immunization, *Eighty-ninth SAGE meeting on COVID-19,* 13 May 2021, *available at* https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file /988403/S1236_Eighty-nineth_SAGE.pdf; Samuel Alizon, et al., *Rapid Spread of the SARS-CoV-2 Delta Variant in Some French Regions, June 2021*, EuroSurveillance, July 2021, *available at* https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.28.2100573?crawler=true; Jianpeng Xiao, et al., *Transmission Dynamics of an Outbreak of the COVID-19 Delta Variant B.1.617.2 – Guangdong Province, China, May-June 2021*, China CDC Weekly, July 2021, *available at* https://www.researchgate.net/profile/Jianpeng-Xiao/publication/352931648_Transmission_Dynamics_of_an_Outbreak_of_the_COVID-19_Delta_Variant_B16172_-_Guangdong_Province_China_May_-

2

_June_2021/links/60dfcde4a6fdccb745ffff20/Transmission-Dynamics-of-an-Outbreak-of-the-COVID-19-Delta-Variant-B16172-Guangdong-Province-China-May-June-2021.pdf.)

Surges are increasingly impacting younger adults and children. (*See, e.g.*, American Academy of Pediatrics, *Children and COVID-19: State-Level Data Report*, *available at* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/ ("As of July 15, almost 4.09 million children have tested positive for COVID-19 since the onset of the pandemic. After decreases in weekly reported cases over the past couple of months, in July we began seeing increases in cases added to the cumulative total – over 23,500 child cases were added this week.").) We have also seen surges in other parts of the country and the world, increasingly impacting younger adults. (Pan American Health Organization. *Hospitalizations and deaths of younger people soar due to COVID-19*, *available at* https://www3.paho.org/en/news/5-5-2021-hospitalizations-and-deaths-younger-people-soar-due-covid-19-paho-director-reports.) Accordingly, the American Academy of Pediatrics recommends face coverings for anyone over the age of 2. (American Academy of Pediatricians. *COVID-19 Interim Guidance: Face Masks, available at* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/cloth-face-coverings/ (updated May 26, 2021).)

Comprehensive research concerning the spread of the Delta variant is not yet available. The current state of the science is that the Delta variant can spread to and infect even vaccinated individuals. (Ezgi Hacisuleyman, et al., *Vaccine Breakthrough Infections with SARS-CoV-2 Variants*. New England Journal of Medicine, June 10, 2021, *available at* https://www.nejm.org/doi/full/10.1056/nejmoa2105000.) It is also likely that breakthrough infections like these result in vaccinated people then spreading the Delta variant to others. Recent research also suggests that currently-available vaccines are less effective to guard against the Delta variant than the original strain of COVID-19. (Jamie Lopez Bernal, et al., *Effectiveness of COVID-19 Vaccines Against B.1.617.2 (Delta) Variant*, New England Journal of Medicine, July 21, 2021, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2108891.)

### C. The Impact of Wearing a Face Covering

SARS-CoV-2, the virus that causes COVID-19, spreads primarily through respiratory droplets exhaled when infected people breathe, talk, cough, or sneeze. Most of these droplets are smaller than 10 μm in diameter, referred to as aerosols. The amount of small droplets and particles increases with the rate and force of airflow during exhalation (e.g., shouting, vigorous exercise). Proximity, duration of contact, and lack of ventilation all increase risk of exposure. (John T. Brooks, et al., *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, Journal of the American Medical Association, Feb. 10, 2021, *available at* https://jamanetwork.com/journals/jama/fullarticle/2776536.)

Wearing a face covering substantially reduces transmission of COVID-19. Face coverings prevent infected persons from exposing others to SARS-CoV-2 by blocking exhalation of virus-containing droplets into the air (termed *source control*). This is especially important because it is estimated that 50% or more of transmissions are from persons who are not exhibiting COVID-19 symptoms at the time. (*See* Michael Johansson, et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Netw Open, Jan. 7, 2021, *available at*

3

https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707; *see also* Jeremy Howard, *et al.*, *An evidence review of face masks against COVID*-19, Proceedings of the Natinoal Academy of Sciences of the United States of America, *available at* https://www.pnas.org/content/118/4/e2014564118 ("Public mask wearing is most effective at reducing spread of the virus when compliance is high. . . . We recommend that public officials and governments strongly encourage the use of widespread face masks in public, including the use of appropriate regulation."); Dhaval Adjodah, et al., *Association between COVID-19 outcomes and mask mandates, adherence, and attitudes,* PLOS ONE, *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0252315 ("We show that mask mandates are associated with a statistically significant decrease in new cases (-3.55 per 100K), deaths (-0.13 per 100K), and the proportion of hospital admissions (-2.38 percentage points) up to 40 days after the introduction of mask mandates both at the state and county level. These effects are large . . . Our results have policy implications for reinforcing the need to maintain and encourage mask-wearing by the public, especially in light of some states starting to remove their mask mandates.").) The universal wearing of face coverings is particularly important when a surge of COVID-19, or a variant thereof, is impacting a community. (*See, e.g.*, Pien Huang, *Public Health Experts Call on CDC to Change its Mask Mandate*, NPR, *available at* https://www.npr.org/sections/health-shots/2021/07/22/1019311989/public-health-experts-call-on-cdc-to-endorse-masking-indoors ("'In my mind, it would be advisable for CDC to say, given the spread of the delta variant in our country, we would recommend that people go back to using masks indoors,' particularly in areas with huge spikes in cases." (quoting Dr. Carlos del Rio, an epidemiologist at Emory University)); *id.* ("Implementing indoor mask mandates for everyone, regardless of vaccination status, is 'the right and scientific thing to do[.]'" (quoting Ali Mokdad of the Institute for Health Metrics and Evaluation (IHME) at the University of Washington)); The New York Times, *W.H.O. Urges Masking for the Vaccinated, in Split with C.D.C.*, *available at* https://www.nytimes.com/live/2021/06/28/world/covid-vaccine-coronavirus-mask ("World Health Organization officials, concerned about the easing of precautions meant to stop the spread of the coronavirus even as the most contagious variant to date has emerged, have urged even fully vaccinated people to continue wearing masks and to keep taking other measures to prevent infection."); World Health Organization, COVID-19 Virtual Press Conference, June 25, 2021, *available at* www.who.int/publications/m/item/covid-19-virtual-press-conference-transcript---25-june-2021 ("As we have been saying, ... vaccine alone won't stop the community transmission ... People need to continue to use masks consistently, be in ventilated spaces, hand hygiene, respiratory etiquette, the physical distance, avoid crowding.")) Face coverings also protect uninfected wearers by forming a barrier to large respiratory droplets that could otherwise land on exposed mucous membranes of the eye, nose, and mouth and partially filtering out small droplets and particles from inhaled air.

Recent research has also demonstrated the utility of requiring people to wear face coverings instead of relying on people voluntarily wearing them. That research indicates that "mask mandates are associated with a 23.4 percentage point increase in mask adherence in four geographically, culturally and politically diverse states—Hawaii, Iowa, North Dakota and New Hampshire—and that mask adherence is itself associated with a significant decrease in COVID-19 cases and deaths in all 50 states and D.C. We also observe that the recent lifting of state mask mandates is associated with decreases in adherence and increases in cases." (Dhaval Adjodah, et al., *Association between COVID-19 outcomes and mask mandates, adherence, and attitudes,* PLOS ONE, *available at*

4

https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0252315 (June 23, 2021); *see also* Miriam E. Van Dyke, *Trends in County-Level COVID-19 Incidence in Counties with and without a Mask Mandate – Kansas, June 1-August 23 2020*, CDC Morbidity and Mortality Weekly Report 2020 Nov 27; 69(47): 1771-1781, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7727605; Edward S. Knotek II, et al., *Consumers and COVID-19: Survey Results on Mask-Wearing Behaviors and Beliefs*, Economic Commentary, July 16, 2020, available at https://www.clevelandfed.org/newsroom-and-events/publications/economic-commentary/2020-economic-commentaries/ec-202020-survey-results-on-mask-wearing-behaviors-and-beliefs.aspx ("[M]ost respondents indicated that they were extremely likely to wear a mask if doing so were required by public authorities"); Cornelia Betsch, et al., *Social and Behavioral Consequences of Mask Policies during the COVID-19 Pandemic*, Proceedings of the National Academy of Sciences, Sept. 8, 2020, *available at* https://www.pnas.org/content/117/36/21851 ("[S]hould countries or communities want people to wear masks (e.g., to curb local outbreaks or to reduce transmission in future waves of the pandemic), introducing a mandatory policy along with explicit communication of the benefits of mask wearing (risk reduction, mutual protection, positive social signaling) and the benefits of the mandatory policy (fairness, less stigmatization, higher effectiveness) appears advisable.").)

Local evidence also suggests that St. Louis County's previous orders requiring face coverings limited the spread of COVID-19.  Dr. Enbal Shacham and colleagues at St. Louis University found that such orders in St. Louis County and St. Louis City slowed infection rates significantly compared to surrounding counties.  After 3 weeks, the average daily growth rate of cases was 44% lower than in counties without such mandates.  After 12 weeks, it was still 40% lower.  (Enbal Shacham, et al., *Association of County-Wide Mask Ordinances with Reductions in Daily COVID-19 Incident Case Growth in a Midwestern Region over 12 Weeks,* MedRxiv, Oct. 30, 2020, *available at* https://www.medrxiv.org/content/10.1101/2020.10.28.20221705v1; *see also* Centers for Disease Control and Prevention, COVID-19 Science Update, Nov. 10, 2020, *available at* https://www.cdc.gov/library/covid19/111020_covidupdate.html; Bryce Gray, *Where Masks Aren't Mandatory in St. Louis Region, Virus Cases Boom*, St. Louis Post-Dispatch, Nov. 20, 2020, *available at* https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/where-masks-arent-mandatory-in-st-louis-region-virus-cases-boom/article_a9c1940d-727e-50d5-b8bf-1b99f0d9ac42.html.)  Dr. Shacham and his colleagues' overall conclusions were summarized as follows:

> These data demonstrate that county-level mask mandates were associated with significantly lower incident COVID-19 case growth over time, compared to neighboring counties that did not implement a mask mandate. The results highlight the swiftness of how a mask [mandate] can impact the trajectory of infection rate growth.  Another notable finding was that following implementation of mask mandates, the disparity of infection rate by race and population density was no longer significant, suggesting that regional-level policies can not only slow the spread of COVID-19, but simultaneously create more equal environment.

5

## II.     Purpose

The intent of this Order is to reduce the transmission of COVID-19, including variants thereof, in St. Louis County with the least restrictive effective measure. As the CDC has recognized, "Adopting universal masking policies can help avert future lockdowns, especially if combined with other non-pharmaceutical interventions such as social distancing, hand hygiene, and adequate ventilation." (*See* Centers for Disease Control and Prevention, *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, May 7, 2021, *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html.)

This recommendation is consistent with the guidance of the U.S. Surgeon General, the St. Louis Metropolitan Pandemic Task Force, and many independent experts, who support mask mandates to combat local surges of COVID-19. (*See, e.g.*, Tara Haelle, *Scientists Urge Local Mask Mandates as Delta Sweeps the U.S.,* National Geographic, July 23, 2021, *available at* https://www.nationalgeographic.com/science/article/scientists-urge-local-mask-mandates-as-delta-sweeps-the-us; *Fauci: Bringing Back Mask Mandates is 'Under Active Consideration,' CNN,* available at https://grabien.com/story.php?id=343999 ("Even if you are vaccinated, you should wear a mask. That's a local decision that's not incompatible with the CDC's overall recommendations that give a lot of discretion to the locals. And we're seeing that in L.A. We're seeing it in Chicago. We're seeing that in New Orleans, because the officials there, many of them are saying even if you're vaccinated it's prudent to wear a mask indoors. That's a local decision."); Davone Morales, *'Very Reasonable' for Local Officials to Reimplement Mask Mandates Amit Delta Surge: Dr. Vivek Murthy,* ABC News. July 18, 2021, available at https://abcnews.go.com/Politics/delta-variant-surge-unvaccinated-deeply-dr-vivek-murthy/story?id=78902909; KMOV Staff, *St. Louis Pandemic Task Fore Urges Return to Public Masking to Avoid Drastic Measures*, July 20, 2021, *available at* https://www.kmov.com/news/st-louis-pandemic-task-force-urges-return-to-public-masking-to-avoid-drastic-measures/article_9f5b35a6-e97a-11eb-913a-9fcfc2b8d049.html.)

## III.    Policy

1. Face Coverings are required to be properly worn by all individuals ages 5 and older while in indoor and enclosed public buildings and spaces and public transportation vessels in St. Louis County.  For purposes of clarity, "indoor and enclosed public buildings and spaces" include all indoor and enclosed spaces other than private dwellings or private transportation vessels.  "Face Coverings" for the purpose of Sections II and III of this Order means a device, usually made of cloth, that covers the nose and mouth.
2. Face Coverings are recommended in indoor private settings and crowded outdoor settings where there is close contact with other people who may not be fully vaccinated. This is particularly important if an individual is not fully vaccinated.
3. Face Coverings are not required to be worn by:

    i.    Children under the age of 2;
    ii.   Children between the ages of 2-5 who are strongly encouraged, but not required, to wear a Face Covering while under the direct supervision of an adult;

iii.   Persons with health conditions that prohibit wearing a Face Covering. Nothing in this Order shall require the use of a Face Covering by any person for whom doing so would be contrary to their health or safety because of a medical condition;

iv.   Persons who have trouble breathing, or are unconscious, incapacitated, or otherwise unable to remove the Face Covering without assistance;

v.   Persons who are deaf or hard of hearing, or someone who is communicating with a person who is deaf or hard of hearing, where the ability to see the mouth is essential for communication;

vi.   Persons who are alone in a separate room, office, or interior space;

vii.   Persons who are consuming food or drink, including for religious purposes; and

viii.   Persons who are obtaining a service, including a religious service, involving the nose or face for which temporary removal of the Face Covering is necessary to perform the service.

## IV.   Application and Enforcement

To the extent not otherwise explicitly modified or rescinded in this Order or otherwise, all other orders and guidelines of the Director of DPH remain in effect and this Order shall not supplant, supersede, replace, rescind, amend, or modify any other County Executive Order, law, ordinance, rule, regulation, or permit condition or requirement. This Order is to be construed and applied only to the extent permitted by the U.S. Constitution, the Missouri Constitution, and all other applicable laws.  The St. Louis County Counselor can seek emergency injunctive relief or other civil relief to enforce any provision of this Order.

## V.   Effective Date

This Order shall become effective at 8:00 A.M. on Monday, July 26, 2021, and continue in effect until amended or rescinded.

## VI.   Savings Clause

If any provision of this Order or its application is held to be invalid, then the remainder of this Order shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

## VII.   Authorization

This Order is authorized pursuant to Executive Orders 10 through 18, which are incorporated herein by reference, and to Missouri and St. Louis County law, including the Missouri Constitution, §§ 192.006, 192.200, 192.260, 192.280, and 192.290 RSMo., Chapter 44 RSMo., 19 CSR 20-20.010, 20-20.040, and 20-20.050 of the Rules of the Department of Health and Senior Services, the St. Louis County Charter, and the St. Louis County Revised Ordinances.

So Ordered this 26th day of July 2021.

By:

Dr. Faisal Khan
Director
St. Louis County Department of Public Health



**FREDRICK ECHOLS, M.D.**
**HEALTH COMMISSIONER**

# CITY OF ST. LOUIS
**1520 MARKET STREET**
**ST. LOUIS, MO 63103**
**(314) 612-5100**

**TISHAURA JONES**
**MAYOR**

**July 23, 2021**

## HEALTH COMMISSIONER'S ORDER NO. 1

This Order No. 1 shall become effective at 12:01 a.m. on July 26, 2021 and will continue to be in effect for 30 calendar days, subject to extension.

My intent is to ensure that the maximum number of people take prudent precautions to reduce the exposure to, and slow the spread of, SARS CoV-2, the virus that causes COVID-19. All provisions of this Order shall be interpreted to effectuate this intent.

Whereas, a resurgence of COVID-19 cases is occurring in the St. Louis Metropolitan Area, there is evidence of increased COVID-19 transmission in all City of St. Louis zip codes, there is increased transmission among all age groups, hospitalizations and deaths related to COVID-19 continue to increase, and more than 50% of City of St. Louis residents have not received a single dose of a COVID-19 vaccine and are at risk of severe complications (including hospitalizations and death) if infected with the virus.

By the authority vested in me by Article XIII, Section 14-C(c) of the Charter of the City of St. Louis and by 19 CSR 20-20.050(c) of the Code of State Regulations, I hereby order as follows:

1. Individuals, both vaccinated and unvaccinated, age 5 and older shall be required to properly wear a face covering that covers the wearer's nose and mouth while in indoor and enclosed public buildings and spaces, and public transportation vessels in the City of St. Louis. While on duty, all City of St. Louis employees shall wear a face covering when riding in City vehicles with one or more other persons.

2. Exceptions to the required face covering are recognized for:

   a. Individuals who have an official order or documentation from a medical or behavioral health provider to not wear face coverings;

   b. Individuals who are seated in a restaurant or bar and are actively engaged in consuming food or drink;

   c. Persons who have trouble breathing, or are unconscious, incapacitated, or otherwise unable to remove the Face Covering without assistance;

   d. Persons who are obtaining a service involving the nose or face for which temporary removal of the Face Covering is necessary to perform the service

   e. Individuals who have disabilities that:

      i. Prevent them from wearing or taking off face coverings.

      ii. Prevent them from communicating while wearing face coverings.

EXHIBIT

D

<u>23JUL21</u>
Date

Fredrick L. Echols, M.D.
Acting Director of Health & Hospitals/Health Commissioner

# THE CIRCUIT COURT OF ST. LOUIS COUNTY
## TWENTY-FIRST JUDICIAL CIRCUIT OF MISSOURI

THE STATE OF MISSOURI ex rel.
ERIC S. SCHMITT,

        *Plaintiff,*

   v.

SAM PAGE, et al.

        *Defendants.*

No. 21SL-CC03334

## SUPPLEMENTAL AFFIDAVIT OF JEFF P. JOHNSON

## SUPPLEMENTAL AFFIDAVIT OF JEFF P. JOHNSON

I, Jeff P. Johnson, being first duly sworn upon oath, deposes and states as follows:

1. I am over 18 years of age and am an attorney at the Office of the Attorney General for the State of Missouri.  I represent plaintiff in this case.

2. The State of Missouri's Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") includes a description of the July 27, 2021 Regular Meeting of the St. Louis County Council meeting, available at https://www.youtube.com/watch?v=naLwKEx_OCY.

3. The video is referenced in the First Amended Petition and the Motion.

4. At time stamp 2:08:51–2:11:38, resident Ann Doyle described the physical, academic, and mental toll that her children experienced during the pandemic.  She expressed her worry about the conflict the County Mask Mandate would engender between her customers and her young employees.  She noted that the price of enforcing the County Mask Mandate falls on her, a small business owner, because with "'No Mask, No Service' my sales go down even more."

5. At time stamp 2:03:36–2:06:36, Pastor Matthew Sheffer described a suicide that occurred in his congregation that he attributed to the isolation caused by previous public health orders.  He further explained what he saw as the futility of mandating small children to wear masks as they throw them on the ground and do not wash their hands before they touch their masks.

6. At time stamp 1:37:22 –1:40:26, resident Dee Broderick expressed her view that "mandates are not helping anyone but to point fingers at the other side."  She further

1

described how previous public health orders had shuttered her business and prevented her from reopening to full capacity, even though no transmission event had been linked to salons.

7. At time stamp 1:28:50–1:30:00, Pastor Hans Fiene stated his view that the community was concerned that "the reintroduction of mask mandates is more about singling people out and scapegoating people, rather than bringing about higher rates of vaccination." He further explained that "My great concern with reintroducing a mask mandate is: All of the people that are in the sitting-on-the-fence-about-getting-vaccinated category are going to have all of their suspicions confirmed by telling them that once again they have to do this, that COVID's never going to go away, that this is just simply a power struggle. And I want those people to be vaccinated. I'm firmly convinced that that's the best way out of the pandemic, and I think that mandating this again is the worst possible way to achieve that end. It's only going to make— It's only going to take those people and shift them into the never-get-vaccinated category. I don't want to see that happen."

8. At time stamp 2:26:20–2:28:06, resident Emily Dall'Est described that the County Mask Mandate puts the responsibility on small business owners because "you're asking us to tell people to leave. And that is their income. That is my employees' income, that is the income of my family, that is the income of everybody that works with me." She explained that "You're asking us to be the police, to tell them they can't come in if they don't want to wear a mask."

2

9. At time stamp 2:18:44–2:19:22, resident Amanda Garavaglia read her daughter's letter noting the difficulty of breathing with her mask on at school and having bad headaches.   Ms. Garavaglia explained that because headaches are a potential symptom of COVID-19, she has to pick up her daughter from school and have her tested, and thus her child's instructional time has been reduced.   She further explained that her insurance premiums have increased.   She expressed her frustration that her vaccination now counts for nothing.

10. At time stamp 2:24:59–2:26:12, resident Shawn Summers, describing the effect that the mask mandate has on his business and others: "As our clients are coming in, they're seeing this, they're seeing this new mask mandate, and it's shutting them down.  They're not happy.  They're not wanting to come in. This just happened on Monday. So when I went to a gym that normally is packed every Monday, not a soul, not one soul. I went to stop at First Watch today, I buy my team breakfast stuff in the morning, not a soul. They were sending employees home when I got there. It's two days."

11. The statements quoted above are true and accurate representations of the official recording of the St. Louis City Council's Regular Meeting on July 27, 2021, and are subject to judicial notice.

DATED this 29th day of July, 2021.

_____
Jeff P. Johnson

Subscribed and sworn to before me this 29th day of July , 2021

_____
Notary

My Commissions expires:

JASON K. LEWIS
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis City
My Commission Expires: July 30, 2024
Commission Number: 13531231